IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
                                   :     Chapter 11

In re                                 :

INSILCO TECHNOLOGIES, INC., et al.[1],    :     Case No. 02 – 13672 (MFW)

                                   :

           Debtors.          :     (Jointly Administered)

                                   :
-----------------------------------------------------------------x

### EMERGENCY MOTION OF THE DEBTORS PURSUANT TO SECTIONS 361, 362(d) AND 363 OF THE BANKRUPTCY CODE AND RULE 4001(d) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR INTERIM AND FINAL ORDERS AUTHORIZING THE USE OF CASH COLLATERAL AND GRANTING REPLACEMENT LIENS

Insilco Holding Co. and certain of its direct and indirect subsidiaries, as debtors

and debtors-in-possession (collectively, the "Debtors"), request by this motion (the "Motion"),

pursuant to sections 361, 362(d) and 363 of title 11, United States Code (the "Bankruptcy Code")

and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), entry of an interim order (the "Interim Order") and a final order (the "Final Order")

authorizing the Debtors to use cash collateral and grant adequate protection in accordance with

the form of order submitted herewith, and respectfully represent and state as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding

---

[1]      The other debtors in these jointly administered chapter 11 proceedings are Insilco Holding Co , InNet Technologies, Inc , Insilco International Holdings, Inc , Precision Cable Mfg Corporation, Eyelets for Industry, Inc , EFI Metal Forming, Inc , Stewart Stamping Corporation, Stewart Connector Systems, Inc , Signal Caribe, Inc and Signal Transformer Co , Inc.

pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested herein are sections 361, 362(d) and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(d).

## Background

2. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing in the management and possession of their properties as debtors in possession.

3. No trustee or examiner has been appointed in these cases, and no committees have been appointed or designated.

4. The Debtors and their non-debtor affiliates (collectively, the "Company") are leading global manufacturers and developers of highly-specialized electronic interconnection components and systems, serving the telecommunications, computer networking, electronics, automotive and medical markets. They offer a broad range of magnetic interface products, cable assemblies, wire harnesses, fiber optic assemblies and subassemblies, high-speed data transmission connectors, power transformers and planar magnetic products, and highly engineered, precision-stamped metal components.

5. The Debtors' operations are organized into three distinct business segments: Custom Assemblies, Passive Components and Precision Stampings. The Custom Assemblies segment produces custom wire, cable and electromechanical assemblies used by manufacturers in the telecommunications, data processing and other industries. Passive Components offers high-speed data network connectors, integrated magnetic components and power transformers for producers in computer networking, telecommunications, electronics and

security systems markets. Precision Stampings offers precision metal stampings and wire formed parts used in a broad range of industries, including the electronics, electrical and automotive markets.

6. The Company maintains more than 1.5 million square feet of active manufacturing space in 20 locations throughout the United States, Canada, Mexico, China, Ireland and the Dominican Republic. The Company's unique manufacturing capabilities, combined with its global presence, enable the Company to deliver prompt solutions tailored to customers' needs.

7. For the fiscal year ended December 31, 2001, the Company had revenue of approximately $246.1 million. For the nine month period ended September 30, 2002, the company had revenue of approximately $147.3 million. As of the Petition Date, the Company had approximately 4,450 employees throughout the United States and abroad.

8. Due to the continuing depressed state of the telecommunications industry, many of the Debtors' primary customers have significantly reduced the volume of products purchased from the Debtors and the Debtors' revenues have failed to reach previous levels. As a result of their diminished cash flow, the Debtors do not presently have the ability to service their significant long-term debt obligations in the ordinary course of business. After examining numerous restructuring alternatives with their investment advisors and consulting with their senior secured lenders, the Debtors determined that it was in the best interest of their creditors, customers and employees to file these chapter 11 proceedings. Contemporaneous with the filing of these cases the Debtors are filing motions seeking approval of bidding procedures for sales of substantially all of the Debtors' assets on a going concern basis and authorization to consummate such sales.

3

## The Prepetition Credit Facility

9.     On or about August 25, 2000, Insilco Technologies and TAT Technology Inc. ("TAT"), a Canadian subsidiary of Insilco Technologies, the Agent, DLJ Capital Funding as Lead Arranger and Syndication Agent and TransAmerica Business Credit Corporation and LaSalle National Bank as Co-Documentation Agents, together with the various financial institutions from time to time signatories thereto, entered into that certain Second Amended and Restated Credit Agreement dated as of August 25, 2000 pursuant to which the Lenders agreed to make loans and other financial accommodations to Insilco Technologies and TAT, including, inter alia, (i) a Term Loan A to Insilco Technologies in the principal amount of $35,000,000, a Term Loan B to Insilco Technologies in the principal amount of $35,000,000 and to TAT in the Canadian dollar equivalent of the principal amount of (U.S.) $90,000,000, and revolving loans to Insilco Technologies in a committed amount up to $50,000,000, and (ii) in connection with an Additional Term B Loan Request dated January 5, 2001, an additional Term Loan B to Insilco Technologies in the principal amount of $25,000,000. Pursuant to that certain Amendment No. 1 to the Second Amended and Restated Credit Agreement, dated as of August 14, 2001, certain Lenders agreed to make a Term Loan C to Insilco Technologies in the principal amount of $15,000,000 on an unsecured basis. The Second Amended and Restated Credit Agreement, as amended by Amendment No. 1, shall hereinafter be referred to as the "Prepetition Credit Agreement".[2] Pursuant to the Prepetition Credit Agreement, Insilco Technologies absolutely, unconditionally and irrevocably guaranteed the payment of all Obligations of TAT, as more particularly set forth in Article X thereof. The Prepetition Credit Agreement was signed on or

---

[2]     All references herein to "Lenders" shall include the Term Loan C Lenders, while all references to "Secured Parties" shall include all Lenders other than the Term Loan C Lenders.

about August 25, 2000 by validly authorized representatives of Insilco Technology and TAT. A true and correct copy of the Prepetition Credit Agreement is included as Exhibit A to that certain Compilation of Exhibits Relating to Cash Collateral Use (the "Compilation"). The Prepetition Credit Agreement along with any instruments, security agreements, guaranties and other documents executed in connection therewith are referred to herein as the "Prepetition Credit Documents." The Prepetition Credit Documents are extensive and have not, therefore, been appended to this Motion. Rather, one Compilation has been filed with the Court and the Debtors will provide interested parties with access to or copies of such Compilation. Capitalized terms used herein not otherwise defined or qualified by reference to another document shall have the meanings ascribed to them in the Prepetition Credit Agreement.

10. On or about August 25, 2000, Holding Co. executed and delivered to the Agent that certain Holdco Guaranty and Pledge Agreement dated as of August 25, 2000 (a true and correct copy of which is attached to the Compilation as Exhibit B), which amended and restated in its entirety the Amended and Restated Guaranty, dated as of November 24, 1998, and the Amended and Restated Security Agreement dated as of November 24, 1998 between Holding Co. and the Agent. Pursuant to the Holdco Guaranty and Pledge Agreement, inter alia, Holding Co. guaranteed the payment of all Obligations of each other Obligor, confirmed the assignments, pledges, hypothecations, charges, mortgages, deliveries and transfers previously made by Holding Co. to the Agent for its benefit and the ratable benefit of each of the Secured Parties pursuant to such existing agreements, and pledged, hypothecated, charged, mortgaged, delivered transferred and granted to the Agent for its benefit and the ratable benefit of each of the Secured Parties a continuing security interest in all issued and outstanding shares of Capital Stock of Insilco Technologies, all other Pledged Shares (as defined therein), all other Pledged Property (as

5

defined therein), all Dividends and Distributions (as defined therein), and other payments and rights with respect to any Pledged Property, together with all products and proceeds of any of the foregoing (collectively "Holdco Pledged Collateral").

11.     On or about August 25, 2000, Insilco Technologies executed and delivered to the Agent that certain Company Pledge and Security Agreement dated as of August 25, 2000, (as amended by the Amendment to the Company Pledge and Security Agreement dated as of November 7, 2001, the Supplement to Company Pledge and Security Agreement dated as of January 10, 2001, and the Second Amendment to the Company Pledge and Security Agreement dated as of May 30, 2002, the "Insilco Technologies Security Agreement," a true and correct copy of which is attached to the Compilation as Exhibit C), which amended and restated in their entirety the Amended and Restated Company Pledge Agreement and the Amended and Restated Company Security Agreement, both dated as of November 24, 1998, between Insilco Corporation and the Agent. Pursuant to the Insilco Technologies Security Agreement, Insilco Technologies inter alia, (i) confirmed the assignments, pledges, hypothecations, charges, mortgages, deliveries, and transfers previously made by Insilco Technologies to the Agent for its benefit and the ratable benefit of each of the Secured Parties pursuant to such existing agreements and (ii) pledged, hypothecated, charged, mortgaged, delivered and transferred to the Agent for its benefit and the ratable benefit of each of the Secured Parties a continuing security interest in all or substantially all of its existing and after acquired personal property, including, but not limited to, Intercompany Notes (as defined therein), all investment property, all Capital Stock which represents interests in limited liability companies or partnerships in which Insilco Technologies has an interest, in each case together with Dividends and Distributions (as defined therein), Equipment, Inventory, Receivables, Related Contracts, Intellectual Property Collateral,

6

the Collateral Account (as each such capitalized term is defined therein), Insilco Technologies'
interest in litigation it has instituted against Star Services, Inc., of Delaware and PRD Holdings,
Inc. and any judgment, settlement or other recovery therefrom (the "Star Litigation"), books,
records, other property, and all products and proceeds of any of the foregoing (collectively the
"Insilco Technologies Security Agreement Collateral"). The Insilco Technologies Security
Agreement Collateral secures the payment of the Obligations.

12. On or about August 25, 2000 each of the Subsidiaries (other than InNet)
executed and delivered to the Agent that certain Subsidiary Pledge and Security Agreement
dated as of August 25, 2000 (as supplemented by the Supplement to Subsidiary Pledge and
Security Agreement dated as of January 10, 2001 executed by InNet, and as amended by the
Amendment to Subsidiary Security Agreement dated as of May 30, 2002, the "Subsidiary
Security Agreement"), a true and correct copy of which is attached to the Compilation as Exhibit
D), which amended and restated in their entirety the Amended and Restated Subsidiary Security
Agreements dated as of November 24, 1998 and executed by Stewart Stamping Corporation,
Stewart Connector Systems, Inc. Signal Caribe, Inc., and Signal Transformer Co., Inc. Pursuant
to the Subsidiary Security Agreement, each of the Subsidiaries (i) confirmed the assignments,
pledges, hypothecations, charges, mortgages, deliveries, and transfers previously made by each
Subsidiary (other than InNet) to the Agent for its benefit and the ratable benefit of the Secured
Parties pursuant to such existing agreements and (ii) assigned, pledged, hypothecated,
mortgaged, delivered and transferred to the Agent for its benefit and the ratable benefit of each
of the Secured Parties a continuing security interest in all or substantially all personal property of
each Subsidiary, including, without limitation, Intercompany Notes (as defined therein),
investment property and Capital Stock, together with Dividends and Distributions (as defined

7

therein), Equipment, Inventory, Receivables, Related Contracts, Intellectual Property Collateral (in each case, as defined therein) books and records, other property and products and proceeds of all of the foregoing (collectively the "Subsidiary Security Agreement Collateral"). The Subsidiary Security Agreement Collateral secures the payment of the Obligations.

13. On or about November 8, 2001, Insilco Technologies and certain other Debtors executed and delivered to the Agent certain mortgages and deeds of trust (collectively, the "Mortgages") encumbering certain real property in North Myrtle Beach, South Carolina, Loris, South Carolina, Lake Wales, Florida, Taylorsville, North Carolina, Rockwall, Texas, Inwood, New York, Yonkers, New York, and Thomaston, Connecticut, and granting a security interest in and mortgage lien upon such real property and the related estate, interest, claims and other rights (collectively, the "Mortgage Collateral"). True and correct copies of the recorded Mortgages are attached to the Compilation as Exhibit E. The Mortgage Collateral secures the payment of the Obligations.

14. On or about August 25, 2000, each Subsidiary (other than InNet) executed and delivered to the Agent that certain Subsidiary Guaranty dated as of August 25, 2000 (as supplemented by the Supplement dated as of January 10, 2001 executed by InNet, the "Subsidiary Guaranty," a true and correct copy of which is attached to the Compilation as Exhibit F), which amended and restated in its entirety the Amended and Restated Subsidiary Guaranty dated as of November 24, 1998. Pursuant to the Subsidiary Guaranty, each Subsidiary jointly and severally, absolutely, unconditionally and irrevocably guaranteed the payment of all Obligations of Insilco Technologies and each other Obligor, all as more particularly set forth in the Subsidiary Guaranty.

8

15.    The Holdco Pledged Collateral, the Insilco Technologies Security
Agreement Collateral, the Subsidiary Security Agreement Collateral, the Mortgage Collateral
and any other collateral granted pursuant to any of the Prepetition Credit Documents shall
collectively be referred to hereinafter as the "Prepetition Collateral."

16.    As used in this Motion, the term "Cash Collateral" includes, without
limitation, "cash collateral" as defined by section 363(a) of the Bankruptcy Code, all deposits
subject to setoff and cash arising from the collection or other conversion to cash of property of
the Debtors in which the Agent, for its benefit and the ratable benefit of the Secured Parties, has
a security interest or lien, whether those security interests or liens existed as of the
commencement of this case or arise thereafter pursuant to this Order, and whether the property
converted to cash existed as of the commencement of this case or arose or was generated
thereafter.

17.    In order to perfect its security interest in and liens upon the Prepetition
Collateral, the Agent, for its benefit and the ratable benefit of the Secured Parties, has recorded
mortgages, filed financing statements and fixture filings, and taken possession of relevant
instruments, certificates, or other property. All of such mortgages, financing statements and
fixture filings were validly executed by authorized representatives of the relevant Debtors. True
and correct executed and file-stamped copies of such financing statements are included in the
Compilation as Exhibit G. (See Exhibit E of the Compilation for true and correct copies of the
file stamped mortgages).

18.    Pursuant to the Prepetition Credit Documents, each of the Debtors is
indebted to the Lenders, and as of the Petition Date each of the Debtors was jointly and severally
indebted to the Lenders in an aggregate principal amount not less than $236,780,934.71 inclusive

9

of $29,750,000 in principal amount owing under Term Loan A, $147,812,186.72 (U.S.) in principal amount owing under Term Loan B, $20,881,247.99 in principal amount owing under Term Loan C, $38,337,500 in outstanding revolving loans, including letter of credit obligations in the amount of $5,837,500, plus not less than $9,782,743.14 in accrued and unpaid interest, as well as accrued letter of credit fees, costs, other fees and expenses due under the Prepetition Credit Agreement (collectively the "Prepetition Indebtedness").[3]

19. Pursuant to the Prepetition Credit Documents, other than such prepetition liens and security interests, if any, that (i) existed pursuant to law, (ii) were properly perfected, valid, non-avoidable and enforceable liens or security interests as of the Petition Date, and (iii) were senior in priority to the prepetition liens and security interests of the Agent, for its benefit and the ratable benefit of the Secured Parties (the "Prepetition Prior Liens"), the Prepetition Indebtedness is secured by first-priority, non-avoidable, perfected, valid and enforceable liens on and security interests in all or substantially all of the Debtors' right, title and interest in and to the Prepetition Collateral granted to and held by the Agent, for its benefit and the benefit of the Secured Parties including, without limitation, a first-priority, non-avoidable, perfected, valid and enforceable lien on and security interest in the cash proceeds of the Prepetition Collateral, which proceeds constitute Cash Collateral within the meaning of section 363 of the Bankruptcy Code.

---

[3]    In addition to the Prepetition Indebtedness and certain ordinary course trade debt, certain of the Debtors are indebted (i) in the aggregate amount of approximately $120 million in respect of the 12% Senior Subordinated Notes Due 2007, governed by the Indenture dated as of November 9, 1998 (the "12% Notes"), and (ii) in the aggregate amount of approximately $113 million in respect of the 14% Senior Discount Notes Due 2008, governed by the Indenture dated as of August 17, 1998 (the "14% Notes")

## Additional Background

20. Contemporaneous with the commencement of these cases, the Debtors will be filing motions seeking approval of bidding procedures and sale agreements (subject to higher and better offers) setting forth the terms and conditions of the transactions through which the Debtors intend to sell substantially all of their assets, including the Prepetition Collateral (the "Sales")[4].

21. To facilitate the Sales and enable the Debtors to pay the costs and expenses related thereto, prior to filing this Motion, the Debtors prepared and delivered to the Agent (i) a budget reflecting on a line-item basis the Debtors' anticipated cumulative weekly cash receipts and expenditures and all necessary and required cumulative expenses which the Debtors expect to incur during each week for the period from the Petition Date through the date that is thirty (30) days thereafter (the "Interim Budget", a copy of which is annexed hereto as Exhibit A), (ii) a listing of anticipated expenses to be incurred by the Debtors as a result of the Sales and the cessation of Debtors' operations ("Wind Down Budget", a copy of which is annexed hereto as Exhibit B) and (iii) a monthly accrual budget through March 2003 for the professionals retained or to be retained by the Debtors (excluding professionals retained as "ordinary course professionals") and any statutory committees that may be appointed in these cases (collectively, the "Retained Professionals"), a copy of which is annexed hereto as Exhibit C (the "Professional Fee Accrual Budget").

22. In order to induce certain key executives and key employees of the Debtors to remain in the Debtors' employ prior to the time the Sales are consummated, in May

---

[4] These sales shall include any transaction involving the Agent or the Secured Parties, or an entity designated by the Agent or the Secured Parties, as purchaser under a credit bid pursuant to Bankruptcy Code section 363(k)

2002 the Debtors implemented the Insilco Holding Co. Key Executive and Key Employee Retention Plan (the "Retention Plan") and the Insilco Holding Co. Key Executive and Key Employee Severance Plan (the "Severance Plan"). Pursuant to the Forbearance Agreement, dated as of May 3, 2002, the Lenders under the Prepetition Credit Agreement agreed to a "carve-out" of collateral proceeds from the sales of the Debtors' businesses for payments to be made by the Debtors under the Retention Plan and the Severance Plan (the "Forbearance Payments"), subject to and expressly conditioned on the terms and conditions of such plans and the Forbearance Agreement as amended to replace the reference in paragraph 6 thereof to "the date that is 9 months after the Effective Date" with "April 9, 2002".

23. The Agent has indicated that the Interim Budget, the Professional Fee Accrual Budget and the Wind Down Budget are acceptable to the Agent, and the Secured Parties have either expressly consented or failed to object to the Debtors' use of Cash Collateral subject to the terms and conditions of the Interim Order approving the Motion (including, for the avoidance of doubt, the Interim Budget, the Professional Fee Accrual Budget and the Wind Down Budget and any subsequent Budget, as defined below). The Debtors and the Agent have agreed that the parties may, by agreement, modify the Budget (including the Wind Down Budget) from time to time time without further order of the Court. Notwithstanding anything in this Motion or the Interim Order to the contrary, the use of Cash Collateral for the payment of items included within the Budget for which Court approval is required shall be expressly conditioned upon the prior entry of an order approving such payment, and the Debtor's use of Cash Collateral to make advances to nondebtor affiliates shall be limited to Signal Dominicana S.A., Sempco S.A. de C.V., Signal Transformer Mexicana, S.A. de C.V., Stewart Connector Systems DeMexico S.A., and Precision Cable Mfg. Corp. de Mexico S.A. de C.V.

12

24. Subject to the terms and conditions contained in the Interim Order, and provided that (i) the Debtors' use of cash shall be deemed to come first from cash (if any) that is not Cash Collateral and thereafter from Cash Collateral, (ii) the Debtors' use of Cash Collateral during the period subject of the Interim Budget does not exceed $19.5 million in the aggregate and (iii) the Debtors' use of Cash Collateral is not earlier terminated by the Agent pursuant to the terms set forth in this Motion, the Agent has agreed that the Debtors may use the Cash Collateral in the amounts and for the purposes set forth in the Interim Budget during the period commencing on the date of the entry by the Bankruptcy Court of the Interim Order through and including the final hearing on this Motion (the "Final Hearing").

25. Subject to the terms and conditions set forth in this Motion, the Agent has agreed that the Debtors may use Cash Collateral in the amounts and for the purposes set forth in the Wind Down Budget provided that the Selling Costs (as defined in the Wind Down Budget) may only be funded from the proceeds of the Sales to which such Selling Costs relate.

26. The Agent has requested, and the Debtors have agreed to prepare and deliver to the Agent for the periods described below, weekly cash flow budgets in form and substance reasonably satisfactory to the Agent, reflecting on a line-item basis the Debtors' anticipated cumulative weekly cash receipts and expenditures and all necessary and required cumulative expenses which the Debtors expect to incur during each week (collectively, including the Professional Fee Accrual Budget, the "Budgets" and each, a "Budget"), together with such consolidating or other "back up" information as may be reasonably requested by the Agent. The Debtors have agreed to deliver to the Agent on or before each of December 20, 2002, January 25, 2003, February 21, 2003 and March 25, 2003 respectively, a weekly cash flow Budget for the months of January, February, March and April 2003, respectively. The Debtors and the Agent

13

have agreed that each Budget shall be prepared by the Debtors in good faith and in consultation with the Agent's professionals using the same processes as were used in preparing the Interim Budget, shall include an allocation of funds for the payment of reasonable and necessary professional fees and related expenses for services provided by professionals retained in these cases (which allocation shall be based upon, to the extent known, the reasonable and necessary fees and expenses actually incurred by each professional and, if not known, upon reasonable estimates provided by the respective professionals) and shall reflect relevant changes in the Debtors' businesses from time the Interim Budget was prepared. The Agent's consent to the Debtors' continued use of Cash Collateral in accordance with any proposed Budget negotiated in good faith and prepared as set forth herein shall not be unreasonably withheld; provided that with respect to each Budget other than the Interim Budget, during any week within a Budget period, the Debtors' use of Cash Collateral to make operating disbursements (as set forth on the line of the Budget entitled "Cash Operating Disbursements") may exceed by not more than five percent (5%) the cumulative, total expenditures set forth in such Budget as measured from the first day of the applicable Budget period through such week (the "Permitted Variance"), and the Agent has agreed that such use of Cash Collateral shall not constitute a breach of, or default under, the Interim Order or any the Final Order authorizing the use of Cash Collateral. The Permitted Variance shall be recalculated for each Budget and shall be cumulative only in respect of the specific Budget to which it is applied. All unpaid professional fees and expenses included in any approved Budget shall, to the extent such fees and expenses are ultimately allowed, be payable from the available Cash Collateral or the Carve-Out (as defined in Paragraph 11 of the Interim Order and as described below).

27.    To assist the Agent in monitoring the Debtors' financial condition, the

Debtors have agreed to deliver to the Agent a weekly report reflecting the actual cash receipts

and disbursements for the preceding week, and on a cumulative basis for the period beginning on

the Petition Date through the end of the week of determination, and the percentage variance of

actual receipts and disbursements from those reflected in the Budget for such week and

cumulative period, together with a written explanation of such variance (the "Variance Report").

The Debtors have also agreed to deliver to the Agent a monthly report delivered seven (7) days

after the end of each Budget period, reflecting the actual or, to the extent actual amounts are not

known, good faith estimates of, professional fees and expenses incurred by the Retained

Professionals employed by the Debtors (other than so-called "ordinary course professionals") for

the preceeding Budget period. Additionally, the Debtors have agreed to continue to deliver to

the Agent, on a weekly basis, an updated cash flow forecast (the "Cash Flow Forecast"),

consistent with their current practice.

28.    The Agent does not consent to the use of the Prepetition Collateral,

including Cash Collateral, except pursuant to the terms and conditions set forth in this Motion

and the Interim Order. The Debtors are presently unable to obtain unsecured credit (allowable

under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or section 364(a)

or 364(b)) to fund their operations.

## **Relief Requested**

29.    By this Motion, the Debtors seek this Court's approval of the Debtors' use

of the Cash Collateral and the granting of replacement liens to the Agent (for the ratable benefit

of the Lenders) as adequate protection for the potential diminution in value of the Prepetition

Collateral as a result of its use by the Debtors and the imposition of the automatic stay.

30. An immediate and critical need exists for the Debtors to use the Cash Collateral. As of the Petition Date, substantially all of the Debtors' cash was maintained in bank accounts that are subject to security interests or rights of setoff under the Prepetition Credit Agreement and, by virtue of such rights, subject to a lien in favor of the Agent pursuant to sections 506(a) and 553 of the Bankruptcy Code. In addition, any proceeds of the Prepetition Collateral provided by the Debtors under the Prepetition Credit Agreement are cash collateral of the secured parties under the Prepetition Credit Agreement pursuant to section 363(a) of the Bankruptcy Code. Without authorization to use cash collateral, the Debtors will not be able to meet the administrative expenses they incur during the course of these cases. The use of cash collateral is critical to the Debtors' ability to consummate the Sales and is in the best interests of their estates.

### Use of Cash Collateral and Adequate Protection

31. As a consequence of the substantial prepetition negotiations between the Debtors and the Agent, the Debtors have been advised that the Agent consents to the Debtors' use of cash collateral and other property on the terms and conditions described herein. The Agent and the Lenders have requested, and the Debtors hereby seek authority to grant to the Agent (for the ratable benefit of the Lenders), as adequate protection for any diminution in value of the collateral of the Agent and the Lenders and for the use of cash collateral, valid, perfected, first priority postpetition security interests (subject only to the Carve-Out) in and liens upon all Postpetition Collateral (as defined below) pursuant to Bankruptcy Code sections 361 and 363(e). In addition, the Debtors' propose to grant to the Agent (for the ratable benefit of the Lenders) an administrative claim under Bankruptcy Code section 364(c)(1).

32. The concept of adequate protection is defined in section 361 of the Bankruptcy Code. Adequate protection may be provided by granting to a secured party an

16

additional or replacement lien to the extent that the automatic stay of Bankruptcy Code section 362 or the use of such party's collateral results in a decrease in the value of such entity's interest in such property. 11 U.S.C. § 361(2).

33.    Adequate protection serves to protect a secured creditor from diminution in the value of its interest in collateral during the period it is used by a debtor. *See In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *Delbridge v. Production Credit Ass'n and Federal Land Bank*, 104 B.R. 824 (E.D. Mich. 1989); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Adequate protection must be determined on a case by case basis, in light of the particular facts and circumstances presented. *See In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the use period. *See In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *Delbridge v. Production Credit Ass'n and Federal Land Bank*, 104 B.R. 824 (E.D. Mich. 1989); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Ledgmere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

34.    The Debtors believe that the Agent and the Lenders are entitled to adequate protection because the Debtors seek to use Cash Collateral and because the value of the Prepetition Collateral may deteriorate during the period in which the Debtors seek to consummate the Sales. The Debtors believe that the adequate protection proposal under the proposed Interim Order attached hereto is fair and reasonable.

35.    In consideration for permitting the Debtors to use the Cash Collateral and as adequate protection for its valid and perfected prepetition security interests, the Debtors submit that pursuant to sections 361 and 363(e) of the Bankruptcy Code and to secure payment

17

of the Adequate Protection Obligations (defined below), the Agent, for its benefit and the ratable

benefit of the Secured Parties, should be granted valid, perfected and enforceable security

interests and liens in and upon all real and personal property of any kind whatsoever of the

Debtors and their estates, whether now owned or existing or hereafter acquired or arising,

whether tangible or intangible, and regardless of where located, and all proceeds, rents, products

or profits thereof including, without limitation, the following:

(a)     All present and future accounts, accounts receivable, contract rights, purchase orders, documents (including all warehouse receipts issued at any time by any public or private warehouse company representing inventory deposited in any such warehouse), chattel paper, leases, licenses, instruments, investment property, certificated and uncertificated securities, warrants, general intangibles, the Star Litigation and other choses in action, money and deposit accounts, now owned and hereafter acquired by the Debtors and the proceeds and products thereof (including, without limitation, the right to proceeds of any insurance policy in which the estate is the named insured and the estate's right to payment from any pension plan or trust as a result of any reversion or termination of the plan or trust to the extent that any such right to payment arises after the date of the Interim Order); provided, however, that such liens and security interests shall not extend to any avoidance actions, including, without limitation, those arising under 11 U.S.C. §§ 510, 544, 545, 547, 548, 549 (other than recoveries under § 549 on account of collateral), 550 and 553;

(b)     All materials, supplies, work-in-process, finished goods, and inventory now owned or hereafter acquired by the Debtors;

(c)     All patents, patent rights, copyrights, interests in copyrights, trade names, trademarks, service marks, type certificates, supplemental type certificates, production certificates, operating certificates, refunds or claims to refunds of any kind, including, without limitation, tax refunds, tax refund claims, and insurance policies now owned or hereafter acquired by the Debtors; and

(d)     All machinery, equipment, appliances, apparatus, tools, machine tools, supplies, accessories, parts, materials, furniture, fixtures, real property, goods, and chattels of every kind, wherever located, now owned or hereafter acquired by the Debtors.

36.     The property subject to the liens and security interests granted pursuant

hereto shall be referred to hereinafter as the "Postpetition Collateral." The Prepetition Collateral

and the Postpetition Collateral shall be referred to as the "Collateral." The liens and security

interests granted to the Agent, for its benefit and the ratable benefit of the Secured Parties, in that

18

portion of the Postpetition Collateral (including, without limitation, any such Postpetition Collateral acquired or generated by the Debtors or their estates on or after the Petition Date) that is not subject to any other properly perfected, valid, non-avoidable and enforceable liens or security interests as of the Petition Date shall have first and paramount priority equivalent to that set forth in section 364(c)(2) of the Bankruptcy Code subject only to the Carve-Out. The liens and security interests granted to the Agent, for its benefit and the ratable benefit of the Secured Parties, in that portion of the Postpetition Collateral that is subject to Prepetition Prior Liens shall have priority equivalent to that set forth in section 364(c)(3) of the Bankruptcy Code, junior only to the Prepetition Prior Liens and the Carve-Out. The liens and security interests granted in the Postpetition Collateral shall otherwise have the same priority as the prepetition liens and security interests of the Agent in the Prepetition Collateral.

   37. The security interests and liens granted in the Interim Order (i) shall be in addition to all security interests, liens and rights of set-off existing in favor of the Agent, for its benefit and the ratable benefit of the Secured Parties, on the Petition Date), (ii) shall be valid, perfected, enforceable and effective as of the Petition Date without any further action by the Debtors, the Agent or the Secured Parties, and without the execution, filing or recordation of any financing statements, vehicle lien applications, mortgages or other documents, and (iii) shall secure payment of the Prepetition Indebtedness in an amount equal to the diminution of value from and after the Petition Date of the Agent's and Secured Parties' interest in the Prepetition Collateral, whether from the use of Cash Collateral or the use, sale, lease, depreciation, decline in market value, or otherwise of the Prepetition Collateral (the "Adequate Protection Obligations"). If the Agent hereafter requests the Debtors to execute and deliver to the Agent, for its benefit and the ratable benefit of the Secured Parties, financing statements, instruments or other documents

considered by the Agent to be necessary or desirable to further evidence the perfection of the liens and security interests granted in this Order, the Debtors shall be authorized and directed to execute and deliver those financing statements, instruments, and documents. Nothing in the Interim Order shall in any way restrict the scope of the prepetition liens, security interests, rights of set-off or claims of the Agent or the Secured Parties with respect to the Prepetition Indebtedness.

38. As further adequate protection for the interests of the Agent, for its benefit and the ratable benefit of the Secured Parties, the Debtors seek authorization to pay to the Agent, for the ratable benefit of the Secured Parties, as and when required to be paid under the Prepetition Credit Documents (and otherwise upon request), all reasonable fees and expenses (including professional fees) for which the Agent and Secured Parties are entitled to receive reimbursement pursuant to the Prepetition Credit Documents and all other fees and expenses incurred in connection with or in preparation for the Debtors' bankruptcy proceeding (including reasonable professional fees and expenses incurred in connection with these chapter 11 cases); provided, however, that the Debtors' payment of such fees and expenses shall be subject to any required recharacterization as principal payments in accordance with section 506(b) of the Bankruptcy Code.

39. As an express condition to the Debtors' use of Cash Collateral, the Debtors have agreed to, (i) maintain their existing cash management system, subject to any further order of the Court, (ii) withdraw or use Cash Collateral only in accordance with the terms of the Interim Order and the Budget, and (iii) maintain such operating and other accounts as exist as of the Petition Date, and the Debtors shall not establish any additional such accounts

20

thereafter, except as expressly authorized by the Agent in writing or pursuant to further order of this Court.

       40.    As additional express conditions to the Debtors' use of Cash Collateral, the Debtors have agreed to:

       (i)    provide to the Agent and any of its representatives, financial advisors or other professionals access to the Debtors' books and records upon reasonable request during normal business hours, and the Debtors shall allow the Agent and any of its representatives, financial advisors or other professionals to inspect, review and photocopy the same upon request;

       (ii)    on or before the third business day of each week, submit to the Agent a Variance Report reflecting the actual cash receipts and disbursements for the preceding week, and on a cumulative basis for the period beginning with the first business day following the Final Hearing through the end of the week of determination, and the percentage variance of actual receipts and disbursements from those reflected in the Budget for such week and cumulative period, together with a written explanation of such variance;

       (iii)    on or before the end of the seventh day following the end of any Budget period, submit to the Agent the Fee Report;

       (iv)    on or before the third business day of each week, submit to the Agent an updated "Cash Forecast" consistent with their current practice;

       (v)    provide to the Agent all written documents and other information available to the Debtors as shall be requested by the Agent regarding the location, use, condition, quantity and value of the Collateral;

       (vi)    permit the Agent and its representatives, appraisers, financial advisors and other professionals and experts, upon reasonable request, to review, count, inspect and photograph the Collateral, and for such purposes to enter and remain upon any premises occupied by the Debtors;

       (vii)    diligently pursue the closing of a transaction or transactions for the sale of all or substantially all the assets of the Debtors, on terms and conditions acceptable to the Agent, and continue to provide the Agent, its financial advisor(s) and other professionals with all material documents and information relating to the proposed sale(s) of the Debtors' assets;

       (viii)    maintain an actual ending cash balance for each week during the term of the Budget, after taking into account the payment of authorized expenditures through such week (the "Weekly Minimum Cash Balance") (a) of at least $15.2 million for the period of the Interim Budget, and (b) for each successive Budget period, an amount equal

21

to the projected ending cash balance for the week minus $1,000,000; provided that the Weekly Minimum Cash Balance applicable to any Budget period shall be reduced to the extent the Debtors are required to use Cash Collateral to make payments in accordance with the Wind Down Budget (other than payments in respect of Selling Costs, which shall be funded from Sales' proceeds, as set forth herein); and

(ix)     cause each foreign subsidiary of the Debtors, on or prior to the closing of the sale of such subsidiary's stock, to remit to an Insilco Technologies account maintained with the Agent all cash held by such subsidiary, except (i) in the case of Insilco Teoranta which shall remit $204,000 to TAT Technologies, Inc. and $156,000 to an Insilco Technologies account maintained with the Agent, and which may retain any remaining cash balance in order to facilitate the sale of such subsidiary's stock, and (ii) in the case of T.A.T. Technology, Inc. which shall retain all its cash except to the extent such funds are required to fund the operations of the Debtors.

The Debtors' failure to comply with any of the conditions set forth in subparagraphs (i) through (ix) hereof shall constitute "Termination Events."

41.     The Agent has required, and the Debtors have agreed, that no Cash Collateral may be used to object to or contest in any manner, or raise any defenses to, the extent, amount, validity, perfection, priority, or enforceability of the Obligations, the Adequate Protection Obligations or any other obligations owed by the Debtors (or any of them) to the Agent and the Lenders or any lien of the Agent or the Secured Parties, or to assert any claims or causes of action against the Agent or any of the Lenders, subject to the sole exception that up to $50,000 of Cash Collateral may be used to pay the allowed fees and expenses of any official committee of unsecured creditors appointed in these cases incurred investigating potential claims or causes of action against the Agent and the Lenders pursuant to, and during the time period set forth in, Paragraph 51 hereof.

42.     Except for the Carve-Out described in Paragraph 11 of the Interim Order (and as otherwise set forth in the Interim Order), nothing contained in the Interim Order shall be deemed to be a consent by the Agent or any of the Lenders to any charge, lien, assessment or claim against the Prepetition Collateral or the Postpetition Collateral under sections 506(c) or 552 of the Bankruptcy Code or otherwise. Subject to the entry of the Final Order, the Debtors

22

waive the right to assert any claims under Section 506(c) of the Bankruptcy Code for any costs

and expenses incurred in connection with the preservation, protection or enhancement of, or

realization by the Agent or the Secured Parties upon, the Collateral, except that the Debtors do

not waive the right to assert any rights under section 506(c) relating to fees and expenses of

Retained Professionals employed by the Debtors in these cases by order of the Court and to the

extent such fees and expenses are in excess of the amounts set forth in Paragraph 11 of the

Interim Order or the corresponding provision of any Final Order.

        43.     In addition to the liens and security interests granted to the Agent, for its

benefit and the ratable benefit of the Secured Parties, the Debtors seek authorization to grant to

the Agent, for its benefit and the ratable benefit of the Secured Parties, as additional protection

for the Adequate Protection Obligations, an administrative expense priority for such Adequate

Protection Obligations equivalent in priority to a claim under section 507(b) of the Bankruptcy

Code, and such administrative expense priority claims shall have priority over all other costs and

expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 506(c)

(subject to entry of a Final Order), 507(a), 507(b), or, to the extent permitted by law, 726 of the

Bankruptcy Code and shall at all times be senior to the rights of the Debtors, and any successor

trustee in this or any subsequent proceedings under the Bankruptcy Code; provided, however,

that the foregoing administrative expense priority claim of the Agent shall be subject and

subordinate only to a carve-out from the Collateral (the "Carve-Out") for the payment of (i) the

unpaid fees of the clerk of the Bankruptcy Court of the United States Trustee pursuant to 28

U.S.C. § 1930(a) and (b), (ii) the Forbearance Payments, (iii) the aggregate allowed unpaid fees

and expenses payable under sections 330 and 331 of the Bankruptcy Code to professional

persons retained in these chapter 11 cases pursuant to an order of the Court by the Debtors or any

statutory committee appointed in these chapter 11 cases (other than professional fees, disbursements, costs or expenses incurred in connection with asserting any claims or causes of action against the Agent or any of the Lenders and/or challenging or raising any defense to the Obligations, the Adequate Protection Obligations or any other obligations owed by the Debtors to the Agent and the Lenders or any lien of the Agent or the Secured Parties), to the extent such fees and expenses were incurred for services rendered on or before the earlier to occur of the delivery of a Termination Notice (as defined in the Interim Order and as described below) by the Agent (whether or not such fees and expenses have been allowed as of the delivery of such Termination Notice) or the expiration of the the Debtors' authority to use Cash Collateral (as set forth in paragraph 16 of the Interim Order) (whether or not such fees and expenses have been allowed as of such date), and provided that the amount of the available Carve-Out under clause (iii) of Paragraph 11 of the Interim Order shall not exceed the difference between (x) $1.8 million and (y) the balance of any unapplied professional retainers as of the date of delivery of such Termination Notice or the date on which the Debtors' authority to use Cash Collateral expires, whichever applies, plus the allowed, unpaid fees and expenses of Retained Professionals employed by the Debtors set forth in any Budget that has been approved by the Agent, (iv) the "Restructuring Fee" payable to Gleacher Partners LLC (f/k/a Gleacher & Co. LLC) pursuant to the terms of the engagement letter, dated January 30, 2002, between Insilco Holding Co. and Gleacher & Co. LLC, as amended by the letter amendment dated December 9, 2003, between Insilco Holding Co. and Gleacher Partners LLC (collectively, the "Gleacher Engagement Letter"), provided that, payment of the Restructuring Fee from the Carve Out shall be subject to the entry of orders (A) approving the retention of Gleacher and (B) approving the payment of such fee, and shall further be subject to the sales of any of the Debtors' three business segments

24

and the allocation of the Restructuring Fee among such business segments (as set forth in the Gleacher Engagement Letter), with that portion of the Restructuring Fee allocated to each of the three business segments to be payable upon the sale of all or substantially all of the assets of that division, whether (a) on a going concern basis, (b) on a liquidating basis, by auction or otherwise, to one or more purchasers, all of whom were contacted by Gleacher, or (c) to the Agent, any of the Lenders or to an entity designated by the Agent or any of the Lenders as the purchaser under a credit bid pursuant to section 363(k) of the Bankruptcy Code, provided that such credit bid followed competitive bidding (or if such credit bid is submitted as a higher and better bid than the "stalking horse" bid if the "stalking horse" bid has not been withdrawn or terminated); and (v) $500,000 for the payment of allowed unpaid fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professional persons retained in these chapter 11 cases pursuant to an order of the Court by the Debtors or any statutory committee appointed in these chapter 11 cases (other than professional fees, disbursements, costs or expenses incurred in connection with asserting any claims or causes of action against the Agent or any of the Lenders and/or challenging or raising any defense to the Obligations, the Adequate Protection Obligations or any other obligations owed by the Debtors to the Agent and the Lenders or any lien of the Agent or the Secured Parties), to the extent such fees and expenses relate to services rendered in these chapter 11 cases following the earlier to occur of (x) the effective date of a Termination Notice delivered by the Agent in accordance with Paragraph 16 of the Interim Order and (y) the date on which the Debtor's authorization to use Cash Collateral expires (as set forth in Paragraph 16 of the Interim Order)

44.    As set forth in the Interim Order, except for the claims payable from the Carve-Out, no other claims, costs or expenses, including, without limitation, any administrative

claim granted to any reclamation claimant, that have been or may be incurred in these cases, or in successor chapter 7 cases in the event any of the Debtors' cases are converted to Chapter 7 pursuant to Bankruptcy Code section 1112 shall be: (A) granted a priority senior to or pari passu with (i) the administrative priority claims of the Agent and the Secured Parties against the Debtors or any successor Debtors or trustee, or (ii) the security interests and liens of the Agent, for the ratable benefit of the Secured Parties, upon the Collateral; or (B) imposed against the Agent, the Secured Parties or the Collateral, while any portion of the Adequate Protection Obligations remains outstanding.

45. Under the Interim Order (and the Final Order) the Agent will be authorized to collect upon, convert to cash, and enforce checks, drafts, instruments, and other forms of payment now or hereafter coming into its possession as collateral or proceeds of collection of the Prepetition Collateral and the Postpetition Collateral, provided that, except as set forth in paragraph 45 below, the proceeds of any such payments shall be available for the Debtors' use as Cash Collateral, subject to the Budget and the terms and conditions of the Interim Order. Other than as expressly set forth therein, subsequent to the termination of the Debtors' right to use Cash Collateral in accordance with Paragraph 16 of the Interim Order (or the corresponding provision in the Final Order), the Agent shall be authorized to apply, in its sole discretion, any amounts on deposit in accounts maintained by the Debtors with the Agent or any of the Secured Parties against any outstanding Obligations, including, without limitation, principal, interest and fees, then due and owing, without further order of Court or notice of any kind.

46. As an additional express condition to the Debtors' use of Cash Collateral, if the Debtors have agreed that if they receive (i) net cash proceeds from the sale or disposition

of any Collateral (including Sales), other than inventory sold in the ordinary course of business, (ii) federal, state, or local income tax refunds, or (iii) litigation recoveries (including from the Star Litigation), the Debtors shall pay such proceeds, refunds and recoveries to the Agent, for provisional application in accordance with the terms of the Prepetition Credit Agreement including, without limitation, (a) to the payment of all fees and expenses owing to the Agent (subject to any reallocation to principal required pursuant to section 506(b) of the Bankruptcy Code), (b) to the payment of accrued interest owing under the Prepetition Credit Agreement (subject to any reallocation to principal required pursuant to section 506(b) of the Bankruptcy Code), and (c) to the payment of principal and any other amounts owing in respect of the Obligations (subject to allowance pursuant to the Bankruptcy Code); provided, however in the event the Debtors receive insurance proceeds relating to any Collateral, such proceeds shall be retained by the Debtors in a separate account with the Agent and, subject to the Agent's prior consent or to the terms of any agreement pertaining to the sale of such Collateral, may be used by the Debtors to replace or repair such Collateral. Notwithstanding the foregoing, the Debtors shall be entitled to retain (A) from Collateral proceeds realized from any Sale, the amount necessary to fund Selling Costs identified in the Wind Down Budget and related to such Sale, and (B) from any Collateral proceeds identified in this paragraph, the amount necessary to fund any shortfall in the remaining unpaid Wind Down Costs (as identified in the Wind Down Budget), provided that such funding shortfall has been reasonably demonstrated to the Agent's satisfaction, and provided further that, if the actual Selling Costs and Wind Down Costs incurred for any line items are less than as set forth in the Wind Down Budget, the unused Cash Collateral attributable to such line items shall be immediately remitted to the Agent for application as provided in the Interim Order.

27

47. The Interim Order provides that the Debtors are authorized and directed to execute and deliver to the Agent such documents as the Agent may reasonably request to implement or facilitate the terms of the Interim Order and the cash collateral usage contemplated thereby.

48. Under the terms of the Interim Order the Debtors' authority to use Cash Collateral (other than as provided in Paragraph 16 of the Interim Order in respect of Wind Down Costs) will automatically expire on the earlier of the date of the Final Hearing or three business days following delivery of a Termination Notice (as defined below), unless the Court shall have approved the continued use of Cash Collateral at the Final Hearing, after notice and a hearing, and shall enter Final Order so providing, in which case such authority shall expire on the earlier of April 30, 2003 at 5:00 p.m. (Eastern Standard time) or three business days following delivery of a Termination Notice.

49. Under the terms of the Interim Order (and the contemplated Final Order), upon five business days following delivery of a Termination Notice, the automatic stay provisions of 11 U.S.C. § 362 shall be automatically vacated without further order of the Court, and the Agent and Secured Parties shall be authorized to exercise all rights and remedies under the Prepetition Loan Documents and applicable law; provided, however, that prior to the expiration of the applicable notice period, the Debtors or any other party with standing will have the right to contest, but solely on the grounds that a Termination Event has not occurred, the Agent's or Secured Parties' exercise of such rights and remedies and the termination of the authorization to use Cash Collateral. A "Termination Notice" shall be a written or facsimile notice of a Termination Event delivered by the Agent to the United States Trustee, counsel to the official committee of unsecured creditors (the "Creditors' Committee"), if by then appointed, and

the Debtors and their counsel (delivered in the case of Debtors' counsel, by facsimile to fax # (212) 848-7179, Attn: Constance A. Fratianni and Scott C. Shelley).

50. Notwithstanding the delivery of a Termination Notice, the Debtors will be authorized to use Cash Collateral to pay the Wind Down Costs identified in the Wind Down Budget, provided that the Termination Event(s) giving rise to the Termination Notice are not predicated upon (A) the intentional breach or intentional non-performance of the Debtors' obligations hereunder (which for the avoidance of doubt shall not include the Debtors' inability to maintain the Minimum Weekly Cash Balance due to lower than projected receipts or any similar breach or nonperformance), (B) the dismissal or conversion of these chapter 11 cases prior to the Sales of substantially all assets of the Debtors, or (C) the appointment of a chapter 11 trustee or examiner with expanded powers. In the event that the actual Wind Down Costs incurred for any line item(s) are lower than projected in the Wind Down Budget, the unused Cash Collateral attributable to such line items shall be immediately turned over to the Agent for application as set forth in Paragraph 45.

51. As used in this Motion, the term "Termination Event" shall mean the occurrence of any of the following to which the Agent has not consented in writing:

  i. The entry of any order in these chapter 11 cases, or any successor cases, which order constitutes the stay, modification, appeal, or reversal of the Interim Order or the Final Order or which otherwise affects the effectiveness of the Interim Order or the Final Order.

  ii. The entry of any order in these chapter 11 cases appointing any examiner having expanded powers or a trustee to operate all or any part of the Debtors' businesses.

29

iii. The entry of any order in these chapter 11 cases substantively consolidating the estates of any of the Debtors.

iv. The entry of any order dismissing these chapter 11 cases, or any of them, or converting them, or any of them, to cases under chapter 7 of the Bankruptcy Code, prior to the consummation of the Sales of substantially all of the Debtors' assets.

v. The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to section 362, which order permits any creditor other than the Agent or Secured Parties to realize upon, or to exercise any right or remedy with respect to, assets of the Debtors of more than a *de minimis* value ($50,000 in the aggregate); or to terminate any lease, license, franchise or similar agreement, where such termination could reasonably be anticipated to have a material adverse effect on the Debtors' financial condition or ability to conduct their businesses in the ordinary course.

vi. The breach of any material term, covenant, condition or provision of the Interim Order or the Final Order by the Debtors or any of them, which shall be deemed to include, without limitation, the reporting requirements set forth herein and compliance with any Budget, as set forth herein.

vii. The Debtors shall have failed to deliver a Budget reasonably satisfactory to the Agent in accordance with Paragraph 2 of the Interim Order.

viii. Aggregate professional fees and expenses of all estate professionals (other than "ordinary course professionals") for any Budget period are in

excess of the amount set forth in the Professional Fee Accrual Budget for such Budget period.

ix. Any misrepresentation by the Debtors in the financial reporting or certifications to be provided by the Debtors hereunder.

x. The Debtors' failure to comply with or their default in performance of, any term of the Interim Order or the Final Order or the declaration by the Agent after the date hereof of any Event of Default under the Prepetition Credit Documents (other than for nonpayment of principal or interest, under the Prepetition Credit Agreement or in respect of the 12% Notes or the 14% Notes, or breach of the financial covenants, or due to the commencement of these chapter 11 cases or the Debtors' status as chapter 11 debtors, or any action taken in consultation with the Agent in furtherance of consummation of the Sale process).

xi. The Debtors' filing of a motion (other than this Motion) with the Bankruptcy Court or any other court of competent jurisdiction, seeking the entry of an order modifying, reversing, revoking, staying, rescinding, vacating or amending the Interim Order or the Final Order.

xii. The Debtors' filing of any motion or application, or the Bankruptcy Court's allowance of any motion or application of any other person, which seeks approval for or allowance of any claim, lien, or security interest ranking equal or senior in priority to the Prepetition Indebtedness and the Agent's liens on the Prepetition Collateral or the claims, liens and security interests

WP3:839435 1

61683 1001

granted to the Agent under the Interim Order or the Final Order, except as expressly permitted there under.

xiii.    The Debtors' filing, or any other person's obtaining Bankruptcy Court approval of, a disclosure statement or a plan of reorganization that does not provide for the full, final and irrevocable payment of the Prepetition Indebtedness upon the effective date of such plan.

xiv.    The Bankruptcy Court shall not have entered the Final Order reasonably satisfactory in all respects to the Agent, on or before the date that is thirty (30) days after the Petition Date, or the Final Order ceases to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court.

xv.    The Bankruptcy Court shall not have entered an order or orders, in form and substance acceptable to the Agent on or before the date that is 45 days after the Petition Date establishing bidding procedures in respect of the sales of substantially all of the Debtors' assets.

xvi.    The Bankruptcy Court shall not have entered an order or orders in form and substance acceptable to the Agent, which shall have become final and non-appealable on or before the date that is 100 days after the Petition Date, approving the sale or sales of substantially all assets of the Debtors on terms acceptable to the Agent.

xvii.    The sales of substantially all of assets of the Debtors (including TAT) shall not have been consummated and the proceeds remitted to the Agent on or before the date that is 120 days after the Petition Date.

52. The Debtors shall commence any adversary proceeding or contested matter challenging the extent, amount, validity, enforceability, or priority of the Prepetition Indebtedness or the liens and security interests held by the Agent in the Prepetition Collateral no later than the date that is 60 days after the Petition Date. If no such adversary proceeding or contested matter is properly commenced as of such date, then: (i) the Prepetition Indebtedness shall constitute an allowed Secured Claim to the extent of the value of the Prepetition Collateral and an allowed unsecured claim in respect of the remaining unsecured Prepetition Indebtedness, in all cases not subject to subordination; (ii) the Agent's security interests in and liens on the Prepetition Collateral shall be deemed first-priority, valid, binding, perfected and otherwise non-avoidable; and (iii) the Prepetition Indebtedness and the Agent's liens on and security interests in the Prepetition Collateral shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates or any successor thereto.

### Debtors' Need For Use of Cash Collateral

53. The Debtors' ability to operate their businesses is contingent upon continued access to Cash Collateral, as the Debtors do not have available sources of working capital and financing to carry on the operations of their businesses without the use of Cash Collateral. The Debtors require cash for the payment of, inter alia, wages, salaries and operating expenses, the purchase of inventory, equipment and supplies and to meet other expenses necessary to preserve their assets and continue operating their businesses, pending the proposed sale thereof.

54. The relief requested herein to use Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors, their businesses and their ongoing efforts to sell their assets, in a manner designed to maximize value for creditors. Entry of the Interim Order

61683 1001

will also minimize disruption of the Debtors as a going concern and is in the best interests of the Debtors, their creditors and estates. The terms of the use of Cash Collateral requested herein are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty, and are supported by reasonably equivalent value and fair consideration.

55. The terms and conditions of the Interim Order have been negotiated in good faith and at arm's length, and the Agent's consent to the use of Cash Collateral hereunder was granted in good faith and in reliance on the terms and conditions set forth in the Interim Order. The Agent's consent to the use of Cash Collateral is subject to the entry of the Interim Order substantially in the form of the form of order attached hereto as Exhibit D.

## Notice

56. Notice of this Motion has been given to (i) the Office of the United States Trustee (ii) the Lenders, (iii) the Debtors' consolidated twenty-five (25) largest unsecured creditors, (iv) all parties that have filed UCC-1 financing statements against the Debtors, and (v) all parties requesting notice pursuant to Bankruptcy Rule 2002 of the hearing on this Motion. The Debtors submit that, given the nature of the relief requested and the absence of any adverse impact on any party in interest, no other or further notice need be given.

## No Prior Request

57. No previous application for the relief sought herein has been made to this or any other court.

WP3:839435 1

WHEREFORE, the Debtors respectfully request that the Court grant this Motion in all respects and grant such other and further relief as is just and proper.

Dated: Wilmington, Delaware
　　　　December 16, 2002

Respectfully Submitted,
**SHEARMAN & STERLING**
Constance A. Fratianni
Scott C. Shelley
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

- and -

**YOUNG CONAWAY STARGATT**
**& TAYLOR, LLP**

Pauline K. Morgan (No. 3650)
Maureen D. Luke (No. 3062)
Sharon M. Zieg (No. 4196)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

**ATTORNEYS FOR DEBTORS AND**
**DEBTORS IN POSSESSION**

WP3:839563 1　　　　　　　　　　　　　　　　　　　　61683 1001