THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME. A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT UNDER SECTION 1125 OF THE BANKRUPTCY CODE HAS BEEN SET BY THE BANKRUPTCY COURT FOR FEBRUARY 13, 2004 AT 10:00 A.M. THE DEBTORS RESERVE THE RIGHT TO MODIFY OR SUPPLEMENT THIS DISCLOSURE STATEMENT PRIOR TO AND UP TO THE DATE OF SUCH HEARING.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------x

                                      :    **Chapter 11**

**In re**                                  :

                                    :    **Case No. 02-13672 (KJC)**

**INSILCO TECHNOLOGIES, INC., et al.[1]** : 

                                    :    **(Jointly Administered)**

                **Debtors.**         :

                                    :

---------------------------------------------------- x

**DISCLOSURE STATEMENT**
**PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**
**FOR THE DEBTORS' JOINT LIQUIDATING PLAN**

---

**IMPORTANT DATES**

➤    Date by which Ballots must be received: [_____,] 2004 at 4:00 p.m. (prevailing Eastern Time)

➤    Date by which objections to confirmation of the Plan must be filed and served: [_____,] 2004 at 4:00 p.m. (prevailing Eastern Time)

➤    Hearing on confirmation of the Plan: [_____,] 2004 at 11:00 a.m. (prevailing Eastern Time)

---

| | |
|---|---|
| SHEARMAN & STERLING LLP | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Constance A. Fratianni (NY CAF-0672) | Pauline K. Morgan (Del. 3650) |
| Scott C. Shelley (NY SCS-1013) | Maureen D. Luke (Del. 3062) |
| 599 Lexington Avenue | Sharon M. Zieg (Del. 4196) |
| New York, New York 10022 | The Brandywine Building |
| Telephone: (212) 848-4000 | 1000 West Street, 17th Floor |
| Facsimile: (212) 848-7179 | Wilmington, Delaware 19801 |
| | Telephone: (302) 571-6600 |
| | Facsimile: (302) 571-1253 |

Co-Counsel for the Debtors and Debtors in Possession
Dated as of January 8, 2004

---

[1] The other debtors in these jointly administered chapter 11 proceedings are Insilco Holding Co., InNet Technologies, Inc., Insilco International Holdings, Inc., Precision Cable Mfg. Corporation, Eyelets for Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc., Signal Caribe, Inc. and Signal Transformer Co., Inc.

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1
   A.   Holders of Claims and Equity Interests Entitled to Vote ........................................1
   B.   Voting Procedures ...................................................................................................2
   C.   Confirmation Hearing .............................................................................................3

ARTICLE I OVERVIEW OF PLAN .........................................................................................3
   A.   Summary of Classification and Treatment of Claims and Equity Interests Under the Plan .............4

ARTICLE II GENERAL INFORMATION .................................................................................6
   A.   Description and History of Business .......................................................................6

ARTICLE III THE DEBTORS' CHAPTER 11 CASES .............................................................8
   A.   Events Leading to the Chapter 11 Filing ................................................................8

ARTICLE IV HISTORY OF THESE BANKRUPTCY CASES .................................................8
   A.   General ....................................................................................................................8
   B.   First Day Orders .....................................................................................................9
   C.   Employee Matters ...................................................................................................9
   D.   Use of Cash Collateral .........................................................................................11
   E.   Reclamation ..........................................................................................................11
   F.   Professionals Retained by the Debtors .................................................................12
   G.   Creditors' Committee ...........................................................................................12
   H.   Claims Process and Bar Date ...............................................................................13
   I.   Sale of Substantially All of the Debtors' Assets ..................................................14
   J.   Motion for Appointment of Chapter 11 Trustee or Examiner ...............................14
   K.   Asset Reallocation and Settlement Agreement ....................................................15

ARTICLE V THE PLAN OF REORGANIZATION .................................................................15
   A.   Introduction ..........................................................................................................15
   B.   Rationale Underlying Plan Treatments of Claims ................................................16
   C.   Substantive Consolidation and Cancellation of Intercompany Claims .................16
   D.   Administrative Claims and Professional Fees ......................................................17
   E.   Asset Reallocation and Settlement Agreement and Treatment of Unsecured Creditors .................19
   F.   Classification and Treatment of Claims and Equity Interests Under the Plan ......19
   G.   Effect of Confirmation of the Plan .......................................................................25
   H.   Provisions Governing Creditor Trust and Rights of Action .................................27
   I.   Procedures for Resolving Objections to Unsecured Claims .................................28
   J.   Provisions Regarding Distributions ......................................................................30
   K.   Executory Contracts and Unexpired Leases .........................................................34
   L.   Conditions Precedent ............................................................................................35
   M.   Retention of Jurisdiction .......................................................................................35
   N.   Modification of Plan .............................................................................................37
   O.   Revocation or Withdrawal ....................................................................................37
   P.   Injunction ..............................................................................................................38
   Q.   Exculpation and Limitation of Liability ...............................................................38
   R.   Indemnification .....................................................................................................39
   S.   Releases ................................................................................................................39
   T.   Discharge ..............................................................................................................40
   U.   Terms of Existing Injunctions or Stays ................................................................41
   V.   Cancellation of Notes, Instruments, Debentures and Equity Securities ...............41
   W.   Post-Effective Date Fees and Expenses ...............................................................41
   X.   Section 1146 Exception ........................................................................................41

Y.   Severability ............................................................................................................41
Z.   Recognition .............................................................................................................41
AA.  Governing Law .......................................................................................................42
BB.  Notices ....................................................................................................................42
CC.  Closing of Cases .....................................................................................................43
DD.  Section Headings ....................................................................................................43
EE.  Primacy of Asset Reallocation and Settlement Agreement ...................................44
FF.  Continuing Viability of Other Orders/Agreements ................................................44
GG.  Administration of Wind Down Budget ...................................................................44

**ARTICLE VI VOTING PROCEDURES AND REQUIREMENTS ..............................44**
A.   Holders of Claims or Equity Interests ....................................................................44
B.   Classes Entitled to Vote ..........................................................................................45
C.   Vote Required for Acceptance by Classes of Claims .............................................45

**ARTICLE VII CONFIRMATION OF THE PLAN ......................................................46**
A.   Confirmation Hearing .............................................................................................46
B.   Requirements for Confirmation of the Plan ............................................................47
C.   Feasibility ................................................................................................................48

**ARTICLE VIII FINANCIAL INFORMATION ............................................................49**

**ARTICLE IX ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN49**
A.   Liquidation Under Chapter 7 ...................................................................................49
B.   Alternative Chapter 11 Plan ....................................................................................50

**ARTICLE X CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...............50**

**ARTICLE XI CONCLUSION AND RECOMMENDATION ........................................50**

## EXHIBIT LIST

| | |
|---|---|
| Exhibit A | The Plan |
| Exhibit B | Disclosure Order |
| Exhibit C | Unaudited Balance Sheet |
| Exhibit D | Liquidation Analysis |

# INTRODUCTION

This Disclosure Statement is being furnished by Insilco Technologies, Inc. and its affiliated debtors and debtors in possession in these jointly administered Chapter 11 Cases (the "Debtors") in connection with the Debtors' solicitation of votes to confirm the Joint Liquidating Plan Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"). A copy of the Plan is attached hereto as Exhibit A.[2]

The purpose of this Disclosure Statement is to set forth information: (1) regarding the history of the Debtors, their businesses and these Chapter 11 Cases; (2) concerning the Plan and alternatives to the Plan; (3) advising the Holders of Claims and Equity Interests of their rights under the Plan; (4) assisting the Holders of Claims entitled to vote in making an informed judgment regarding whether they should vote to accept or reject the Plan; and (5) assisting the Bankruptcy Court in determining whether the Debtors have complied, and the Plan complies, with the provisions of chapter 11 of the Bankruptcy Code.

By Court order (the "Disclosure Order," a copy of which is attached hereto as Exhibit B), the Bankruptcy Court approved this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against, or Equity Interests in, the Debtors to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan and all exhibits hereto and thereto.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

## A.     Holders of Claims and Equity Interests Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests which are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such a plan are entitled to vote on the plan. In these cases, only Holders of Claims in Class 4, Class 5, Class 6, and Class 7 are impaired by the Plan and entitled to vote to accept or reject the Plan. Claims in Class 1, Class 2, and Class 3 are unimpaired by the Plan and the Holders thereof are conclusively presumed to have accepted the Plan. Class 8 claimants will receive no distribution under the Plan and are therefore deemed to have rejected the Plan.

---

[2]     Capitalized terms that are not defined in this Disclosure Statement shall have the meanings set forth in the Plan.

## B.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, enclosed is a ballot (the "Ballot") for the acceptance or rejection of the Plan and a pre-addressed envelope for the return of the Ballot. BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 4, CLASS 5, CLASS 6 AND CLASS 7 BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN. If you are the holder of a Claim in one of these Classes and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning the Disclosure Statement, any of the Exhibits hereto, the Plan or the voting procedures in respect thereof, please contact:

> Balloting Agent
> PATLETT, INC.
> 3 Sunbelt Business Park Drive
> Greer, South Carolina 29650-4529
> Telephone: (864) 662-0034
> Facsimile: (864) 968-0661
> Email: patlett@tds.net

THE DEBTORS RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN.

After carefully reviewing this Disclosure Statement and the Exhibits attached hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and return it either by overnight courier or regular mail in the envelope provided. BALLOTS SUBMITTED BY FACSIMILE OR OTHER ELECTRONIC TRANSMISSION WILL NOT BE ACCEPTED AND WILL BE VOID. Voting procedures and requirements are explained in greater detail elsewhere in this Disclosure Statement. PLEASE VOTE AND RETURN YOUR BALLOT TO:

> Balloting Agent
> PATLETT, INC.
> 3 Sunbelt Business Park Drive
> Greer, South Carolina 29650-4529

IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY 4:00 P.M. (PREVAILING EASTERN TIME) ON [_____,] 2004. ANY EXECUTED BALLOTS THAT ARE TIMELY RECEIVED BUT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN. EACH HOLDER OF AN ALLOWED CLAIM IN CLASSES 5 AND 6 SHALL BE DEEMED TO HAVE PROVIDED THE RELEASES SET FORTH IN SECTION 14.9(b) OF THE PLAN UNLESS ANY SUCH HOLDER SHALL CHECK THE BOX ON ITS BALLOT INDICATING THAT IT ELECTS NOT TO GRANT SUCH RELEASES, IN WHICH CASE SUCH HOLDER SHALL NOT BE ENTITLED TO A DISTRIBUTION UNDER THE PLAN.

The Debtors believe that prompt confirmation and implementation of the Plan is in the best interests of the Debtors, all Holders of Claims and the Debtors' chapter 11 estates.

## C.     Confirmation Hearing

In accordance with the Disclosure Order and section 1128 of the Bankruptcy Code, the confirmation hearing will be held on [_____,] 2004, at [11:00] a.m. (prevailing Eastern Time), in the United States Bankruptcy Court for the District of Delaware, Courtroom 1, 900 Market Street, Philadelphia, Pennsylvania to consider confirmation of the Plan. Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before [_____,] 2004 at 4:00 p.m. (prevailing Eastern Time) in the manner set forth in the Disclosure Order. The hearing on confirmation of the Plan may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THIS DISCLOSURE STATEMENT IS WITHOUT ERROR, ALTHOUGH ALL REASONABLE EFFORTS UNDER THE CIRCUMSTANCES HAVE BEEN MADE TO BE ACCURATE. HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ IT CAREFULLY AND IN ITS ENTIRETY, AND WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, WHICH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF THE PLAN SHALL CONTROL. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING FORECASTS. BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS, THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

[THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME. A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT UNDER SECTION 1125 OF THE BANKRUPTCY CODE HAS BEEN SET BY THE BANKRUPTCY COURT FOR FEBRUARY 13, 2004 AT 10:00 A.M. THE DEBTORS RESERVE THE RIGHT TO MODIFY OR SUPPLEMENT THIS DISCLOSURE STATEMENT PRIOR TO AND UP TO THE DATE OF SUCH HEARING.]

## ARTICLE I
## OVERVIEW OF PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article V below, entitled "The Plan of Reorganization."

The Plan is a plan of liquidation for the Debtors and incorporates a compromise by and among the Debtors, the Lenders, the Creditors' Committee, the 12% Note Indenture Trustee and the 14% Note Indenture Trustee. Substantially all of the Debtors' operating assets have been sold and reduced to Cash. Under the Plan, Holders of Allowed Unsecured Claims will receive an amount of cash described as the Unsecured Creditor Distribution Fund. The percentage recovery will depend on the Cash in the Unsecured Creditor Distribution Fund and the aggregate amount of Allowed Unsecured Claims.

Under the Plan, the Creditor Trust will be established which will hold the Unsecured Creditor Distribution Fund as well as other Assets for the benefit of the Senior Lenders. On the Effective Date, Trustees will be appointed to oversee the administration and implementation of the Plan and the liquidation of the Debtors' remaining assets. In addition, the Unsecured Creditors' Trustee will be authorized to pursue the Rights of Action.

## A. Summary of Classification and Treatment of Claims and Equity Interests Under the Plan

1.　　　　　The following chart summarizes the significant outstanding secured financing debt of the Debtors as of the Petition Date:

### Summary of Secured Financing Debt

| Description | Amount |
|---|---|
| Tranche A Term Advances | $29.8 million |
| Tranche B Term Advances | $147.8 million |
| Revolving Credit Advances | $37.3 million |
| Accrued obligations for unused line fees and letter of credit fees associated with the bank debt listed above | $50,835 |
| Accrued Prepetition Interest | $17.8 million |
| **Total Secured** | $232.7 million |

2.　　　　　The Plan classifies all Claims and Equity Interests of the Debtors into separate classes (each a "Class"). The following chart summarizes the classification and status of Claims and Equity Interests and the treatments afforded under the Plan. The Bar Date for Claims was May 15, 2003. As of October 31, 2003 the Debtors received claims in the amount of $2,467,081,871.85. The Debtors are in the process of analyzing the validity of these claims. Until this process is complete, the Debtors will not be able to state the estimated or projected distributions, except to the extent set forth in the Debtors' Schedules. The Debtors believe that the actual amount of Claims in Classes 3 and 4 may be considerably less than the amounts listed.

| Class | Claim/Interest | Treatment of Claim/Interest | Amount of Scheduled Claims or Equity Interests |
|---|---|---|---|
| 1 | Senior Lenders' Claims | Receipt of (i) all Settlement Proceeds and (ii) to the extent Noteholder Releases are not obtained, an amount equal to the non-releasing Noteholder's Share of the amount of the Contributed Assets (subject to certain exclusions). | $232,712,443.42 |
| 2 | Other Secured Claims | Either (i) return of the Assets on which the Holder has a security interest, or (ii) proceeds from the sale of the Assets to which the security interest attaches. | $183,450.00 |
| 3 | Priority Claims | Payment in full in Cash on the Effective Date equal to the amount of the Allowed Claim. | $310,201.00 |

| 4 | General Unsecured Claims | Cash equal to the ratable share of (i) Unsecured Creditor Distribution Fund and (ii) the Rights of Action Recovery available for Distribution. | $11,453,280.98 |
|---|---|---|---|
| 5 | Senior Discount Notes | Cash equal to the ratable share of (i) Unsecured Creditor Distribution Fund and (ii) the Rights of Action Recovery available for Distribution if Noteholder Release provided. | $124,211,841.93 |
| 6 | Senior Subordinated Notes | Cash equal to the ratable share of (i) Unsecured Creditor Distribution Fund and (ii) the Rights of Action Recovery available for Distribution if Noteholder Release provided. | $138,142,913.00 |
| 7 | Term-C Loan Claims | Cash equal to the ratable share of (i) Unsecured Creditor Distribution Fund and (ii) the Rights of Action Recovery available for Distribution. | $22,221,128.07 |
| 8 | Equity Interests | No distribution under Plan | -- |

THE TREATMENT AND DISTRIBUTIONS PROVIDED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE PLAN ARE IN FULL AND COMPLETE SATISFACTION OF THE ALLOWED CLAIMS ON ACCOUNT OF WHICH SUCH TREATMENT IS GIVEN AND DISTRIBUTIONS ARE MADE. NOTHING IN THE PLAN LIMITS THE ABILITY OF THE DEBTORS TO PAY ADMINISTRATIVE EXPENSE CLAIMS THAT ARE NOT DISPUTED BEFORE THE EFFECTIVE DATE.

THERE CAN BE NO ASSURANCE THAT THERE WILL BE SUFFICIENT AVAILABLE CASH TO SATISFY ALL ADMINISTRATIVE EXPENSE CLAIMS IN THE MANNER DESCRIBED IN THE PLAN. THERE MAY BE INSUFFICIENT CASH, ABSENT THE ACTUAL OR DEEMED CONSENT OF THE ALLOWED ADMINISTRATIVE EXPENSE CLAIMANTS, TO PAY THE HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS, AS REQUIRED BY SECTION 1129(a)(9) OF THE BANKRUPTCY CODE, IN WHICH CASE THE DEBTORS MAY BE ADMINISTRATIVELY INSOLVENT. IF ONE OR MORE OF THE HOLDERS OF SUCH CLAIMS, WHETHER DISPUTED OR UNDISPUTED, OBJECTS TO ITS TREATMENT UNDER ARTICLE III OF THE PLAN, IT MAY BE THAT A PLAN CANNOT BE CONFIRMED PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. IN THAT EVENT, IT MAY BE NECESSARY FOR THE DEBTORS TO EITHER CONVERT THESE CHAPTER 11 CASES TO A CHAPTER 7 LIQUIDATION OR DISMISS THESE CASES. IN THE EVENT THE DEBTORS ARE FORCED TO TAKE SUCH ACTION, THE DEBTORS BELIEVE THAT HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS THAT HAVE NOT BEEN PAID AS OF SUCH DATES MAY RECEIVE NO DISTRIBUTION ON ACCOUNT OF THEIR ADMINISTRATIVE EXPENSE CLAIMS. SEE ARTICLE IX. "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN."

ANY PARTY WHO DOES NOT OBJECT TO THE DISCLOSURE STATEMENT IS NOT DEEMED TO WAIVE ANY RIGHTS TO OBJECT TO THE CONFIRMATION OF THE PLAN ON ANY BASIS, OTHER THAN LACK OF ADEQUATE DISCLOSURE UNDER SECTION 1125 OF THE BANKRUPTCY CODE.

## ARTICLE II
## GENERAL INFORMATION

### A. Description and History of Business

#### 1. The Debtors

The Debtors and their non-debtor affiliates (the "Company") were a worldwide designer, manufacturer and distributor of highly-specialized electronic interconnection components and systems for original equipment manufacturers ("OEMs") and electronic manufacturing service ("EMS") providers in the telecommunications, computer networking, electronics, automotive and medical markets. The Debtors marketed their products and services to Fortune 100 companies, which included leading OEMs and EMS providers such as Nortel Networks Corporation, Avaya Inc., Siemens Aktiengesellschaft, C-Mac Industries, Inc. (a unit of Solectron), Cisco Systems, Inc., Jabil Circuit, Inc., Littelfuse, Inc., Delphi Automotive Systems, Inc. and Tyco International Ltd. The Debtors served numerous end-use markets for a broad range of applications, including (i) custom wire, cable and electromechanical assemblies used by OEMs and EMS providers in the telecommunications, data processing and other industries, (ii) high speed data network connectors and power transformers for OEMs and EMS providers in the computer networking, telecommunications, cellular telephone, electronics and security systems markets and (iii) precision metal stampings for the electronics, automotive, battery and other markets.

The Debtors operated their businesses through three primary product line segments: Custom Assemblies, Passive Components and Precision Stampings. Custom Assemblies manufactured custom cable assemblies, wire harnesses and electromechanical assemblies. The Debtors' Passive Components segment produced high-speed modular plugs, jacks and interconnect devices that transfer and regulate electronic signals from one device to another. The Passive Components segment also produced transformers that transfer and regulate electronic signals and currents between integrated circuits and electronic devices. The Precision Stampings segment produced precision metal stampings and wire-formed parts used in connector contacts, circuit breakers, fuses, lighting and process controls, sensors and relays. As of the Petition Date, the Company maintained more than 1.5 million square feet of active manufacturing space in twenty (20) locations throughout the United States, Canada, Mexico, China, Ireland and the Dominican Republic, as well as a workforce of approximately 4,450 hourly and salaried employees and sales representatives.

For the twelve-month period ending December 31, 2002, the Company recorded revenue of $196,045,000 and a net loss of $75,301,000. As of December 31, 2002, the Company's books and records, prepared in accordance with Generally Accepted Accounting Principles, reflected assets totaling approximately $141,519,000 and liabilities totaling approximately $572,322,000.

#### 2. Prior Transactions

In August 1998, beneficial ownership of the Debtors was acquired by DLJ Merchant Banking Partners, II ("DLJMB") and Citicorp Venture Capital Limited through a series of transactions in which DLJMB contributed $44 million in capital. Shortly thereafter the Debtors entered into various transactions to align their operations with their strategic objectives. The Debtors acquired Eyelets for Industry, Inc. in January 1999 to expand their production capabilities to deep drawn and wireformed parts, sold certain assets and intellectual property of its heat exchanger machinery and equipment business for $1.7 million in July 1999, and sold the assets of its welded stainless steel tubing business for $16.5 million in August 1999. In February 2000, the Debtors sold 100% of Taylor Publishing Company's shares for $93.48 million to a wholly owned subsidiary of Castle Harlan Partners III, L.P. and acquired T.A.T. Technology, Inc. to build upon its global preferred supplier relationship with a large

telecommunications equipment manufacturer and expand its custom assemblies product offerings into the optical networking market. In August 2000, the Debtors sold their automotive related businesses to ThermaSys Holdings Co. for $144.5 million and acquired Precision Cable Manufacturing Company, Inc. to further penetrate the custom assemblies market, including the core telecommunications equipment segment, and to gain access to low-cost manufacturing facilities in Mexico. Finally, in January 2001, the Debtors acquired the remaining 84% outstanding interests in InNet Technologies, Inc. to take advantage of product design and global marketing synergies within its high-speed data grade connector business and to gain access to significant low-cost manufacturing facilities in Asia.

### 3. Summary of Capital Structure

As of the Petition Date, the Debtors were indebted to the Senior Lenders in the aggregate principal amount of approximately $232.7 million, consisting of approximately (i) $37.3 million of principal with respect to secured revolving loans, (ii) $29.8 million of principal with respect to secured Term A Loans, (iii) $147.8 million of principal with respect to secured Term B Loans, (iv) $50,835 of accrued interest for unused line fees and letter of credit fees associated with respect to (i), (ii) and (iii), and (v) $17.8 million of unpaid accrued interest with respect to (i), (ii) and (iii). The Debtors are also indebted to the Lenders in the amount of $15 million of principal with respect to unsecured Term-C Loans and approximately $7.2 million of unpaid accrued interest with respect to the same.

The Senior Lenders' Claims are secured by liens upon, and security interests in (the "Prepetition Liens"), substantially all of the Debtors' assets and property, including without limitation, certain accounts, intercompany notes, equipment, inventory, general intangibles, investment property and other capital stock, receivables, fee owned real estate and the proceeds, products, rents and profits thereof (collectively, the "Prepetition Collateral"). The Debtors' cash and cash equivalent proceeds of the Prepetition Collateral constitute Prepetition Collateral or proceeds of Prepetition Collateral and, therefore, are cash collateral of the Prepetition Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

In August 1998, Insilco Holding Co., t/k/a Silkworm Acquisition Corporation, issued and sold $138 million principal amount at maturity ($70.2 million initial accreted value) of 14% Senior Discount Notes due 2008 pursuant to that certain Indenture dated August 17, 1998, between Silkworm Acquisition Corporation, as issuer, and Star Bank, N.A. n/k/a U.S. Bank, as trustee. The Senior Discount Notes are structurally subordinated to the Debtors' obligations under the Credit Agreement. None of the Debtors' subsidiaries guarantee the obligations under the Senior Discount Notes. As of the Petition Date, over $124.2 million of the Senior Discount Notes were still outstanding.

In November 1998, Insilco Technologies, Inc., t/k/a Insilco Corporation, issued $120 million of 12% Senior Subordinated Notes due 2007 pursuant to that certain Indenture dated November 9, 1998, between Insilco Corporation, as issuer, and Star Bank, N.A., n/k/a U.S. Bank, as trustee. In June 2002, to avoid a potential conflict of interest, Wachovia Bank, N.A. became trustee under the 12% Note Indenture. The Senior Subordinated Notes are contractually subordinated to the Debtors' obligations under the Credit Agreement. The Debtors' domestic subsidiaries are guarantors of the Senior Subordinated Notes. As of the Petition Date, over $119.7 million of the Senior Subordinated Notes were still outstanding and the Debtors owed approximately $18.4 million in accrued interest related to the Senior Subordinated Notes.

## ARTICLE III
## THE DEBTORS' CHAPTER 11 CASES

### A. Events Leading to the Chapter 11 Filing

From 1999 to 2001, Insilco completed several acquisitions, divestitures and refinancings (described above) to transform the Company from a diversified holding company to a focused electronics and telecommunication components company. As a result of these transactions, the Debtors' long-term debt obligations significantly increased.

In the fourth quarter of 2000, the telecommunication markets began to experience a downturn due to a slowdown in the U.S. economy, reduced capital spending by well-capitalized telecommunication service providers and excessive inventory levels throughout the telecommunication supply chain. These circumstances carried into 2001 and adversely affected the Company's financial results throughout 2001. In the first three quarters of 2002, the Company's performance continued to be impacted by a number of external factors, including the weakened U.S. macroeconomic landscape, ongoing financial issues with emerging telecom service providers and cautious capital spending by larger, well-capitalized telecom service providers. These factors created a significant reduction in demand for the Company's customers' end products and created excessive inventory levels throughout the Company's supply chain.

Specifically, due to the continuing depressed state of the telecommunications industry, many of the Debtors' primary customers continued to significantly reduce the volume of products purchased from the Debtors and the Debtors' revenues failed to reach previous levels. As a result of their diminished cash flow, the Debtors no longer had the ability to service their significant long-term debt obligations in the ordinary course of business. The Debtors failed to make their February 15, 2002 interest payment on their Senior Subordinated Notes, which created defaults under the Credit Agreement and under the 14% Note Indenture.

In January 2002, the Debtors began a review of strategic alternatives to address issues related to their capital structure. To assist in that regard, the Debtors engaged the financial advisory services of Gleacher Partners LLC ("Gleacher"). As part of this process, the Debtors considered a variety of strategic options to maximize value through strategic business initiatives, equity investments, capital restructurings and/or asset dispositions involving all or part of the Company. The continuing depressed state of the industries the Debtors served — including the telecommunications and related technology industries — caused a significant decline in the Debtors' revenue. As a result, the Debtors no longer had the resources to fund operations and make payments on their long-term indebtedness. Faced with diminishing liquidity, the Debtors determined that the best means to maximize the recovery for their stockholders was to market the Company and seek offers to purchase some or all of the Company's assets or to make an investment in the Company. After extensive marketing of the Debtors' businesses, the Debtors further determined that it was in the best interest of their creditors, customers and employees to file chapter 11 proceedings to pursue the sale of substantially all of the Debtors' assets on a going concern basis (the "Going Concern Sales").

## ARTICLE IV
## HISTORY OF THESE BANKRUPTCY CASES

### A. General

On December 16, 2002 (the "Petition Date"), the Debtors commenced voluntary chapter 11 cases before the Bankruptcy Court. On December 17, 2002, the Debtors' chapter 11 cases were procedurally consolidated for administrative purposes only.

The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases. An official committee of unsecured creditors was appointed in these cases on January 3, 2003.

Since the Petition Date, the Debtors have been engaged in: (i) operating their businesses as debtors in possession under the Bankruptcy Code (until the sale of substantially all of their business Assets); (ii) administering, managing and coordinating the Chapter 11 Cases; (iii) winding down and liquidating the various Debtors' Assets and; (iv) developing a plan by which the proceeds from the liquidation of Debtors' Assets will be distributed to Holders of Claims pursuant to the Bankruptcy Code.

## B. First Day Orders

On the Petition Date, the Debtors filed numerous customary "first day motions" which were granted after various hearings before the Bankruptcy Court on December 17, 2002 and thereafter. The first day orders included, inter alia: (i) an order directing joint administration of the Chapter 11 Cases; (ii) an order authorizing payment of certain critical trade vendor claims; (iii) an order (a) prohibiting utilities from discontinuing service and (b) establishing procedure for determining adequate assurances pursuant to section 366 of the Bankruptcy Code; (iv) an order authorizing the Debtors to pay certain prepetition shipping charges, import obligations and related promissory liens; (v) an order authorizing the Debtors to pay sales and use taxes; (vi) an order authorizing the Debtors to pay employee wages and other compensation; (vii) an order authorizing the Debtors to continue their cash management system; (viii) an order authorizing the Debtors to employ Patlett, Inc. as claims agent pursuant to 28 U.S.C. §156(c) and (ix) an order approving use of cash collateral and granting replacement liens

## C. Employee Matters

### 1. Key Executive and Key Employee Retention and Severance Plans

In early 2002, the Debtors determined that, due to the continued downturn in the Debtors' industries and the resulting financial condition of the Debtors' businesses, incentives beyond those provided in their ordinary compensation scheme were necessary to retain their work force. In May 2002, the Debtors implemented employee retention and severance plans (the "Stay Plans") to motivate, retain and reward key executives and other key employees for their continued service to the Debtors and thereby preserve the enterprise value of each of the Debtors' operations.

To facilitate payment of sums that might become payable under the Stay Plans, the Debtors negotiated an arrangement with the Lenders pursuant to which the Lenders agreed to make funds available from the proceeds of the Going Concern Sales, subject to the terms and conditions of a forbearance agreement, dated as of May 3, 2002, by and among Insilco, T.A.T. Technology Inc. and BankOne, N.A., as agent (the "Agent") for the Lenders (as subsequently amended, the "Forbearance Agreement"). Under this arrangement with the Lenders, the availability of cash to make payments pursuant to the Stay Plans was dependent on (i) the consummation of the sales of the Debtors' assets on or before April 30, 2003 and (ii) the amount of net cash proceeds received in connection with the Going Concern Sales.

On December 19, 2002 the Debtors filed a motion seeking authorization to continue the Stay Plans. The Debtors' retention plan provided for approximately $1.3 to $2.1 million in payments to approximately 70 employees who were identified as key to the Debtors' business or restructuring efforts. The Debtor's severance plan covered approximately 61 employees, with the maximum aggregate

payments of approximately $4.9 million. The Debtors obtained Bankruptcy Court approval for the plans by an order dated January 29, 2003.

In addition, by motion filed March 26, 2003, the Debtors sought approval of a supplemental employee compensation plan (the "Employee Compensation Plan") to compensate certain employees for (i) services rendered on behalf of the Debtors in connection with the Chapter 11 Cases and in reliance on the availability of postpetition severance benefits for employees that are terminated by the Debtors and not hired by any purchaser of the Debtors' assets and (ii) earned but unused vacation time and the hardships resulting from loss of employment. Payments under the Employee Compensation Plan were to be funded with up to $750,000 of cash collateral, pursuant to an agreement with the Senior Lenders. The Bankruptcy Court approved the Employee Compensation Plan by order dated April 11, 2003.

## 2. 401(k), Pension, and Nonqualified Plans

Debtor Insilco Technologies, Inc. was the plan sponsor and administrator of the Insilco Technologies, Inc. 401(k) Plan (the "401(k) Plan"), the Insilco Technologies, Inc. Retirement Plan (the "Pension Plan"), and a nonqualified supplemental deferred compensation plan. Each of these plans is an employee pension benefit covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

In anticipation of the cessation of business and the sale of substantially all Assets, the Debtors began prior to the Petition Date to prepare for terminating the 401(k) Plan. Contributions by the employees via payroll deferral and by the employer as matching contributions ceased to be made under the 401(k) Plan as of April 14, 2002. Following the closing of the sale of substantially all of the assets of Stewart Stamping Corporation in March 2003, the account balances for the employees of Stewart Stamping Corporation were transferred to a new 401(k) plan sponsored by the purchaser of those assets. The 401(k) Plan was otherwise frozen, and the third-party plan recordkeeper began the process of terminating the 401(k) Plan by distributing each remaining participant's account balance. To the extent that a valid address was available, each 401(k) Plan participant was notified of the participant's options and responsibilities for electing a cash distribution or a rollover to another tax-qualified retirement account. For any account that was not the subject of a proper rollover direction and where the recordkeeper had a valid address, a check for the account amount, less the applicable tax withholdings and penalties, was sent. Where no address was available, efforts were made both by the Debtors and the plan recordkeeper to obtain addresses. In accord with the 401(k) Plan document, accounts for missing participants for whom no addresses can be obtained will be forfeited and used to pay administrative expenses.

With respect to the Pension Plan, the Debtors paid all required premiums and administered pension payments in accordance with the terms of the Pension Plan until the Pension Plan was terminated. In connection with termination of employment of the Pension Plan participants related to the sale of the Debtors' operating Assets, employees were informed of their rights to take monthly annuity payments or lump sum payments of their accrued benefits under the Pension Plan. The Debtors and their professionals have worked with the Pension Benefit Guaranty Corporation (the "PBGC") in an attempt to have an orderly transition to the PBGC's administration of the fund. As a result, Insilco Technologies, Inc. and the PBGC entered into an "Agreement for Appointment of Trustee and Termination of Plan," which provides for the termination of the Plan as of March 28, 2003 under 29 U.S.C. Section 1348 and the appointment of the PBGC to serve as trustee of the Plan. Because the Plan assets are not sufficient to pay benefits when due, the PBGC will guarantee the retirement payments for Pension Plan participants, except benefits that exceed certain PBGC limits. The PBGC has filed several proofs of claim in these administratively consolidated cases related to the Pension Plan. The Debtors and the PBGC are negotiating towards the goal of agreement on the amount and priority of those claims. If an agreement is

not reached, it is possible that the PBGC will be granted a substantial administrative claim. If the PBGC were to insist upon payment in full of that claim, the Debtors' estates could be rendered administratively insolvent and under those circumstances, it is unlikely that the Plan could be confirmed.

In addition, the Debtors have certain other nonqualified deferred compensation and supplemental pension arrangements with former employees to provide supplemental retirement benefits. The benefits are unfunded, subject to the claims of general creditors, and not covered by Title IV of ERISA. The Debtors are treating these claims of former employees as Class 4 General Unsecured Claims.

### 3. Union Contracts

Prior to the commencement of the Chapter 11 Cases, Signal Transformer, Inc, was party to (x) a collective bargaining agreement, dated as of April 26, 1996, with Local 810 Steel, Metals, Alloys and Hardware Fabricators and Warehousemen, affiliated with the International Brotherhood of Teamsters, AFL-CIO (the "Union"), that expires by its terms on May 1, 2004 and (y) a October 24, 2001 Shutdown Agreement (together, as amended, the "CBA") On April 14, 2003, the Bankruptcy Court entered an Order Pursuant to Bankruptcy Code Section 363(b) and Fed. R. Bankr. P. 9019 Approving Settlement Agreement between Insilco Technologies, Inc. and Local 810, Steel Metals, Alloys and Hardware Fabricators and Warehousemen. This order approved a settlement in which the Debtors agreed to make a $12,000 severance fund available to certain terminated Union employees and in return the Debtors obtained certainty that (i) all obligations under the CBA have been discharged, (ii) they will not be forced to incur litigation costs in connection with a dispute arising under the CBA and (iii) the Union will not be able to assert administrative expense claims that could pose an impediment to confirmation of a chapter 11 plan.

### D. Use of Cash Collateral

As of the Petition Date, the Debtors owed the Lenders in excess of $227.2 million with respect to the Senior Lenders' Claims, with such obligations secured by liens upon and security interest in substantially all of the Debtors' assets and business operations, the value of which the Debtors estimated to be less than $80 million. As of the Petition Date, the Debtors believed their assets were declining in value. With no unencumbered assets to offer an alternative lender as collateral, the Debtors' only realistic source of working capital was the Senior Lenders. Following extensive negotiations, the Debtors and the Senior Lenders reached an agreement on the terms and conditions on which the Senior Lenders would permit the Debtors to use cash collateral in the bankruptcy cases.

On the Petition Date the Debtors filed a motion requesting authorization to use the Senior Lenders' cash collateral, which the Bankruptcy Court granted on an interim basis on December 17, 2002. On January 16, 2003 the Bankruptcy Court entered a final order authorizing the Debtors' use of the Senior Lenders' cash collateral (as amended from time to time, the "Cash Collateral Order"). The Cash Collateral Order allows the Debtors to use cash collateral in accordance with a budget finalized after extensive negotiations with the Senior Lenders. The Cash Collateral Order includes a separate "Wind Down Budget" for expenses related to the winding up of the Debtors' estates, and a "Carve-Out" for professional fees.

### E. Reclamation

In order to address reclamation claims asserted by vendors, the Bankruptcy Court approved certain procedures for the payment of reclamation claims to vendors, as set forth in the Order Under 11 U.S.C. §§ 105(a), 503(b), 546(c)(2) and 546(g) Establishing Procedure for Treatment of Reclamation Claims, which was entered on January 10, 2003 (the "Reclamation Order"). Pursuant to the Reclamation

Order, on April 14, 2003 the Debtors filed a report indicating that the Debtors did not believe any of the reclamation claims asserted against the Debtors to be valid pursuant to the Reclamation Order (the "Reclamation Report"). As of the May 12, 2003 objection deadline, no holder of a reclamation claim had filed an objection to the inclusion, omission or characterization of any asserted reclamation claim in the Reclamation Report. As set forth in the Reclamation Report, the Debtors do not intend to make any distributions on account of any alleged reclamation claim, other than as a general unsecured claim.

## F. Professionals Retained by the Debtors

To assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors employed, with authorization from the Bankruptcy Court, Shearman & Sterling LLP and Young Conaway Stargatt & Taylor, LLP ("Young Conaway") as bankruptcy co-counsel.

The Bankruptcy Court also approved the Debtors' application to employ FTI Consulting, Inc. ("FTI") as bankruptcy advisors in these Chapter 11 Cases. The Debtors compensated FTI at its customary hourly rates.

The Debtors also retained Gleacher as financial advisors, and agreed to pay Gleacher a monthly advisory fee of $125,000 and a "Restructuring Fee" of $3 million upon the consummation of a "restructuring" of the Debtors (including any refinancing or recapitalization of existing indebtedness, conversion of debt to equity and any sale, merger or consolidation of the Debtors with another person or entity), with fifty percent (50%) of any monthly fees credited to the "Restructuring Fee."

Moreover, to assist in the coordination of the Going Concern Sales and the administration of the Chapter 11 Cases, the Debtors employed, with the Bankruptcy Court's approval, (i) Porter, Wright, Morris & Arthur, LLP ("Porter Wright"), as special counsel for employment, employee benefits, executive compensation and other related matters, (ii) Benetar Bernstein Schair & Stein ("Benetar Bernstein"), as special counsel for labor law and related matters, (iii) Kekst & Company, as communications consultant and (iv) PricewaterhouseCoopers, as internal auditors.

The US Trustee filed a limited objection with respect to the retainer provisions set forth in the Debtors' applications to retain (i) Young Conaway, (ii) Shearman & Sterling LLP, (iii) Porter Wright, (iv) Benetar Bernstein and (v) Gleacher. Following an evidentiary hearing on March 24, 2003, the Bankruptcy Court entered a Memorandum Opinion dated April 18, 2003 approving the so-called "evergreen retainer" provisions in these applications. To assist with a variety of other legal matters, the Debtors also retained numerous other attorneys and accountants as "ordinary course professionals" pursuant to an order entered January 22, 2003.

## G. Creditors' Committee

On January 3, 2003, the US Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") to represent the interests of the Debtors' unsecured creditors in these cases. Following its formation, the Debtors have consulted with the Creditors' Committee concerning the administration of these Chapter 11 Cases. The Debtors have kept the Creditors' Committee informed about the Debtors' operations and have sought the concurrence of the Creditors' Committee for actions and transactions taken outside of the ordinary course of the Debtors' businesses. The Creditors' Committee has, through its advisors, participated actively, together with the Debtors' management and professionals, in, among other things, reviewing the Debtors' operations and the Going Concern Sales. The Debtors and their respective professionals have consulted with the Creditors' Committee and its

professionals in connection with the negotiation of the Plan with the goal of achieving a consensual plan. The current members of the Creditors' Committee and their attorneys and advisors are as follows:

*Committee Members*

Wachovia Bank, N.A.
401 South Tryon St., 12th Floor
Charlotte, NC 28288
Contact: Bob Bice

Tyco Electronics Corporation
2901 Fulling Mill Road
Middletown, PA 17057
Contact: Valerie S. Nehilla

U.S. Bank, N.A.
100 Wall Street
New York, NY 10005
Contact: Romano I. Peluso

Lucent Technologies
65 Livingston Avenue
Roseland, NJ 07068
Contact: Peter D'Auria & Ken Rosen

*Co-Counsel to the Creditors' Committee*

Andrew I. Silfen
Arent Fox Kitner Plotkin
& Kahn PLLC
1675 Broadway
New York, NY 10019

Warren T. Pratt
Drinker Biddle & Reath LLP
1100 North Market Street
10th Floor
Wilmington, DE 19801

*Financial Advisor to the Creditors' Committee*

Perry M. Mandarino
Traxi LLC
212 West 35th Street
New York, NY 10001

## H. Claims Process and Bar Date

### 1. Schedules and Statements

On January 23, 2003, the Debtors filed their respective schedules of assets and liabilities and statements of financial affairs with the Bankruptcy Court. On April 15, 2003, the Debtors filed amended schedules of assets and liabilities and statements of financial affairs, to correct and clarify certain information included in, or omitted from, the original schedules and statements.

### 2. Bar Date Order

On March 25, 2003, the Bankruptcy Court entered an order (the "Bar Date Order") establishing May 15, 2003 as the deadline (the "Bar Date") for filing (i) proofs of claim against the Debtors and (ii) requests for payments of administrative expenses incurred on or before April 30, 2003. Under the Bar Date Order, all creditors (including governmental entities) were required to file proofs of claim or requests for administrative expenses incurred on or before April 30, 2003 no later than the Bar Date, or be barred from asserting any Claim or any such administrative expense against the Debtors and from voting upon or receiving distributions under the Debtors' chapter 11 plan. Proofs of claim and requests for administrative expenses were not required to be filed at that time by the following parties: (A) any party seeking a claim in respect of any proof of claim or request of an administrative expenses previously

allowed by order of the Bankruptcy Court, (B) any party having filed a proper request with the Bankruptcy Court seeking to assert an administrative claim and (C) any party whose claim is listed on the Debtors' schedules in a liquidated amount and not designated as "contingent" or "disputed."

Pursuant to the Bar Date Order, any party that holds a claim arising from the rejection of an executory contract or unexpired lease must file a proof of claim based on such a rejection on or before the later of the Bar Date or thirty (30) days after the date on which (i) the party's nonresidential real property lease has been rejected pursuant to section 365(d)(4) of the Bankruptcy Code, or (ii) an order is entered authorizing the rejection of the party's executory contract or unexpired lease.

## I. Sale of Substantially All of the Debtors' Assets

Prior to the commencement of the Chapter 11 Cases, the Debtors, in consultation with their legal and financial advisors, considered a variety of strategic options and determined that the best means to maximize the recovery for their stakeholders was to market the Company and seek offers to make an investment in the Company or to purchase some or all of the Company's assets. Gleacher promptly undertook an exhaustive marketing process for the Debtors' assets, by contacting more than 240 potential buyers.

After extensive due diligence and negotiations with several of these potential buyers, on December 15, 2002 the Debtors entered into five separate sales agreements (as amended, the "Sale Agreements"): (i) an Asset Purchase Agreement with SRDF Acquisition Company, LLC ("SRDF") for the sale of assets related to the Debtors' precision stampings business for approximately $13 million; (ii) a Stock and Asset Purchase Agreement with Amphenol Corporation and Amphenol Technical Products International Co. (together, "Amphenol") for the sale of the assets related to the Debtors' custom assemblies business for $10.14 million; (iii) a Stock and Asset Purchase Agreement with Bel Fuse Ltd., Bel Fuse Macau, L.D.A., Bel Connector Inc. and Bel Transformer Inc. (collectively, "Bel Fuse") for the sale of the assets related to the Debtors' passive components business for $35 million; (iv) a Share Sale and Purchase Agreement with Stephen Bullock ("Bullock") for the sale of the Debtors' interest in Insilco Teoranta for $100,000 and the assumption of certain liabilities; and (v) an Asset Purchase Agreement with LL&R ("LL&R" and together with SRDF Amphenol, Bel Fuse and Bullock, the "Buyers") for the sale of the Debtors' North Myrtle Beach, South Carolina custom assemblies facility for $1.7 million. On December 19, 2002 the Debtors filed motions seeking approval of bidding procedures to govern each of these sales as well as authorization to sell substantially all of the Debtors' assets to the Buyers pursuant to the Sale Agreements, or any other party submitting a higher or better offer at an auction. An auction was held in New York on March 3, 2003 with respect to the assets related to the Debtors' custom assemblies business. At the conclusion of the auction, the Debtors determined that the highest and best offer was a bid from Amphenol for $14.0 million. Following a sale hearing on March 7, 2003, orders approving the Sale Agreements were entered by the Bankruptcy Court on March 10, 2003. As of March 28, 2003, the Debtors had closed each of the five sale transactions.

## J. Motion for Appointment of Chapter 11 Trustee or Examiner

On March 5, 2003 the Creditors' Committee filed a motion seeking an order appointing a chapter 11 trustee or in the alternative an examiner with expanded powers pursuant to 11 U.S.C. §§ 1104(a) and (c) and 105(a) and Bankruptcy Rules 2007.1 and 9014 (the "Chapter 11 Trustee Motion"). On March 31, 2003, the Debtors filed an objection to the Chapter 11 Trustee Motion. As part of the Asset Reallocation and Settlement Agreement described herein, the Creditors' Committee withdrew the Chapter 11 Trustee Motion, with prejudice.

## K. Asset Reallocation and Settlement Agreement

Following extensive negotiations, the Debtors, the administrative agent for the Senior Lenders, the Creditors' Committee, the 12% Note Indenture Trustee and the 14% Note Indenture Trustee reached an agreement in principle on the terms of a global settlement which was subsequently refined and memorialized in a written agreement dated as of May 13, 2003 (the "Asset Reallocation and Settlement Agreement"). The Asset Reallocation and Settlement Agreement provides, among other things, for the final allowance of the Senior Lenders' Claims, treatment on account of the Senior Lenders' Claims and the Senior Lenders' consent to a reallocation of a portion of their collateral for the benefit of the holders of unsecured claims and administrative expense claims. The Agreement also sets forth a timeline for confirmation of a chapter 11 plan. The terms of the Asset Reallocation and Settlement Agreement were approved by the Bankruptcy Court by an order dated June 16, 2003.

Specifically, under the Asset Reallocation and Settlement Agreement, the Senior Lenders agreed, inter alia, to make funds available for a distribution to the unsecured creditors, including Noteholders, in exchange for certain releases and waivers from the Creditors' Committee and the Noteholders. The amount of distribution to be received by unsecured creditors under the Asset Reallocation and Settlement Agreement is reflected in the Plan as the "Unsecured Creditor Distribution Fund."

Pursuant to the Asset Reallocation and Settlement Agreement, the Unsecured Creditor Distribution Fund will include (i) $1.75 million of the net proceeds realized from the closing of the Going Concern Sales and (ii) the sale proceeds from the sale of various of the Debtors' real and personal property. In addition, the Asset Reallocation and Settlement Agreement provided that $250,000 plus 10% of the recoveries derived from certain litigation and tax claims not to exceed $750,000 in the aggregate, will be set aside to establish a "Creditor Trust" to investigate and pursue claims not specifically released under the Asset Reallocation and Settlement Agreement which are assertable by or on behalf of the Debtors or their estates for the benefit of unsecured creditors.

The Asset Reallocation and Settlement Agreement contains other provisions relating to the Plan, which are encompassed and incorporated into the Plan.

## ARTICLE V
## THE PLAN OF REORGANIZATION

### A. Introduction

The following summary and other descriptions in the Disclosure Statement are qualified in their entirety by reference to the provisions of the Plan and its exhibits, a copy of which is annexed hereto as Exhibit A. Each Holder of a Claim or Equity Interest is urged to carefully review the terms of the Plan. In the event of any inconsistency between the provisions of the Plan and the summary contained herein, the terms of the Plan shall govern. Moreover, all capitalized terms not otherwise defined in this Disclosure Statement shall have the meaning set forth in the Plan.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan and (iii) contains other provisions necessary to the reorganization or liquidation of the debtor. Under the Bankruptcy Code, "claims" and "equity interests" are classified rather than "creditors" and "shareholders" because such entities may hold claims or equity interests in more than one class. For purposes of the Disclosure Statement, the term "Holder" refers to the holder of a Claim or Interest, respectively, in a particular Class under the Plan.

A chapter 11 plan may specify that certain classes of claims or equity interests are either to be paid in full upon effectiveness of the plan or are to remain unchanged by the plan. Such classes are referred to as "unimpaired," and because of such favorable treatment the holders in such classes are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution or property or retain any claim against a debtor. Such classes are deemed to have rejected the plan and, therefore, need not be solicited to vote to accept or reject the plan.

## B. Rationale Underlying Plan Treatments of Claims

The central economic terms of the Plan are derived from the Asset Reallocation and Settlement Agreement among the Debtors, the Creditors' Committee, the Senior Lenders, the 12% Note Indenture Trustee and the 14% Note Indenture Trustee. The distributions contemplated by the Plan represent estimates of distributions accomplished through the compromise set forth in the Asset Reallocation and Settlement Agreement.

## C. Substantive Consolidation and Cancellation of Intercompany Claims

The Plan is premised upon the substantive consolidation of the Debtors' estates for the purposes of voting on, confirmation of and distributions under, the Plan. On the Effective Date: (a) all assets and liabilities of the Debtors shall be merged or treated as though they were merged into and with the assets and liabilities of each other Debtor; (b) all Intercompany Claims shall be eliminated and extinguished, and no distributions shall be made under the Plan on account of any Intercompany Claims; (c) any Claims against one or more of the Debtors based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Debtor shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to Distributions under the Plan only with respect to such single Claim; and (d) all allowed Claims against the Debtors shall be satisfied from the assets of a single consolidated estate. Substantive consolidation is an equitable remedy that a court may be asked to apply in chapter 11 cases involving affiliated debtors. As contrasted with procedural consolidation, substantive consolidation may affect the substantive rights and obligations of creditors and debtors. Substantive consolidation involves the pooling and merging of the assets and liabilities of the affected debtors; all of the debtors in the substantially consolidated group are treated as if they were a single corporate economic entity. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored. However, substantive consolidation does not affect the debtors' separate corporate existence or independent ownership of property for any purposes other than for making distributions of property under a plan of reorganization or otherwise as necessary to implement such plan.

The Plan constitutes a motion by the Debtors for the entry of an order providing for the substantive consolidation of the Debtors for Plan and Claim purposes. The Debtors posit that an adequate basis exists for the Bankruptcy Court to grant such relief for several reasons. First, the Debtors maintained and reported their financial information on a consolidated basis, filed consolidated tax returns and shared the same management at the highest levels of their corporate structure. Moreover, each of the Debtors other than Holdings is a wholly owned direct or indirect subsidiary of Holdings. In addition, the Debtors' schedules of liabilities indicate that each of the Debtors other than Holdings is jointly and severally liable for indebtedness incurred under the Credit Agreement. The Debtors believe that the obligations under the Credit Agreement will not be paid in full and satisfied. Accordingly, absent the substantive consolidation of the Debtors' estates (which is a prerequisite to the reallocation of assets for the benefit of unsecured creditors under the Asset Reallocation and Settlement Agreement) General Unsecured Claims would not be entitled to a distribution from the Debtors' estates.

Thus, the Debtors believe that substantive consolidation for purposes of the Plan is appropriate, will not materially advantage the interests of any creditor over the interests of any other and will not materially prejudice any of the Debtors' creditors. In fact, the use of substantive consolidation solely for purposes of calculating claims will facilitate an effective liquidation and foster similarity and fairness of treatment of creditors. In the event the Bankruptcy Court does not approve the substantive consolidation of all of the Debtors as set forth in the Plan, the Debtors reserve the right to modify the Plan as the Debtors, in their sole discretion, deem appropriate.

## D. Administrative Claims and Professional Fees

### 1. Administrative Claims

Unless the Holder of an Allowed Administrative Claim agrees to a different treatment, Allowed Administrative Claims shall be paid in Cash from proceeds of Excluded Assets, in accordance with the allocations therefore as set forth in the Asset Reallocation and Settlement Agreement and in the Wind Down Budget, as applicable.

On or before the Effective Date, the Debtors (in accordance with the Budget) shall pay in full the amount of Allowed Administrative Claims as of such date and shall fund the Administrative Claims Reserve Fund and the Creditor Trust shall pay each Administrative Claim in full, without interest and in Cash (except for Professional Fees to the extent that their treatment, which is set forth below, differs) when and to the extent the Administrative Claim is or becomes Allowed. The Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by such Holder and the respective Debtor.

Holders of Administrative Claims that arose on or before April 30, 2003 were required to file an Administrative Claim on or before May 15, 2003 (the First Administrative Bar Date) pursuant to the Bar Date Order. Holders of Administrative Claims that arose after April 30, 2003 that have not been paid as of the Effective Date must file a request for payment of Administrative Claims with the Bankruptcy Court and serve the same upon counsel to each of the Trustees such that it is received no later than 4 p.m. prevailing Eastern Time on the date that is 45 days after the Confirmation Date (the "Second Administrative Bar Date"). If an Administrative Claim (i) was not timely filed by the First Administrative Bar Date or (ii) arose after April 30, 2003 and is not timely filed by the Second Administrative Bar Date, as applicable, then such Administrative Claim shall be forever barred and shall not be enforceable against Debtors, their successors, their assigns or their property, the Administrative Claims Reserve Fund or the Creditor Trust. The foregoing shall not apply to the Professional Fee Claims. An objection to an Administrative Claim filed pursuant to this provision must be filed within ninety (90) days from the later of the date such Administrative Claim is filed and properly served or ninety (90) days after the Effective Date. The Debtors, the Creditors' Committee and the Trustees shall have the right to seek an extension of the time to object.

Subject to the provisions of the Plan and the Cash Collateral Order, and within the confines of the Budget, all reasonable fees for services rendered in connection with the Chapter 11 Cases and the Plan after the Effective Date, including those relating to the resolution of pending Claims, shall be paid by the Creditor Trust after the submission by the party seeking compensation of a monthly fee statement with service upon counsel to each of the Trustees and the Agents' counsel, provided that no objections are received within ten (10) days of such service. If no objections are received, the Trustees shall be authorized to pay such amounts requested without further Bankruptcy Court authorization. If any objections are received and such objections are not capable of being resolved between the parties in a timely manner, the Bankruptcy Court shall reserve jurisdiction to resolve such disputes.

## 2. Statutory Fees

Without limiting the foregoing, all fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date from the Budget. Payments after the Effective Date shall be made as required by statute and shall be paid by the Creditor Trust in accordance with the Budget.

## 3. Professional Fees

The Creditor Trust shall pay Professionals who are entitled to allowance of fees and reimbursement of expenses as of the Effective Date from the Creditor Trust Expense Fund as provided under the Asset Reallocation and Settlement Agreement.

The Bankruptcy Court must rule on each request for payment of Professional Fees before the fees will be paid, except as such fees have been paid pursuant to the Interim Compensation Order. For all Professional Fees, the Professional in question must file and serve a properly noticed fee application and the Bankruptcy Court must rule on the application. Only the amount of fees allowed by the Bankruptcy Court will be owed and required to be paid under the Plan; provided that nothing herein or in the Plan shall be deemed a waiver by the Professionals of the unpaid portions of their Allowed but unpaid Professional Fee Claims, nor shall anything herein or in the Plan abrogate or modify the terms of the Cash Collateral Order as such Order pertains to the payment of Allowed Professional Fees.

Except as otherwise provided by Bankruptcy Court order for a specific Professional, any Professional or other entity requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered prior to the Effective Date must file and serve, pursuant to the notice provisions of the Interim Compensation Order and the Bankruptcy Code, an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court and to the provisions of the Cash Collateral Order as such Order pertains to the payment of Allowed Professional Fees. Holders of Administrative Claims (including, without limitation, Professionals) requesting compensation or reimbursement of expenses that do not file such requests by the applicable bar date shall be forever barred from asserting such claims against the Debtors or their successors, their assigns or their property. Any objection to a Professional Fee Claim shall be filed on or before the date specified in the application for final compensation.

Notwithstanding anything in the Plan to the contrary, following the occurrence of the Effective Date, Professionals shall be authorized to retain any funds held on retainer for payment of fees and expenses authorized to be paid pursuant such Professionals' final applications for allowance of compensation and reimbursement of expenses and any retainer balance remaining after payment of allowed fees and expenses pursuant to such final applications shall promptly be remitted to the agent for the Senior Lenders. Notwithstanding the foregoing, Shearman & Sterling LLP, counsel for the Debtors, shall be authorized to continue to hold a retainer in the amount of $25,000 until the earlier of (i) six months after the Effective Date or (ii) entry of the Final Decree and shall be authorized without further order of the Bankruptcy Court to apply such retainer to fees and expenses incurred in connection with services rendered (x) in connection with the implementation of the Plan or (y) for, on behalf of, or at the request of the Debtors or the Creditor Trust on or after the Effective Date.

### 4. Success Fee/Transaction Fee

Pursuant to the retention agreement of Gleacher, the Debtors agreed to provide result-based compensation as described below.

Gleacher is entitled to receive a monthly advisory fee of $125,000 and a "Restructuring Fee" of $3 million upon the consummation of a "restructuring" of the Debtors (including any refinancing or recapitalization of existing indebtedness, conversion of debt to equity and any sale, merger or consolidation of the Debtors with another person or entity), with fifty percent (50%) of any monthly fees credited to the "Restructuring Fee." The Debtors consummated the sale of substantially all of their assets in March 2003. The Court entered an order approving payment of Gleacher's Restructuring Fee on August 20, 2003 and the Debtors paid this fee after entry of that order.

### E. Asset Reallocation and Settlement Agreement and Treatment of Unsecured Creditors

The Plan incorporates the terms of the Asset Reallocation and Settlement Agreement. The Debtors entered into that agreement because, in light of the amount of the Senior Lenders' Claims and their security interests in and liens upon substantially all of the Debtors' Assets and their entitlement to the Settlement Proceeds, Distributions to creditors holding Unsecured Claims would have been impossible absent the consent of the Senior Lenders to a reallocation of a portion of the Settlement Proceeds. Under the terms of the Asset Reallocation and Settlement Agreement, the Senior Lenders consented to the reallocation of a portion of the proceeds of their collateral for distribution to Holders of General Unsecured Claims and administrative expenses claims, and, in consideration therefore, the Creditors' Committee and Debtors agreed to waive and release the Senior Lenders from all claims.

The Excluded Assets (and proceeds thereof) reallocated to unsecured creditors are defined as the "Unsecured Creditor Distribution Fund" and the "Rights of Action Recovery" in the Plan. As provided in the order approving the Asset Reallocation and Settlement Agreement, the Senior Lenders' Claims are Allowed Claims, the Senior Lenders have agreed to waive any right to seek a deficiency Distribution on account of such Claims, and the Senior Lenders have also agreed to waive contractual subordination provisions relative to the Holders of the Senior Subordinated Notes who provide Noteholders Releases. Absent such waiver, the Holders of Senior Subordinated Notes would not be entitled to any distribution under the Plan.

### F. Classification and Treatment of Claims and Equity Interests Under the Plan

The Plan divides the Claims against, and the Equity Interests in, the Debtors into the following Classes:

### 1. Senior Lenders' Claims (Class 1) – Unimpaired

(a)     Classification: Class 1 consists of the Senior Lenders' Allowed Claims against the Debtors in the amount of $232,712,443.42.

(b)     Treatment: Holders of Allowed Class 1 Claims shall continue to receive the treatment set forth in the Asset Reallocation and Settlement Agreement and approved pursuant to the Final Order entered on June 16, 2003, including specifically, the receipt, for application to their Allowed Secured Claims, of (i) all Settlement Proceeds and (ii) to the extent Noteholder Releases are not obtained, an amount equal to the non-releasing Noteholder's Share of the amount of the Contributed Assets

(subject to certain exclusions), as set forth in Paragraph 4B of the Asset Reallocation and Settlement Agreement. The treatment of the Claims of the Senior Lenders set forth in the Asset Reallocation and Settlement Agreement is incorporated by reference in the Plan, but is in no way dependent upon the confirmation or consummation of the Plan. All Cash held by the Debtors for payment of line item expenditures under the Wind Down Budget that have already been paid or for which no further payment is required, together with all other Cash held by the Debtors not constituting Excluded Assets, shall be remitted directly to the Agent on or prior to the Effective Date and shall not vest in the Creditor Trust. All Cash held by the Debtors for payment of line item expenditures under the Wind Down Budget that have not been paid as of the Effective Date shall vest in the Creditor Trust for use in paying such line item expenditures, with any remaining balance to be remitted by the Creditors' Trustee promptly to the Agent once such expenditures have been paid or at such time as it appears that no further payments in respect of such expenditures will be required, but in any event no later than sixty (60) days following the Effective Date, with the exception of such line item expenditures that the Creditors' Trustee certifies in good faith may still require payment.

(c) <u>Voting</u>: Class 1 is, by agreement, an Unimpaired Class and Holders of Class 1 Claims are, therefore, not entitled to vote to accept or reject the Plan.

(d) <u>Projected Recovery</u>: The Debtors estimate that the projected recovery to Holders of Class 1 Claims will be approximately 25%.

**2. Other Secured Claims (Class 2) – Unimpaired**

(a) <u>Classification</u>: Class 2 consists of Secured Claims against the Debtors other than those Class 1 Secured Claims.

(b) <u>Treatment</u>: Unless the Holder of a Class 2 Claim agrees to a different treatment, each Holder of an Allowed Class 2 Claim shall receive on the Effective Date, either (i) the return of such Assets on which the Holder has a senior perfected and indefeasible lien or security interest, or (ii) all proceeds (up to the amount of the Allowed Class 2 Claim) from the sale, liquidation, or abandonment of any Asset on account of which the Holder has a senior, perfected and indefeasible Lien or security interest, including those proceeds of Going Concern Sales held by the Debtors to fund the Wind Down Budget (but solely to the extent that such Lien or security interest as of the Petition Date is senior in priority to any lien or security interest of the Senior Lenders on the same Asset) as full and complete satisfaction of all Class 2 Claims.

(c) <u>Voting</u>: Class 2 is an Unimpaired Class and Holders of Class 2 Claims are therefore not entitled to vote to accept or reject the Plan.

(d) <u>Projected Recovery</u>: The Debtors anticipate that the recovery under the Plan to Holders of Class 2 Claims will be 100%.

3. **Priority Claims (Class 3) – Unimpaired**

    (a)    <u>Classification</u>: Class 3 consists of Holders of Priority Claims specified under sections 507(a) and 502(f) of the Bankruptcy Code, including but not limited to priority tax Claims and priority wage Claims.

    (b)    <u>Treatment</u>: The Bankruptcy Code requires that each Holder of such an Allowed Priority Claim receive the present value of such Claim. On the Effective Date, each Holder of an Allowed Priority Class 3 Claim shall be entitled to receive Cash derived from Excluded Assets equal to the full amount of such Allowed Priority Claim, unless that Holder has agreed to a different treatment.

    (c)    <u>Voting</u>: Class 3 is an Unimpaired Class and Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

    (d)    <u>Projected Recovery</u>: The Debtors anticipate that the recovery under the Plan to Holders of Class 3 Claims will be 100%

4. **General Unsecured Claims (Class 4) – Impaired**

    (a)    <u>Classification</u>: Class 4 consists of the Unsecured Claims other than (i) the Noteholder Claims and (ii) the Term-C Loan Claims.

    (b)    <u>Treatment</u>: Unless the Holder of a Class 4 Claim agrees to a different treatment, each Holder of an Allowed Class 4 Claim shall receive, on each Distribution Date, Cash derived from Excluded Assets equal to its ratable share of (i) the Unsecured Creditor Distribution Fund available for Distribution on each such Distribution Date and (ii) the Rights of Action Recovery available for Distribution on each such Distribution Date. The distributions to be made to Holders of Class 4 Claims represent a reallocation from Holders of Claims in Class 1 pursuant to the Asset Reallocation and Settlement Agreement.

    (c)    <u>Voting</u>: Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

    (d)    <u>Projected Recovery</u>: The Debtors estimate that the projected recovery under the Plan to Holders of Allowed Unsecured Claims will be between 0.5% to 2%. This estimate is based on several assumptions, including the probable dollar amount of the proceeds from the Rights of Action Recovery and certain causes of action that the Creditor Trust may pursue, the probable amount of the Administrative Claims that will ultimately be Allowed and paid by the Debtors, and the probable total amount of Unsecured Claims that will be Allowed. Because of the volatility of these factors, the actual recovery by Holders of Unsecured Claims may be less than the Debtors' current estimate.

5. **Senior Discount Notes (Class 5) – Impaired**

    (a)    <u>Classification</u>: Class 5 consists of the Claims in respect of the Senior Discount Notes.

    (b)    <u>Treatment</u>: Each Holder of a Class 5 Claim that has provided or is deemed to have provided a Noteholder Release in accordance with the terms of the Plan shall receive, on each Distribution Date, Cash derived from Excluded Assets equal to its ratable share of (i) the Unsecured Creditor Distribution Fund available for Distribution on each such Distribution Date and (ii) the Rights of Action Recovery available for Distribution on each such Distribution Date from the Creditor Trust. In accordance with Paragraph 4B of the Asset Reallocation and Settlement Agreement and Section 14.9 of the Plan, the Senior Lenders' waiver of subordination rights shall not apply to any Holder of a Class 5 Claim that has elected not to grant such a Noteholder Release (which election may be made by checking the appropriate box on the ballot provided). With respect to any Holder of a Class 5 Claim that has elected not to grant such Release, (a) the Agent shall be paid an amount which equals the Noteholder's Share of the amount of Contributed Assets (exclusive only of the Contributed Assets described in Paragraph 3Aiii of the Asset Reallocation and Settlement Agreement and the Noteholder's pro rata portion of the Administrative Expense Carve Out), and (b) such Noteholder shall not receive any distribution, including, without limitation, any proceeds of recoveries obtained through the use of Contributed Assets described in Paragraph 3Aiii of the Settlement Agreement. The Distributions to be made to Holders of Class 5 Claims represent a reallocation from Holders of Claims in Class 1 pursuant to the Asset Reallocation and Settlement Agreement.

    (c)    <u>Voting</u>: Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

    (d)    <u>Projected Recovery</u>: The Debtors estimate that the projected recovery under the Plan to Holders of Allowed Senior Discount Notes will be between 0.5% to 2%. This estimate is based on several assumptions, including the probable dollar amount of the proceeds from the Rights of Action Recovery and certain causes of action that the Creditor Trust may pursue, the probable amount of the Administrative Claims that will ultimately be Allowed and paid by the Debtors, and the probable total amount of Senior Discount Notes that will be Allowed. Because of the volatility of these factors, the actual recovery by Holders of Senior Discount Notes may be less than the Debtors' current estimate.

6. **Senior Subordinated Notes (Class 6) – Impaired**

    (a)    <u>Classification</u>: Class 6 consists of the Claims in respect of the Senior Subordinated Notes.

    (b)    <u>Treatment</u>: Subject to the possible application of the subordination provisions of the 12% Note Indenture (as described in Article V,

Paragraph J(2) below), each Holder of a Class 6 Claim that has provided or is deemed to have provided a Noteholder Release in accordance with the terms of the Plan shall receive, on each Distribution Date, Cash derived from Excluded Assets equal to its ratable share of (i) the Unsecured Creditor Distribution Fund available for Distribution on each such Distribution Date and (ii) the Rights of Action Recovery available for Distribution on each such Distribution Date. In accordance with Paragraph 4B of the Asset Reallocation and Settlement Agreement and Section 14.9 of the Plan, the Senior Lenders' waiver of subordination rights shall not apply to any Holder of a Class 6 Claim that has elected not to grant such Noteholder Release (which election may be made by checking the appropriate box on the ballot provided). With respect to any Holder of a Class 6 Claim that has elected not to grant such Release, (a) the Agent shall be paid an amount which equals the Noteholder's Share of the amount of Contributed Assets (exclusive only of the Contributed Assets described in Paragraph 3Aiii of the Asset Reallocation and Settlement Agreement and the Noteholder's pro rata portion of the Administrative Expense Carve Out) and (b) such Holder of a Class 6 Claim shall not receive any Distribution, including, without limitation, any proceeds of recoveries obtained through the use of Contributed Assets described in Paragraph 3Aiii of the Asset Reallocation and Settlement Agreement. The Distributions to be made to Holders of Class 6 Claims represent a reallocation from Holders of Claims in Class 1 pursuant to the Asset Reallocation and Settlement Agreement.

(c)     Voting: Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

(d)     Projected Recovery: The Debtors estimate that the projected recovery to Holders of Allowed Senior Subordinated Notes will be between 0.5% to 2%. This estimate is based on several assumptions, including the probable dollar amount of the proceeds from the Rights of Action Recovery and certain causes of action that the Creditor Trust may pursue, the probable amount of the Administrative Claims that will ultimately be Allowed and paid by the Debtors, and the probable total amount of Senior Subordinated Notes that will be Allowed. Because of the volatility of these factors, the actual recovery by Holders of Senior Subordinated Notes may be less than the Debtors' current estimate. In the event the subordination provisions of the 12% Note Indenture (as described in Article V, Paragraph J(2) below) are determined to be applicable to distributions to Holders of Class 6 Claims, then the Debtors project that Holders of Class 6 Claims will not be entitled to any recovery under the Plan.

7.   **Term-C Loan Claims (Class 7) – Impaired**

(a)     Classification: Class 7 consists of the Claims of the Term-C Lenders under the Term-C Loan in the amount of $22,221,128.07.

(b)    Treatment: Unless the Debtors (or the Creditors' Committee on behalf of the Debtors) or Indenture Trustees have commenced an adversary proceeding or contested matter prior to the Confirmation Date seeking to subordinate or reclassify the Allowed Claims in Class 7, and subject to the last sentence of this paragraph (b), each Holder of an Allowed Class 7 Claim shall receive, on each Distribution Date, Cash derived from Excluded Assets equal to its ratable share of the Unsecured Creditor Distribution Fund available for Distribution on such Distribution Date and the Rights of Action Recovery available for Distribution on each such Distribution Date. If the Debtors (or the Creditors' Committee or Indenture Trustees) have commenced such an adversary proceeding or contested matter prior to the Confirmation Date, then the Allowed Class 7 Claims shall be Disputed Claims, and any Distribution otherwise payable to the Holders of Class 7 Claims shall be held in the Unsecured Creditor Disputed Claims Reserve pending the resolution of such adversary proceeding or contested matter by a Final Order. Any Distribution made under the Plan to Holders of Class 7 Claims represents a reallocation from Holders of claims in Class 1 pursuant to the Asset Reallocation and Settlement Agreement, however, such Distribution may remain subject to any intercreditor or other contractual arrangements with the Senior Lenders, to the extent applicable.

(c)    Voting: Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

(d)    Projected Recovery: The Debtors estimate that the projected recovery under the Plan on account of Allowed Term-C Loan Claims will be between 0.5% to 2%. This estimate is based on several assumptions, including the probable dollar amount of the proceeds from the Rights of Action Recovery and certain causes of action that the Creditor Trust may pursue, the probable amount of the Administrative Claims that will ultimately be Allowed and paid by the Debtors, and the probable total amount of Term-C Loan Claims that will be Allowed. Because of the volatility of these factors, the actual recovery on account of Term-C Loan Claims may be less than the Debtors' current estimate.

## 8.  Equity Interests (Class 8) – Impaired

(a)    Classification: Class 8 consists of all Equity Interests in the Debtors.

(b)    Treatment: All Equity Interests of each of the Debtors shall be cancelled on the Effective Date and Holders of such Equity Interests will not receive or retain any property or Distributions under the Plan.

(c)    Voting: Class 8 Equity Interests will receive no Distribution under the Plan and are, therefore, deemed to have rejected the Plan. Accordingly, Class 8 Equity Interests are not entitled to vote.

(d)    Projected Recovery: None.

### G. Effect of Confirmation of the Plan

#### 1. Vesting of Assets in the Creditor Trust

On the Effective Date, all Assets of the Debtors, including Excluded Assets (but excluding Cash remitted to the Agent pursuant to Section 4.2(b) of the Plan) shall vest in the Creditor Trust, with the Excluded Assets to be held by and separately accounted for as part of the Unsecured Creditor Series and all other Assets (including specifically Tax Refunds and the Star Litigation) to be held by and separately accounted for as part of the Senior Lender Series. Except to the extent expressly provided for in the Asset Reallocation and Settlement Agreement, the Plan or the Creditor Trust Agreement, the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of the Creditor Trust generally or the assets of the other Series, and the Budget (including Wind Down Budget) shall be allocable in accordance with the foregoing. The Unsecured Creditor Distribution Fund, the Administrative Claims Reserve Fund, the Creditor Trust Expense Fund, and the Rights of Action shall all be assets of the Unsecured Creditor Series; any other Assets (including the Star Litigation, Tax Refunds and any other Assets that will give rise to Settlement Proceeds) shall be part of the Senior Lender Series. The Excluded Assets in the Unsecured Creditor Series shall be managed and used for the sole purposes of achieving Consummation and carrying out the Plan and effectuating the Distributions provided for in the Plan provided, however, that, in accordance with and subject to the Asset Reallocation and Settlement Agreement and the Cash Collateral Order, any amounts included in the Wind Down Budget (other than the Reallocated Monies) that are not required to fund specific line item expenses for which such amounts were allocated, together with any other amounts to which the Agent is entitled under the Asset Reallocation and Settlement Agreement, shall be promptly remitted by the Unsecured Creditors' Trustee to the Agent for the benefit of the Senior Lenders. Notwithstanding anything herein to the contrary, in accordance with the Asset Reallocation and Settlement Agreement, the Agent's liens shall continue to attach to all Assets in the Creditor Trust other than Excluded Assets, including, without limitation, unliquidated Contributed Assets, the Star Services Litigation and all Tax Refunds and any amounts required to be remitted to the Agent due to the failure of any Noteholders to provide Noteholder Releases as provided for under the Plan. The unliquidated Assets held as part of the Senior Lender Series of the Creditor Trust (including the Star Litigation, Tax Refunds and the estate's interest in retainers or any other Assets that would give rise to Settlement Proceeds) shall be administered by the Senior Lenders' Trustee subject to the obligation to remit to the Unsecured Creditors' Trustee such amount as may be required by the Asset Reallocation and Settlement Agreement.

#### 2. Authority to Effectuate Plan

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Creditor Trust and the Trustees shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan and to effectuate the Distributions provided for under the Plan, subject to the provisions of the Plan, including Article VII. The Creditor Trust and the Trustees are expressly authorized to sell or dispose of any and all Excluded Assets and to pay all costs and expenses associated with such sale or disposition without further order of the Bankruptcy Court, subject to the provisions of the Asset Reallocation and Settlement Agreement, and of the provisions of the Plan, including Article VII.

#### 3. Dismissal of Officers and Directors and Dissolution of the Debtors and Board

Upon the Effective Date, (i) the existing Board of Directors of each Debtor and any remaining officer of any Debtor shall be dismissed and (ii) each of the Debtors shall be deemed dissolved without

any further action required on the part of the Debtors, the shareholders of the Debtors, or the officers or directors of the Debtors.

### 4. Dissolution of Creditors' Committee; Plan Oversight Committee

On the Effective Date, the Creditors' Committee will dissolve and its members will be released and discharged from all further duties and obligations arising from or related to the Chapter 11 Cases. The professionals retained by the Creditors' Committee and the members thereof will not be entitled to compensation or reimbursement of expenses for any services rendered other than in connection with the preparation of applications under sections 330 and 503 of the Bankruptcy Code.

On the Effective Date, the Plan Oversight Committee shall be created. The Plan Oversight Committee shall have overall direction and control of the liquidation of the Excluded Assets, prosecution, settlement and abandonment of Rights of Action and the prosecution and resolution of claims pursuant to the Plan and the terms of the Creditor Trust Agreement, and shall direct, oversee and control all of the activities of the Unsecured Creditors' Trustee. Persons who served as professionals to the Creditors' Committee prior to the Effective Date may also continue to serve as professionals to the Plan Oversight Committee and/or Unsecured Creditors' Trustee. With the approval of the Plan Oversight Committee and Unsecured Creditors' Trustee, a member of the Plan Oversight Committee may receive reimbursement of reasonable fees and expenses of such member's attorneys from the Excluded Assets allocable to the Unsecured Creditor Series of the Creditor Trust. This Plan Oversight Committee shall consist of any member of the Creditors' Committee that notifies the Unsecured Creditors' Trustee in writing of its intention to serve on the Plan Oversight Committee. The By-Laws of the Creditors' Committee as in effect on the Effective Date shall govern the proceedings of the Plan Oversight Committee subject to amendment by the Plan Oversight Committee. This Plan Oversight Committee shall be dissolved on the earlier of the Final Decree or the termination of the Creditor Trust, or pursuant to an order of the Court. In the event of the resignation of a member of the Plan Oversight Committee, the remaining members may, but need not, designate a successor from among the Holders of Class 4, 6 and 7 Claims. Unless and until such vacancy is filled, the Plan Oversight Committee shall function with such reduced membership. Neither the Plan Oversight Committee nor any of its members, nor any of its employees, professionals or agents, shall in any way be liable for any acts or for any acts of any of its members, except for acts undertaken in bad faith, willful misconduct or gross negligence, in the performance of their duties as members of the Plan Oversight Committee. The Unsecured Creditor Series of the Creditor Trust shall indemnify and hold harmless the Plan Oversight Committee, its members, and its professionals from and against any and all liabilities, expenses, claims, damages or losses incurred by them as a direct result of acts or omissions taken by them in their capacities as members or agents for the Plan Oversight Committee except for acts undertaken in bad faith, willful misconduct or gross negligence.

### 5. Late Claims Void

Unless otherwise expressly ordered by the Bankruptcy Court or otherwise provided by the Plan, any Claim filed after the Bar Date shall be void and of no force or effect. Unless otherwise expressly ordered by the Bankruptcy Court, any such late-filed Claim shall not be entered on the official claims register, shall be deemed disallowed and expunged and shall receive no distribution under the Plan.

### 6. Funding of Plan

The source of all Cash necessary to achieve entry of the Final Decree and to carry out the Plan shall be the Excluded Assets, including the Rights of Action Recovery.

## 7. Organization of the Debtors

On the Effective Date, the Equity Interests in the Debtors will be cancelled and the Creditor Trust shall succeed to all of the Debtors' right, title and interest in the Unsecured Creditor Distribution Fund and the Rights of Action.

## H. Provisions Governing Creditor Trust and Rights of Action

### 1. Creation of the Creditor Trust

On or before the Effective Date, (i) the Creditor Trust shall be created and established by the execution and delivery of the Trust Agreement and any other necessary action, subject to the provisions of the Asset Reallocation and Settlement Agreement and the Plan, and (ii) all Rights of Action and other Excluded Assets shall be transferred to the Unsecured Creditor Series of the Creditor Trust, free of all Claims, Liens and interests. The Creditor Trust shall reduce to Cash or otherwise liquidate the Rights of Action and other Excluded Assets and distribute such liquidated Assets in accordance with and subject to the terms and provisions of the Asset Reallocation and Settlement Agreement and the Plan. The costs and expenses incurred by the Unsecured Creditor Series of the Creditor Trust on and after the Effective Date shall be paid from the Creditor Trust Expense Fund. Upon entry of the Final Decree, the Creditor Trust shall be dissolved without further action by the Trustees. The costs and expenses incurred by the Senior Lender Series of the Creditor Trust shall be paid from the assets of the Senior Lender Series, including that portion of the Budget and Wind Down Budget allocable to the recovery of the Star Litigation and Tax Refunds.

As of the Effective Date, the Creditor Trust shall be responsible for (i) the winding up of the Debtors' Estates, (ii) liquidating or otherwise reducing to Cash the Excluded Assets in accordance with the Trust Agreement, (iii) filing, prosecuting and settling the Rights of Action, (iv) making Distributions to Holders of Allowed Claims, (v) complying with and carrying out the terms of the Asset Reallocation and Settlement Agreement, (vi) overseeing the continued liquidation to Cash of all other Assets (including the Star Services Litigation and the Tax Refunds) and promptly remitting to the Agent all Settlement Proceeds and all Cash (other than Cash which is proceeds of Excluded Assets), and (vii) settling, resolving and objecting to Claims. The Creditor Trust shall have the authority without further Bankruptcy Court approval to liquidate the Excluded Assets, to hire and pay reasonable professional fees and expenses of counsel and other advisors, to prosecute and settle objections to Disputed Claims, to pursue any preserved Rights of Action, and otherwise to take such other actions as shall be necessary to administer the Chapter 11 Cases and effect the closing of the Chapter 11 Cases; provided, however, that, to the extent reasonably practicable, the Star Services Litigation and the recovery of Tax Refunds shall continue to be administered in the same manner and by the same personnel and professionals (who may not be removed without the approval of the Senior Lenders' Trustee, with any replacement or successor to be subject to such Trustee's approval) and any settlement, compromise or other proposed resolution of the Star Services Litigation or any Tax Refund shall require the prior written approval of the Senior Lenders' Trustee.

The beneficial interests in the Creditor Trust are not transferable.

### 2. The Trustees

Five (5) days prior to the Confirmation Hearing, the Creditors' Committee shall select one Person to serve as the Unsecured Creditors' Trustee and the Agent shall select one person that is a resident of Delaware to serve as the Senior Lenders' Trustee, and each shall file a notice of such selection with the Bankruptcy Court. The Trustees, once appointed by the Bankruptcy Court, shall act as co-Trustees on

behalf of the Creditor Trust to carry out their obligations and exercise their rights in accordance with, and subject to, the Plan, the Confirmation Order and the Asset Reallocation and Settlement Agreement. The Trustees shall be compensated on a per hour basis plus actual out-of-pocket expenses as set forth in the Trust Agreement and shall not be required to file a fee application to receive compensation. Any objection to the designation of the Trustees shall be raised at the Confirmation Hearing. The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitration or other action or proceeding shall be commenced against the Trustees in their official capacity, with respect to their status, duties, powers, acts or omissions as Trustees in any forum other than the Bankruptcy Court. The Trustees shall be vested with the rights, powers and benefits set forth in the Trust Agreement, which shall include, without limitation, all rights, powers, and benefits afforded to a "trustee" under sections 704 and 1106 of the Bankruptcy Code. The Unsecured Creditors' Trustee shall be subject to the directions of the Plan Oversight Committee and the Senior Lenders' Trustee shall be subject to the direction of the Agent. Subject to the provisions of the Trust Agreement, the Trustees shall be entitled to hire such professionals as they deem necessary to assist them in carrying out their duties, with the fees and expenses of such professionals to be borne by the Creditor Trust Expense Fund, in the case of professionals retained by the Unsecured Creditors' Trustee, and by the assets of the Senior Lender Series, in the case of the Senior Lenders' Trustee.

### 3. The Rights of Action

In accordance with the Plan, the Unsecured Creditors' Trustee shall be authorized and empowered to pursue and prosecute, to settle, or to decline to pursue, the Rights of Action, including all pending adversary proceedings and contested matters, whether or not such causes of action have been commenced prior to the Effective Date, and shall be substituted as the real party in interest in any such action, commenced by or against the Debtors, Debtors' Estates or Creditors' Committee. The Unsecured Creditors' Trustee may settle, release, sell, assign, otherwise transfer or compromise such Rights of Action, in the Unsecured Creditors' Trustee's business judgment, subject to the provisions of the Plan without Bankruptcy Court approval.

Except as otherwise set forth in the Plan, but subject in all respects to the Asset Reallocation and Settlement Agreement, the Unsecured Creditors' Trustee may, but shall not be required to, set-off against any Claim and the Distributions to be made pursuant to the Plan in respect of such Claim, any Rights of Action the Estates may have against the Holder of the Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Unsecured Creditors' Trustee of any such Rights of Action, set-off or recoupment which the Debtors may have against such Holder.

### 4. Limitation of Liability for the Trustees

Subject to any applicable law, the Trustees will not be liable for any act the Trustees may do or omit to do in that capacity, while acting in good faith and in the exercise of reasonable judgment. The Trustees will not be liable in any event except for gross negligence, fraud or willful misconduct. This limitation on liability will apply equally to the agents, staff and professionals of the Trustees on behalf of the Trustees in the fulfillment of the Trustees' duties.

## I. Procedures for Resolving Objections to Claims

### 1. Prosecution of Objections to Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as set forth in the Plan, the Creditor Trust shall have the right to make and file objections to Unsecured Claims,

Administrative Claims, Other Secured Claims and Priority Claims; provided that the Creditor Trust will not have the right, power or authority to pursue the Released Claims. The Creditor Trust shall have the right to prosecute objections to Claims previously filed by the Debtors.

Unless another time is set by order of the Bankruptcy Court, all objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made by the later of (a) ninety (90) days after the Effective Date; or (b) ninety (90) days after a timely Proof of Claim or request for payment with respect to such Claim is filed; provided, however, that the Creditor Trust may seek an extension of such time to object.

Except as expressly set forth in the Plan or the Asset Reallocation and Settlement Agreement, nothing in the Plan, the Disclosure Statement, the Confirmation Order or any order in aid of confirmation of the Plan, shall constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that Debtors had immediately prior to the commencement of the Chapter 11 Cases, against or with respect to any Claim or Equity Interest. Except as set forth in the Plan or the Asset Reallocation and Settlement Agreement, upon confirmation of the Plan, the Debtors shall have, retain, reserve and be entitled to assert all such claims, causes of action, rights of setoff and other legal or equitable defenses of the Debtors, which shall be vested in and assigned to the Creditor Trust as of the Effective Date.

## 2. Estimation of Claims

The Creditor Trust may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Creditor Trust previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Creditor Trust may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

## 3. Allowance of Claims and Equity Interests

(a)     Disallowance of Claims: Pursuant to sections 105 and 502(d) of the Bankruptcy Code, no Distributions will be made to Holders of Claims held by Entities from which property is recoverable under section 542, 543, 550, 553, 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code (including the Rights of Action) until such time as such causes of action against that Entity have been settled or resolved by a Final Order and all sums due to the respective Debtor or the Creditor Trust have been turned over to the Debtors or the Creditor Trust.

(b)     Allowance of Claims: Except as expressly provided in the Plan or Asset Reallocation and Settlement Agreement, no Claim shall be deemed Allowed by virtue of the Plan, confirmation of the Plan, or any order of the Bankruptcy Court in the Chapter 11 Cases, unless and until such Claim is deemed Allowed under the Bankruptcy Code.

(c)    No Distribution Pending Allowance:  If any Claim is a Disputed Claim, no Distribution provided under the Plan shall be made on account of such Claim unless such Claim becomes an Allowed Claim.

## J.  Provisions Regarding Distributions

### 1.  Distribution to Creditors

Subject to the provisions of the Asset Reallocation and Settlement Agreement and any Final Order, the Creditor Trust will make Distributions to all Allowed Claim Holders in accordance with the terms of the Plan; provided that the Indenture Trustees are designated as disbursing agents for purposes of effecting Distributions to the respective Noteholders as of the Record Date pursuant to the Plan (without requirement of surrender of the certificates evidencing the Senior Notes) and the Indenture; and provided further that the Agent is designated as disbursing agent for purposes of payments to the Senior Lenders remitted by the Creditor Trust in accordance with the Asset Reallocation and Settlement Agreement. All Distributions shall be made by the Creditor Trust, the Indenture Trustees, the Senior Lenders' Trustee and/or the Agent without any requirement for bond or surety with respect thereto. Any reference to the "Creditor Trust" in respect of (i) Distributions to be made to the Noteholders shall be deemed to refer to the respective Indenture Trustees or their nominees, designees or affiliates, and (ii) payments to be made to the Senior Lenders shall be deemed to refer to the Agent or its nominee, designee or affiliate. All Distributions to be made to the Noteholders under the Plan shall be made to the Indenture Trustees in accordance with the respective Indenture, applicable law, and the Plan, and the Indenture Trustees shall, as soon as reasonably practicable, in accordance with the 14% Note Indenture and the 12% Note Indenture, applicable law and the Plan, deliver the Distributions, subject to provisions and priorities established under the Indentures and the rights of the appropriate Indenture Trustee to assert its Charging Lien against such distribution, to the respective Noteholders as provided herein and the respective Indentures. All payments to be made to the Senior Lenders under the Asset Reallocation and Settlement Agreement, as incorporated by the Plan, shall be made to the Agent.

### 2.  Effect of Contractual Subordination Provisions

Under the terms of the Asset Reallocation and Settlement Agreement, the Senior Lenders agreed to waive and relinquish any right or entitlement to recovery or distributions on their allowed unsecured deficiency claims and, effective upon the receipt of the releases described in Paragraph 4B of the Asset Reallocation and Settlement Agreement from the holders of the Senior Subordinated Notes and the Senior Discount Notes, further agreed to waive any enforcement of their contractual subordination rights vis-à-vis the holders of the Senior Subordinated Notes and their structural subordination rights vis-à-vis the holders of the Senior Discount Notes in order to effectuate the reallocation and distributions set forth in Paragraph 3 of the Asset Reallocation and Settlement Agreement, with such sharing and reallocation expressly conditioned upon and subject to the provisions of Paragraph 4B of the Asset Reallocation and Settlement Agreement.

Paragraph 4B of the Asset Reallocation and Settlement Agreement provides that whether the Contributed Assets are distributed under a Plan or otherwise, it shall be a condition both (i) to the receipt of any Contributed Assets and any other distributions of any kind and howsoever generated, (such as, by way of example, recoveries obtained by the Creditor Trust), by any Noteholder and (ii) to the waiver by the Senior Lenders, as to any Noteholder, of the Senior Lenders' contractual subordination rights in respect of the Senior Subordinated Notes and structural subordination rights vis-à-vis the holders of the Senior Discount Notes, either that such Noteholder has provided the Agent and Senior Lenders with a release of the Noteholder Claims in a form reasonably satisfactory to the Agent, or that the Bankruptcy

Court has determined, in a final order, that the Noteholder Claims have been deemed released as to such Noteholder.

The Senior Lenders' waiver of subordination rights shall not apply to any Noteholder who elects not to grant or who is not deemed to have granted such release. With respect to any Noteholder that shall not have granted or is not deemed to have granted such release, (a) the Agent shall be paid the amount which equals the Noteholder's Share (as defined below) of the amount of Contributed Assets, exclusive of (x) the Contributed Assets described in Paragraph 3(A)(iii) of the Asset Reallocation and Settlement Agreement, and (y) the pro rata portion of the Administrative Expense Carve Out allocable to such non-releasing Noteholder (which shall be an amount equal to the Noteholder's Share of the Administrative Expense Carve Out), and (b) such Noteholder shall not receive any distributions from the estates, including any proceeds of recoveries obtained through the use of Contributed Assets described in Paragraph 3(A)(iii) of the Asset Reallocation and Settlement Agreement, with distributions instead to be reallocated, pursuant to a confirmed Plan or other order of the Bankruptcy Court, among the allowed claims of other Unsecured Creditors. "Noteholder's Share" shall mean the ratio of the allowed claims of such non-releasing Noteholder to the allowed claims of all Unsecured Creditors.

In accordance with the terms of the Asset Reallocation and Settlement Agreement, the Senior Lenders' waiver of subordination rights vis-à-vis the Noteholders does not constitute a waiver of any subordination rights by the Term-C Lenders. The Term-C Loan constitutes "Senior Debt" as defined under the 12% Note Indenture. Pursuant to Section 13.01 of the 12% Note Indenture, payments to holders of the Senior Subordinated Notes are "expressly subordinate and subject in right of payment to the prior payment in full of all Senior Debt of the Company." Pursuant to Section 13.02 of the 12% Note Indenture, in the event of any insolvency or bankruptcy of Insilco Technologies, Inc., "the holders of all Senior Debt of the Company shall first be entitled to receive payment in full of the principal of (and premium, if any), interest on and all other Obligations in respect of such Senior Debt . . . before the holders of the [Senior Subordinated Notes] are entitled to receive any payment or distribution of any kind or character from the Company . . . ." Section 13.02 of the 12% Note Indenture further provides that in the event any payment is made by Insilco Technologies, Inc. to any holder of a Senior Subordinated Note, then such payment "shall be paid over or delivered forthwith to the holders of Senior Debt for application to the payment of such Senior Debt remaining unpaid, to the extent necessary to pay such Senior Debt in full . . . ."

Application of the foregoing subordination provisions pursuant to Bankruptcy Code section 510(a) could result in the holders of Senior Subordinated Notes remaining contractually subordinated to the Term-C Lenders. In such event, notwithstanding the waiver of the subordination provisions by the Senior Lenders in favor of the Noteholders under the Asset Reallocation and Settlement Agreement, the holders of Senior Subordinated Notes would not receive any distribution under the Plan unless and until distributions on account of the Term-C Lenders' claims have been fully funded or such claims have been otherwise addressed. However, because the Distributions to Holders of Senior Subordinated Notes are funded by the reallocation of the Senior Lenders' collateral pursuant to the Asset Reallocation and Settlement Agreement, and are not funded directly by Insilco Technologies, Inc. or any of the other Debtors, the subordination provisions under the 12% Note Indenture may not be applicable to such Distributions. Additionally, any Distributions on account of the Term-C Lenders' Claims may remain subject to intercreditor and other contractual arrangements with the Senior Lenders, as applicable, which are not modified by the Plan.

### 3. Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, or as may be ordered by the Bankruptcy Court, for those Claims that are Allowed as of the Initial Distribution Date and are entitled to receive Distributions

under the Plan, Distribution shall be made on the Initial Distribution Date (or as soon thereafter as is practicable) by the Unsecured Creditors' Trustee; provided, however, that all payments required to be made to the Agent on behalf of the Senior Lenders under the Asset Reallocation and Settlement Agreement shall promptly be made, pursuant to and in accordance with the terms of the Asset Reallocation and Settlement Agreement, without regard to the Distribution Dates and Distribution mechanisms set forth in the Plan. Distributions on account of Claims that become Allowed after the Initial Distribution Date shall be made by the Unsecured Creditors' Trustee pursuant to the provisions of the Plan.

### 4. Unsecured Disputed Claims Reserve

The Creditor Trust shall maintain, in accordance with the Creditor Trust's powers and responsibilities under the Plan and the Trust Agreement, the Unsecured Disputed Claims Reserve. Any Distribution to a Holder of a Disputed Unsecured Claim that has not been resolved by Final Order as of the Effective Date shall be made by the Unsecured Creditors' Trustee as soon as reasonably practicable when and if a Final Order resolves such Claim, which Claim if Allowed shall be treated as if it had been Allowed as of the Effective Date. To the extent that a portion or all of the funds in the Unsecured Disputed Claims Reserve are no longer necessary to cover Disputed Unsecured Claims, such funds shall be promptly released to the Creditor Distribution Fund.

### 5. Time and Manner of Payments

Any payment in Cash shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

### 6. Delivery of Distributions

Subject to the provisions of Bankruptcy Rule 2002(g) and except as otherwise provided under the Plan, Distributions to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address set forth on proofs of claim filed by such Holders, or if the Debtors or the Creditor Trust have been notified in writing of a change of address. All payments on account of the Allowed Claims of the Class 1 Senior Lenders shall be made to the Agent at the address set forth in the proof of claim filed by the Agent.

### 7. Undeliverable Distributions

(a)    Holding of Undeliverable Distributions: If any Distribution to any Holder of an Allowed Unsecured Claim is returned to the Debtors as undeliverable, no further Distributions shall be made to such Holder unless and until the Trustee is notified, in writing, of such Holder's then-current address. Subject to Section 9.6(b) of the Plan, undeliverable Distributions shall remain in the possession of the Creditor Trust until such time as a Distribution becomes deliverable. All persons ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind based upon the delay in receipt. Nothing contained in the Plan shall require the Creditor Trust to attempt to locate any Holder of an Allowed Claim. Notwithstanding the foregoing, the Indenture Trustees shall deliver the distributions in accordance with their respective Indentures.

(b)    <u>Failure to Claim Undeliverable Distributions</u>: Within ten (10) Business Days after the first anniversary of the first Distribution under the Plan, the Creditor Trust shall file a list with the Bankruptcy Court setting forth the names of those Entities for which Distributions have been attempted under the Plan and have been returned as undeliverable as of the date thereof. Any Holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a Distribution within two (2) months from and after the filing of such list shall have its Claim for such undeliverable Distribution discharged and shall be forever barred from asserting any such Claim against the Debtors or the Creditor Trust. In such case, any consideration held for Distribution on account of such Claim shall revert to the Creditor Trust for Distribution to the beneficiaries in accordance with the terms of the Plan. Notwithstanding the foregoing, the Indenture Trustees shall deliver the distributions in accordance with their respective Indentures.

(c)    <u>Fractional Amounts, De Minimis Distributions</u>: Notwithstanding anything contained herein or in the Plan to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. The Creditor Trust, as successor to the Debtors shall have the discretion not to make payments of less than twenty-five ($25) on account of any Allowed Unsecured Claim, unless a specific request is made in writing to the Debtors and/or the Creditor Trust on or before ninety days after allowance of such Claim. In addition, after the first Distribution Date, the Creditor Trust shall not be required to make any Distribution on account of any Claim in the event that the costs of making such Distribution payment exceed the amount of such Distribution payment, and all cash that otherwise would have been distributed to the Holders of such de minimis claims shall otherwise be distributed in accordance with the terms of the Plan.

## 8. Compliance with Tax Requirements/Allocation

In connection with the Plan, to the extent applicable, the Trustee in making Distributions under the Plan shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Trustee may withhold the entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides to the Trustee the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Trustee to the appropriate authority. If the Holder of an Allowed Claim fails to provide to the Trustee the information necessary to comply with any withholding requirements of any governmental unit within six months after the date of first notification by the Trustee to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then the Holder's Distribution shall be treated as an undeliverable Distribution in accordance with the Plan.

The Creditor Trust shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to applicable withholding and reporting requirements. For tax purposes, Distributions received in respect of Allowed

Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

### 9. Time Bar to Cash Payments

Checks issued by the Creditor Trust on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Creditor Trust by the Holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made on or before the later of (a) the first anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final Distribution under the Plan on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the right to moneys from the voided checks shall revert to the Creditor Trust for Distribution in accordance with the Plan.

### 10. Set-Offs

The Creditor Trust, as successor to the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account thereof (before any Distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Debtors may hold against the Holder of such Allowed Claim. The Holders of Claims may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off any Allowed Claims such Holder possesses against any claim, rights or causes of action of any nature that the Creditor Trust, as successor to the Debtors, may hold against such Holder. Neither the failure to effect such a set-off nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or such Holders of any such claims, rights and causes of action that such parties may possess under section 553 of the Bankruptcy Code.

## K. Executory Contracts and Unexpired Leases

### 1. Rejection of Executory Contracts and Unexpired Leases

Any executory contracts or unexpired leases which have not expired by their own terms on or prior to the Effective Date, which have not been assumed and assigned or rejected with the approval of the Bankruptcy Court, which are not the subject of (i) a motion to assume the same pending as of the Effective Date, or (ii) not otherwise listed in a notice that the Debtors shall file and serve ten (10) days before the Confirmation Date,[3] shall be deemed rejected by the Debtors on the Effective Date or as otherwise agreed upon by the parties. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### 2. Rejection Damage Claims

Notwithstanding anything in the Bar Date Order to the contrary, Claims, if any, arising out of the rejection of executory contracts or unexpired leases rejected as of the Effective Date pursuant to the Plan must be filed and served on the Creditor Trust pursuant to the procedures specified in the Confirmation Order or another order of the Bankruptcy Court, no later than thirty (30) days after the Effective Date. Any claim not filed within such time will be forever barred from assertion against the Creditor Trust, the

---

[3] The Debtors shall serve the notice via regular mail upon the (i) affected contract counter-parties, (ii) parties that have requested notice pursuant to Rule 2002, (iii) counsel to the Lenders, (iv) counsel to the Creditors' Committee and (v) the US Trustee.

Debtors, their estates, their respective successors or their respective properties. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as Unsecured Claims under the Plan.

## L. Conditions Precedent

### 1. Conditions Precedent to Confirmation Date of the Plan

The occurrence of the Confirmation Date shall be subject to the entry of the Confirmation Order in form and substance reasonably acceptable to Debtors, Creditors' Committee and Agent.

### 2. Conditions Precedent to Effective Date of the Plan

The occurrence of the Effective Date is subject to satisfaction of the following conditions precedent:

(a) <u>Confirmation Order as Final Order</u>: The Confirmation Order shall, in form and substance reasonably acceptable to Debtors, Creditors' Committee and Agent, be a Final Order in full force and effect and shall not have been amended, modified, stayed or reversed.

(b) <u>Execution of Documents; Other Actions</u>: All other actions and documents necessary to implement the Plan shall have been effected or executed.

(c) <u>Ability to Meet Projected Cash Needs</u>: The Debtors shall have sufficient Cash and Assets to permit compliance with the terms and conditions of the Plan, including the satisfaction of all the projected fees and expenses of the Creditor Trust and the projected fees, expenses and wind down costs of the Debtors.

(d) <u>Creditor Trust</u>: The Creditor Trust shall have been created pursuant to the terms of the Plan and the Bankruptcy Court shall have approved the identity and appointed the Trustees and the Creditor Trust Agreement in form and substance acceptable to the Creditors' Committee and the Agent.

## M. Retention of Jurisdiction

### 1. Retention of Jurisdiction

Except as provided in the Plan, the Bankruptcy Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code or arising in or related to the Chapter 11 Cases including interpretation and implementation of the Plan. The Bankruptcy Court shall also have exclusive jurisdiction:

(a) to resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any of the Debtors was or is a party or with respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the

amendment after the Effective Date of the Plan, to add any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be rejected;

(b)  to enter such orders as may be necessary or appropriate to implement, interpret or enforce the provisions of the Plan and any contracts, instruments, releases, transactions and other agreements or documents created in connection with the Plan;

(c)  to determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Creditor Trust after the Effective Date (to the extent such venue is selected by the Creditor Trust);

(d)  to ensure that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

(e)  to hear and determine any timely objections to Administrative Claims or to proofs of Claims and Equity Interests filed, both before and after the Effective Date, including any objections to the classification of any Claim or Interest, and to allow, disallow, reduce, modify, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

(f)  to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

(g)  to issue orders in aid of execution of the Plan;

(h)  to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(i)  to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

(j)  to hear and determine disputes arising in connection with or relating to the Plan, the interpretation, implementation or enforcement of the Plan, or the extent of any Entity's obligations incurred in connection with or released under the Plan;

(k)  to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation or enforcement of the Plan;

(l)  to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order or

any contract, instrument, release or other agreement or document created in connection with the Plan or the Disclosure Statement;

(m) to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(n) to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

(o) to hear and determine any matters that may arise in connection with the sales of the Debtors' Assets or any order of the Bankruptcy Court with respect thereto;

(p) to determine matters that may arise in connection with the Creditor Trust or the Trust Agreement;

(q) to determine and hear any actions or controversies by or against Trustees or Plan Oversight Committee; and

(r) to hear and determine any matter relating to or arising out of any action or act taken or omission in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, including, without limitation, the Asset Reallocation and Settlement Agreement, or any other act or omission taken or to be taken in connection with the Chapter 11 Cases commenced against any party in the Chapter 11 Cases, including, without limitation, the Creditor Trust, the Debtors, the Creditors' Committee, the Lenders and their respective current and former directors and officers, members, agents, advisors, attorneys, advisors and other professionals and Entities employed pursuant to sections 327 and 1103 of the Bankruptcy Code.

## N. Modification of Plan

Subject to obtaining the approval of the Creditors' Committee and the Agent, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order. Upon entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Claimants that have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim.

## O. Revocation or Withdrawal

The Plan may be revoked or withdrawn by the Debtors prior to the Confirmation Date. If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any claims by the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

## P. Injunction

Except as otherwise expressly provided in the Plan and the Asset Reallocation and Settlement Agreement, all Entities who have held, hold or may hold Claims or Equity Interests are permanently enjoined, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against the Debtors, their estates, the Trustees or the Creditor Trust; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their estates, the Trustees or the Creditor Trust; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their estates, the Trustees, the Creditor Trust or against the property or interests in property of any of the foregoing Entities; and (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the Debtors or against the property of the Debtors, their estates, the Trustees or the Creditor Trust with respect to any such Claim or Interest; **provided** that except with respect to the Released Claims, nothing contained in the Plan or the Confirmation Order shall prohibit or restrain the prosecution of any Claims or Rights of Action against the Debtors' present or former directors and officers or Holders of Equity Interests based on acts, events or omissions occurring before the Petition Date.

## Q. Exculpation and Limitation of Liability

None of the Agent, the Debtors, the Creditor Trust, the Trustees, the Creditors' Committee, the Senior Lenders or the Indenture Trustees, nor any of their respective present of former members, officers, directors, employees, advisors, or attorneys shall have or incur any liability to any holder of a Claim or Equity Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, including, without limitation, the Asset Reallocation and Settlement Agreement, the formulating, negotiating or implementing of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct, and in all respects such parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities in the Chapter 11 Cases and under the Plan.

Notwithstanding any other provision of the Plan, no holder of a Claim or Equity Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Creditor Trust, the Trustees, any of the Debtors, any statutory committee, the Agent, the Senior Lenders or any of their respective present or former members, officers, directors, employees, advisors or attorneys, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing the Asset Reallocation and Settlement Agent and the Plan, the consummation of the Plan, the confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except to the extent such right of action arises from any such party's gross negligence or willful misconduct.

The Creditor Trust shall indemnify each person exculpated pursuant to Section 14.10 of the Plan against, hold each such person harmless from, and reimburse each such person for, any and all losses, costs, expenses (including attorneys' fees and expenses), liabilities and damages sustained by such person arising from any liability described in Section 14.10(a) of the Plan.

## R. Indemnification

The Creditor Trust shall indemnify and hold harmless (i) the Trustees, (ii) the Plan Oversight Committee, and (iii) all professionals retained by the Trustees or the Plan Oversight Committee (collectively, the "Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Debtors or the implementation or administration of the Plan, if the Indemnified Parties acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Debtors, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful; provided, however, that the Unsecured Creditor Series of the Creditor Trust shall be exclusively responsible (and the Senior Lender Series shall have no obligation) for such indemnity as it relates to the Unsecured Creditors' Trustee, the Plan Oversight Committee and all professionals retained by either. To the extent the Creditor Trust indemnifies and holds harmless the Indemnified Parties comprised of the Unsecured Creditors' Trustee, the Plan Oversight Committee or their professionals, as provided above, the legal fees and costs related to the defense of such claims giving rise to the right of indemnification shall be paid out of the Rights of Action Recovery. The Senior Lender Series shall be exclusively responsible (and the Unsecured Creditor Series shall have no obligation) for the foregoing indemnity as it relates to the Senior Lender Trustee, the Agent and all professionals retained by either.

## S. Releases

Pursuant to the Asset Reallocation and Settlement Agreement and Section 14.9 of the Plan, the Debtors and the Creditors' Committee, on behalf of themselves and the estates of the Debtors, and each of their respective predecessors, successors and assigns, released the Agent and each of the Senior Lenders from any and all actions, causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liabilities, claims, damages, losses, controversies, trespasses, remedies, defenses, set-offs, cost or expense of any nature whatsoever, known or unknown, fixed or contingent, which the parties to the Asset Reallocation and Settlement Agreement have had, now have, or may hereafter have against each other, by reason of any matter, cause or thing whatsoever, from the beginning of time through and to the earlier of (i) the date on which Bankruptcy Court entered a final and non-appealable order approving the Asset Reallocation and Settlement Agreement, or (ii) the date on which the Bankruptcy Court enters a final and non-appealable order confirming a plan of liquidation proposed by the Debtors which incorporates the terms of or is otherwise consistent with the Asset Reallocation and Settlement Agreement and is in form and substance reasonably acceptable to the Senior Lenders. The Bankruptcy Court entered an order approving the Asset Reallocation and Settlement Agreement on June 16, 2003, rendering effective the releases of the Agent and the Senior Lenders granted therein by the Debtors and the Creditors' Committee.

Pursuant to the Asset Reallocation and Settlement Agreement and Section 14.9 of the Plan, the 12% Note Indenture Trustee and the 14% Note Indenture Trustee, and each of their respective predecessors, successors and assigns agreed to use their reasonable best efforts either to obtain authority under their respective indenture or pursuant to the Bankruptcy Code to cause their respective constituencies to fully waive and release the Agent and each of the Senior Lenders from any and all manner of actions, causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liabilities, claims, damages, losses, controversies, trespasses, remedies, defenses, set-offs, cost or expense of any nature whatsoever, known or unknown, fixed or contingent, which the parties have had, now have, or may hereafter have against each other, by reason of any matter, cause or thing whatsoever, from the beginning of time through and to the to

the earlier of (i) the date on which Bankruptcy Court enters a final and non-appealable order approving the Asset Reallocation and Settlement Agreement, or (ii) the date on which the Bankruptcy Court enters a final and non-appealable order confirming a plan of liquidation proposed by the Debtors which incorporates the terms of or is otherwise consistent with the Asset Reallocation and Settlement Agreement and is in form and substance reasonably acceptable to the Senior Lenders, relating to or concerning in any way the Debtors, the Credit Agreement, the Senior Subordinated Notes and the Senior Discount Notes. The 12% Note Indenture Trustee and the 14% Note Indenture Trustee have not obtained authority under their respective indentures to effectuate the releases contemplated by the Asset Reallocation and Settlement Agreement. The Debtors anticipate that these releases will be implemented through confirmation of the Plan.

The releases contained in the Asset Reallocation and Settlement Agreement and Section 14.9 of the Plan also apply to DLJ Capital Funding, Inc., DLJ Merchant Banking Partners II, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Offshore Partners II, C.V., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., DLJ EAB Partners, L.P., DLJ Millennium Partners, L.P., DLJ ESC II, L.P., DLJ Millennium Partners-A, L.P. and Donaldson, Lufkin and Jenrette Securities Corporation (collectively, the "DLJ Entities") but only in respect of the Term-C Loans under the Credit Agreement and notwithstanding anything to the contrary in the Asset Reallocation and Settlement Agreement, the DLJ Entities have not otherwise been released or deemed released.

Subject to the terms of the Asset Reallocation and Settlement Agreement and Section 14.9 of the Plan, the Agent and the Senior Lenders waived any and all interest in and claims that each of them have or may have against the Contributed Assets and Avoidance Actions.

Subject to the terms of the Asset Reallocation and Settlement Agreement and Section 14.9 of the Plan and in consideration for the agreement set forth on the Asset Reallocation and Settlement Agreement and the Benefits and services provided by the Released Employees, the Debtors, the Creditors' Committee, the Agent and the Lenders, on behalf of themselves and the estates of the Debtors, and each of their respective predecessors, successors and assigns, released all avoidance claims and causes of action arising under chapter 5 of the Bankruptcy Code or otherwise relating to or concerning the conversion from recourse to non-recourse of certain loans and the deferred payment of certain bonuses, in an aggregate amount not to exceed $250,000, in respect of the following employees of the Debtors: Michael Elia, Fred Stewart, Steve Crea and Phil Pittman.

## T. Discharge

Consistent with section 1141(d)(3) of the Bankruptcy Code, the Plan does not grant the Debtors a discharge. Notwithstanding the foregoing, except as otherwise provided in the Plan, (1) the rights afforded in the Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, discharge and release of such Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Creditor Trust and any of its assets or properties, and (2) all persons and Entities shall be precluded from asserting against the Creditor Trust or any of its assets or properties any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date, except as otherwise provided in the Plan.

## U. Terms of Existing Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, and thereafter shall be annulled.

## V. Cancellation of Notes, Instruments, Debentures and Equity Securities

On the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, certificates and other documents evidencing Claims and all Equity Interests in any of the Debtors shall be canceled and deemed terminated, without any further act or action under any applicable agreement, law, regulations, order or rule. On the Effective Date, except to the extent provided otherwise in the Plan, any indenture relating to any of the foregoing, shall be deemed canceled as permitted by section 1123(a)(5)(F) of the Bankruptcy Code. The Indentures shall survive confirmation of the Plan solely to effectuate Distributions to be made to holders of the Senior Notes as provided in the Plan and to enforce the rights, duties and administrative functions of the Indenture Trustees as provided therein with respect to such Distributions, and permitting the Indenture Trustees to assert the Charging Lien against such Distributions for the payment of the Indenture Trustees' fees and expenses. Upon the final Distributions to the holders of the Senior Notes pursuant to the Plan, the Indentures shall be canceled and deemed terminated and the Indenture Trustees shall be discharged of any further duties, without any further act or action under any applicable agreement, law, regulations, order or rule and the obligations of the Debtors under such Indentures shall be terminated.

## W. Post-Effective Date Fees and Expenses

From and after the Effective Date, the Creditor Trust shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Plan Oversight Committee, the Indenture Trustees in their capacity as disbursing agents, and the Creditor Trust related to implementation and consummation of the Plan, subject to any restrictions imposed under the Cash Collateral Order, provided that such payment shall be borne by the Series of the Creditor Trust to which such fees and expenses relate.

## X. Section 1146 Exception

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the making or delivery of an instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

## Y. Severability

The provisions of the Plan shall not be severable unless such severance is agreed to by the Debtors, the Creditors' Committee and the Lenders and such severance would constitute a permissible modification of the Plan pursuant to section 1127 of the Bankruptcy Code.

## Z. Recognition

As of the close of business on the Record Date, the Indenture Trustees will have no obligation to recognize any transfer of Notes occurring after the Record Date. For purposes of making distributions under the Plan, the Indenture Trustees will be entitled to recognize and deal for all purposes herein with only those holders of record stated on the transfer ledger maintained by the Indenture Trustees or their designees as of the close of business on the Record Date.

## AA. Governing Law

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York.

## BB. Notices

All notices, requests and demands to or upon the Debtors, the Creditor Trust, the Creditors' Committee or the Lenders to be effective shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered to all of the following or, in the case of notice by facsimile transmission, when received by all of the following and telephonically confirmed, addressed as follows or to such other addresses as filed with the Bankruptcy Court.

To:

**On behalf of the Debtors**:

Constance A. Fratianni
Scott C. Shelley
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

- and -

Pauline K. Morgan
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

Carol Stebbins
Insilco Holding Co.
18880 New Gambier Road
Mt. Vernon, OH 43050
Telephone: (740) 393-3339
Facsimile: (740) 393-3379

**On behalf of the Creditors' Committee**:

Andrew J. Silfen
Arent Fox Kitner Plotkin & Kahn PLLC

1675 Broadway
New York, NY 10019
Telephone: (212) 484-3903
Facsimile: (212) 484-3990

- and -

Warren T. Pratt
Drinker Biddle & Reath LLP
1100 North Market Street
10th Floor
Wilmington, DE 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201

**On behalf of the Creditor Trust:**

The address for delivery of Notices set forth in the Trust Agreement.

**On behalf of the Lenders:**

Janet Henderson
Sidley Austin Brown & Wood
Bank One Plaza
10 S. Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7891
Facsimile: (312) 953-7036

**On behalf of the U.S. Trustee:**

David L. Buchbinder
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
Suite 2313
Wilmington, DE 19801
Telephone (302) 573-6541

## CC.   Closing of Cases

The Creditor Trust shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

## DD.   Section Headings

The section headings contained in the Plan are for reference purposes only and shall not affect the meaning or interpretation of the Plan.

**EE.   Primacy of Asset Reallocation and Settlement Agreement**

To the extent of any conflict or inconsistency between the provisions of the Plan and the provisions of the Asset Reallocation and Settlement Agreement, the provisions of the Asset Reallocation and Settlement Agreement shall govern and be deemed controlling. Notwithstanding anything herein or in the Plan to the contrary, the rights and entitlement of the Senior Lenders, as set forth in the Asset Reallocation and Settlement Agreement, shall in no way be dependent upon, and are expressly independent of, the provisions of the Plan.

**FF.   Continuing Viability of Other Orders/Agreements**

Except to the extent expressly modified by the Plan or the Asset Reallocation and Settlement Agreement, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between creditors or between the Debtors and their creditors shall continue in full force and effect.

**GG.   Administration of Wind Down Budget**

The Trustees shall provide the Agent and the Plan Oversight Committee upon request and no less frequently than monthly a written accounting of (i) all line item expenses paid in the prior month pursuant to the Wind Down Budget and (ii) all projected payments for line item expenses. As soon as the Unsecured Creditors' Trustee determines in his reasonable judgment that any line item expense provided for in the Wind Down Budget has been paid, the Unsecured Creditors' Trustee shall, in accordance with the Cash Collateral Order, remit to the Agent for the benefit of the Senior Lenders any and all remaining cash collateral allocable to such line item in the Wind Down Budget, provided that the Unsecured Creditors' Trustee shall remit to the Agent all remaining unused cash allocable to the Wind Down Budget no later than sixty (60) days after the Effective Date (or such later date as the Agent may agree in writing) with the exception of such line item expenditures as the Creditors' Trustee shall certify in writing and in good faith may still require payment. Notwithstanding anything herein to the contrary, and except as expressly provided in the Asset Reallocation and Settlement Agreement, the Creditor Trust or Contributed Assets shall not be subject to any Claims payable under the Wind Down Budget.

**ARTICLE VI**
**VOTING PROCEDURES AND REQUIREMENTS**

**A. Holders of Claims or Equity Interests**

IT IS IMPORTANT THAT HOLDERS OF CLAIMS ENTITLED TO VOTE EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN. All known Holders of Claims entitled to vote on the Plan have been sent a Ballot together with this Disclosure Statement. Such Holders should read the Ballot carefully and follow the instructions contained therein. Please use only the official Ballot (or Ballots) that accompanies this Disclosure Statement.

FOR YOUR VOTE TO COUNT, YOUR BALLOT MUST ACTUALLY BE RECEIVED BY THE BALLOTING AGENT SET FORTH BELOW, NO LATER THAN 4:00 P.M. PREVAILING EASTERN TIME ON [_____], 2004. IF YOU MUST RETURN YOUR BALLOT TO YOUR BANK OR BROKER, OR THE AGENT OF EITHER, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN IT TO THE BALLOTING AGENT BY THE VOTING DEADLINE.

ANY BALLOT WHICH IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR INDICATES BOTH AN

ACCEPTANCE AND REJECTION OF THE PLAN, WILL BE DEEMED AN ACCEPTANCE OF THE PLAN. IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES OR IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE BALLOTING AGENT AT THE ADDRESS SPECIFIED BELOW:

> Balloting Agent
> PATLETT, INC.
> 3 Sunbelt Business Park Drive
> Greer, South Carolina 29650-4529
> Telephone: (864) 662-0034
> Email: patlett@tds.net

If you wish to obtain an additional copy of the Plan, the Disclosure Statement or any exhibits to such documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please submit your request to PatLett, Inc. at the foregoing address.

## B. Classes Entitled to Vote

Subject to the provisions of the Disclosure Order, any Holder of a Claim against the Debtors as of the Petition Date in Class 4, Class 5, Class 6 and Class 7 which Claim has not been disallowed by order of the Bankruptcy Court and is not disputed, shall be entitled to vote to accept or reject the Plan if (a) such Claim is impaired under the Plan and is not of a Class that is deemed to have accepted or rejected the Plan pursuant to sections 1126(f) and (g) of the Bankruptcy Code and (b) either (i) such Holder's Claim has been scheduled by the Debtors (and such Claim is not scheduled as disputed, contingent or unliquidated), or (ii) such Holder has filed a proof of claim on or before the Bar Date.

Any holder of an Interest in the Debtors is not entitled to vote to accept or reject the Plan because Class 8 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Unless otherwise permitted in the Plan, the holder of any Disputed Claim is not entitled to vote with respect to such Disputed Claim, unless the Bankruptcy Court, upon application by such holder, temporarily allows such Disputed Claim for the limited purpose of voting to accept or reject the Plan. Any such application must be heard and determined by the Bankruptcy Court prior to the Confirmation Hearing. A vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C. Vote Required for Acceptance by Classes of Claims

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class which actually cast ballots for acceptance or rejection of the Plan. Thus, acceptance by a class of claims occurs only if at least two-thirds in dollar amount and a majority in number of the holders of such claims voting cast their ballots in favor of acceptance. A Class of Holders of Claims shall be deemed to accept the Plan in the event that no holder of a Claim within that Class submits a Ballot by the Ballot Date.

CREDITORS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE DISCLOSURE STATEMENT ORDER AND THE PLAN FOR A FULL UNDERSTANDING OF VOTING REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, USE OF BALLOTS AND MASTER BALLOTS.

# ARTICLE VII
## CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan.

## A. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. By order of the Bankruptcy Court, the Confirmation Hearing has been scheduled for [_____], 2004 at [11:00 a.m.] (prevailing Eastern Time) before the Hon. Kevin J. Carey in United States Bankruptcy Court for the District of Delaware, 900 Market Street, Courtroom 1, Philadelphia, Pennsylvania. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court and set forth the name of the objecting party, the nature and amount of the Claim or Equity Interest held or asserted by the objecting party against the Debtors' estates or property, the basis for the objection and the specific grounds therefor. The objection, together with proof of service thereof, must then be filed with the Bankruptcy Court, with a copy to chambers, and served upon (i) Shearman & Sterling LLP, Attorneys for the Debtors, 599 Lexington Avenue, New York, New York 10022, Attn: Constance A. Fratianni, Esq. and Scott C. Shelley, Esq.; (ii) Young Conaway Stargatt & Taylor, LLP, Attorneys for the Debtors, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, Attn: Pauline K. Morgan, Esq.; (iii) Arent Fox Kitner Plotkin & Kahn PLLC, Attorneys for the Creditors Committee, 1675 Broadway, New York, NY 10019, Attn: Andrew Silfen, Esq.; (iv) Sidley Austin Brown & Wood, Attorneys for the Lenders, Bank One Plaza, 10 S. Dearborn Street, Chicago, IL 60603, Attn: Janet Henderson, Esq.; and (v) Office of the U.S. Trustee, J. Caleb Boggs Federal Building, Suite 2313, Wilmington, DE 19801, Attn: David L. Buchbinder.

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED BY [_____], 2004 AT 4:00 P.M. (PREVAILING EASTERN TIME), IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (a) is accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (b) is feasible and (c) is in the "best interests" of Holders of Claims and Equity Interests impaired under the Plan.

### 1. Acceptance

Claims in Class 4, 5, 6 and 7 are impaired and the Holders of such Claims are entitled to vote on the Plan.

Claims in Class 1, 2 and 3 are unimpaired by the Plan, and the Holders thereof are conclusively presumed to have accepted the Plan.

Holders of Class 8 Equity Interests are deemed to have rejected the Plan because they will not receive a Distribution.

### 2. Fair and Equitable Test

The Debtors will seek to confirm the Plan notwithstanding the nonacceptance or deemed nonacceptance of the Plan by any impaired Class of Claims. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to for its claims or interests. The Debtors believe that the Plan satisfies this requirement.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and interests, as follows:

(a)  Secured Claims: Either the plan must provide: (i) for the holders of such claims to retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and each holder of a claim receives deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (ii) for the sale of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such Holders of the indubitable equivalent of such claims.

(b)  Unsecured Claims: Either (i) each Holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)     Equity Interests:  Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such stock or (z) the value of the stock, or (ii) the Holders of interests that are junior to the stock will not receive any property under the plan.

THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.

## C. Feasibility

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor other than as set forth in such plan. The Plan contemplates that all assets of the Debtors will ultimately be disposed of and all proceeds of the assets will be distributed to the creditors pursuant to the terms of the Plan. Since no further financial reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the feasibility requirement. In addition, based upon the availability of assets for distribution resulting from the Going Concern Sales and the Asset Reallocation and Settlement Agreement, the Debtors believe that sufficient funds will exist at confirmation to make all payments required by the Plan.

### 1.  "Best Interests" Test

With respect to each impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each such Holder either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

This analysis requires the Bankruptcy Court to determine what the Holders of Allowed Claims and Allowed Equity Interests in each impaired class would receive from the liquidation of the Debtors' assets and properties in the context of chapter 7 liquidation cases. The value that would be available for the satisfaction of Unsecured Claims and Equity Interests of the Debtors would consist of the cash and other assets reallocated to general unsecured creditors by the Senior Lenders pursuant to the Asset Reallocation and Settlement Agreement, the proceeds, if any, resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash, if any, held by the Debtors at the time of the commencement of the liquidation cases. The Debtors do not believe that they own any unencumbered assets. The value available for distribution to unsecured creditors and the Holders of Equity Interests would be reduced by the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those payable to attorneys, real estate brokers, accountants and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisors, accountants and costs and expenses of members of any official committees that are allowed in the chapter 7 cases.

The foregoing types of Claims and such other claims which may arise in the liquidation cases or result from the pending Chapter 11 Cases would be entitled to be paid in full from the unencumbered

liquidation proceeds, if any, before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the Debtors' unencumbered assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of Claims and Equity Interests under the Plan.

The Asset Reallocation Settlement Agreement is, by its terms and pursuant to the Bankruptcy Court order approving the agreement, dated June 16, 2003, binding upon a chapter 7 trustee. Because the Asset Reallocation and Settlement Agreement is binding upon a chapter 7 trustee, and because the Debtors have no unencumbered assets, creditors will receive no greater dividend under chapter 7 than under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee and (b) the anticipated erosion in value of assets in a chapter 7 case resulting from and the "forced sale" atmosphere that would prevail, the Debtors believe that confirmation of the Plan will provide each holder of an Allowed Claim with more than the amount it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## ARTICLE VIII
## FINANCIAL INFORMATION

The Debtors have filed Statements of Financial Affairs and Schedules of Assets and Liabilities with the Bankruptcy Court as required by the Bankruptcy Code. As debtors in possession, the Debtors have filed and will continue to file monthly operating reports required by the United States Trustee operating guidelines. This financial information may be examined in the Bankruptcy Court Clerk*s Office. Also, attached hereto as Exhibit C is the Debtors' most current unaudited balance sheet.

## ARTICLE IX
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) liquidation of the Debtors under chapter 7 of the Bankruptcy Code or (b) dismissal of the Chapter 11 Cases.

### A. Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to their creditors in accordance with the Asset Reallocation and Settlement Agreement. The Debtors believe that conversion of the Cases to cases under chapter 7 of the Bankruptcy Code would result in diminished distributions to creditors due to the projected reduced value the Debtors' estates would realize from their remaining assets due to the "forced sale" environment of a chapter 7 liquidation, the increased costs of administration and potential difficulties of implementing the Asset Reallocation and Settlement Agreement in chapter 7 proceedings. The Debtors' liquidation analysis is attached hereto as Exhibit D.

## B. Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtors, the Creditors' Committee, or any of the parties in interest could attempt to formulate a different chapter 11 plan. However, the Asset Reallocation and Settlement Agreement has been approved by a final order of the Bankruptcy Court and is binding on all parties in interest. Accordingly, any plan proposed by a party other than the Debtors would have to incorporate the Asset Reallocation and Settlement Agreement, and would yield no greater dividend to unsecured creditors. Moreover, in light of the additional administrative expenses attendant to an alternative plan, it is doubtful that sufficient funds would be available to pay such expenses and confirm an alternative plan. The Debtors believe that the Plan described herein will provide the greatest and most expeditious return to creditors.

## ARTICLE X
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The confirmation and execution of the Plan may have tax consequences to Holders of Claims and Equity Interests. The Debtors do not offer an opinion as to any federal, state, local, or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Plan. All Holders of Claims and Equity Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

## ARTICLE XI
## CONCLUSION AND RECOMMENDATION

The Debtors, the Agent for the Lenders and the Creditors' Committee all believe that the Plan is in the best interests of all Holders of Claims and urge the Holders of impaired Claims in Classes 4, 5, 6 and 7 to vote to accept the Plan and to evidence such acceptance by returning their ballots to the Balloting Agent at the address set forth in Article VI of this Disclosure Statement so that they will be actually received on or before 4:00 p.m., prevailing Eastern Time, on [_____], 2004.

Dated: Wilmington, Delaware
       January 8, 2004

Respectfully Submitted,

INSILCO HOLDING CORPORATION

By: _____
Its: _____

INSILCO TECHNOLOGIES, INC.

By: _____
Its: _____

INNET TECHNOLOGIES, INC.

By: _____
Its: _____

INSILCO INTERNATIONAL HOLDINGS, INC

By: _____
Its: _____

PRECISION CABLE MFG. CORPORATION

By: _____
Its: _____

EYELETS FOR INDUSTRY, INC.

By: _____
Its: _____

EFI METAL FORMING, INC.

By: _____
Its: _____

STEWART STAMPING CORPORATION

By: _____
Its: _____

STEWART CONNECTOR SYSTEMS, INC.

By: _____

Its: _____

SIGNAL CARIBE, INC.

By: _____

Its: _____

SIGNAL TRANSFORMER CORPORATION, INC

By: _____

Its: _____

**EXHIBIT A**

JOINT CONSOLIDATED LIQUIDATING PLAN

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x
                              :    **Chapter 11**

**In re**                       :

                              :    **Case No. 02-13672 (KJC)**

**INSILCO TECHNOLOGIES, INC., et al.,[1]**  :

                              :    **(Jointly Administered)**

               **Debtors.**    :

                              :
---------------------------------------------------x

## JOINT LIQUIDATING PLAN PURSUANT TO
## CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

SHEARMAN & STERLING LLP
Constance A. Fratianni
Scott C. Shelley
Susan A. Fennessey
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

    – and –

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Pauline K. Morgan (Del. 3650)
Maureen D. Luke (Del. 3062)
Sharon M. Zieg (Del. 4196)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Co-Counsel for the Debtors and Debtors in Possession

Dated: January ___, 2004

---

[1]    The other debtors in these jointly administered chapter 11 proceedings are Insilco Holding Co., InNet Technologies, Inc., Insilco International Holdings, Inc., Precision Cable Mfg. Corporation, Eyelets for Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc., Signal Caribe, Inc. and Signal Transformer Co., Inc.

## TABLE OF CONTENTS

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW**...................................................................................1

Section 1.1. Rules of Interpretation, Computation of Time and Governing Law ..............................1
Section 1.2. Defined Terms ................................................................................................................1

**ARTICLE II SUBSTANTIVE CONSOLIDATION OF DEBTORS; CANCELLATION OF INTERCOMPANY CLAIMS**.............................................................................11

Section 2.1. Substantive Consolidation ...........................................................................................11
Section 2.2. Cancellation of Intercompany Claims..........................................................................11

**ARTICLE III ADMINISTRATIVE CLAIMS AND PROFESSIONAL FEES** .....................................11

Section 3.1. Introduction...................................................................................................................11
Section 3.2. Administrative Claims ..................................................................................................12
Section 3.3. Statutory Fees ...............................................................................................................12
Section 3.4. Professional Fees ..........................................................................................................13

**ARTICLE IV CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**.......................................................................................13

Section 4.1. Summary.......................................................................................................................13
Section 4.2. Class 1 – Senior Lenders' Claims.................................................................................14
Section 4.3. Class 2 – Other Secured Claims...................................................................................15
Section 4.4. Class 3 – Priority Claims .............................................................................................15
Section 4.5. Class 4 – General Unsecured Claims............................................................................16
Section 4.6. Class 5 – Senior Discount Notes..................................................................................16
Section 4.7. Class 6 – Senior Subordinated Notes...........................................................................16
Section 4.8. Class 7 – Term-C Loan Claims....................................................................................17
Section 4.9. Class 8 – Equity Interests.............................................................................................17

**ARTICLE V ACCEPTANCE OR REJECTION OF PLAN** ...............................................................18

Section 5.1. Voting Classes ..............................................................................................................18
Section 5.2. Acceptance by Class of Creditors and Holders of Interests ........................................18
Section 5.3. Cramdown.....................................................................................................................18

**ARTICLE VI EFFECT OF CONFIRMATION** ....................................................................................18

Section 6.1. Vesting of Assets in the Creditor Trust........................................................................18
Section 6.2. Authority to Effectuate Plan ........................................................................................19
Section 6.3. Dismissal of Officers and Directors and Dissolution of the Debtors and Board.........19
Section 6.4. Status Reports ...............................................................................................................19
Section 6.5. Escrows.........................................................................................................................20
Section 6.6. Binding Effect...............................................................................................................20
Section 6.7. Corporate Action...........................................................................................................20
Section 6.8. Amendment of Final Cash Collateral Order ................................................................20
Section 6.9. Dissolution of Creditors' Committee; Plan Oversight Committee................................20
Section 6.10. Late Claims Void ........................................................................................................21

**ARTICLE VII IMPLEMENTATION OF THIS PLAN** .......................................................................21

Section 7.1. Funding of Plan.............................................................................................................21
Section 7.2. Creation of the Creditor Trust......................................................................................21

Section 7.3  The Trustees......................................................................................................................22

**ARTICLE VIII RIGHTS OF ACTION.............................................................................................23**

Section 8.1  Maintenance of Rights of Action...................................................................................23
Section 8.2  Preservation of All Rights of Action Not Expressly Settled or Released ....................24

**ARTICLE IX PROVISIONS REGARDING DISTRIBUTIONS......................................................24**

Section 9.1  Distribution to Creditors................................................................................................24
Section 9.2  Claims Allowed as of the Effective Date.......................................................................25
Section 9.3  Unsecured Disputed Claims Reserve.............................................................................25
Section 9.4  Time and Manner of Payments......................................................................................25
Section 9.5  Delivery of Distributions...............................................................................................25
Section 9.6  Undeliverable Distributions...........................................................................................26
Section 9.7  Compliance with Tax Requirements/Allocation............................................................26
Section 9.8  Time Bar to Cash Payments...........................................................................................27
Section 9.9  Fractional Dollars, De Minimis Distributions...............................................................27
Section 9.10  Set-Offs........................................................................................................................27

**ARTICLE X PROCEDURES FOR RESOLVING DISPUTED CLAIMS.......................................27**

Section 10.1  Prosecution of Objections to Claims...........................................................................27
Section 10.2  Estimation of Claims...................................................................................................28
Section 10.3  Cumulative Remedies..................................................................................................28
Section 10.4  Allowance of Claims and Interests..............................................................................28

**ARTICLE XI EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................................29**

Section 11.1  Rejection of Executory Contracts and Unexpired Leases............................................29
Section 11.2  Rejection Damage Claims............................................................................................29

**ARTICLE XII CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE OF THIS PLAN.............................................................................................................29**

Section 12.1  Conditions Precedent to Confirmation Date of this Plan.............................................29
Section 12.2  Conditions Precedent to Effective Date of this Plan....................................................29
Section 12.3  Waiver of Conditions Precedent...................................................................................30

**ARTICLE XIII RETENTION OF JURISDICTION .......................................................................30**

Section 13.1  Retention of Jurisdiction..............................................................................................30

**ARTICLE XIV MISCELLANEOUS PROVISIONS .......................................................................32**

Section 14.1  Title to Assets...............................................................................................................32
Section 14.2  Releases of All Liens....................................................................................................32
Section 14.3  Modification of Plan.....................................................................................................32
Section 14.4  Revocation or Withdrawal............................................................................................32
Section 14.5  Injunction......................................................................................................................32
Section 14.6  Discharge......................................................................................................................33
Section 14.7  Indemnification.............................................................................................................33
Section 14.8  Term of Existing Injunctions or Stays.........................................................................33
Section 14.9  Releases.........................................................................................................................33
Section 14.10  Exculpation and Limitation of Liability.....................................................................34
Section 14.11  Cancellation of Notes, Instruments, Debentures and Equity Securities.....................35
Section 14.12  Post-Effective Date Fees and Expenses......................................................................35
Section 14.13  Section 1146 Exception...............................................................................................35
Section 14.14  Severability..................................................................................................................36

Section 14.15. Recognition ................................................................................. 36
Section 14.16. Governing Law .......................................................................... 36
Section 14.17. Notices ...................................................................................... 36
Section 14.18. Closing of Cases ...................................................................... 37
Section 14.19. Section Headings ...................................................................... 38
Section 14.20. Primacy of Asset Reallocation and Settlement Agreement ...... 38
Section 14.21. Continuing Viability of Other Orders/Agreements ................... 38
Section 14.22. Administration of Wind Down Budget ....................................... 38

The above-captioned debtors and debtors in possession respectfully propose the following Joint Liquidating Plan (this "Plan") pursuant to chapter 11, title 11 of the United States Code, 11 U.S.C. §§ 101-1330.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

Section 1.1. *Rules of Interpretation, Computation of Time and Governing Law*

(a)     For purposes of this Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and each pronoun, whether stated in the masculine, feminine or neuter gender, shall include the masculine, feminine and the neuter gender; (b) any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or exhibit filed, or to be filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (e) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (f) any term used in capitalized form in this Plan that is not defined herein but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

(b)     In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(c)     Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

Section 1.2. *Defined Terms*

(a)     As used in this Plan, the following terms have the respective meanings specified below, which meanings are equally applicable to both the singular and plural forms of the terms defined:

Administrative Claim:  Any Claim constituting a cost or expense of administration of the Chapter 11 Cases asserted under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the businesses of the Debtors in Possession, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the administration and implementation of this Plan, any Claims for compensation and reimbursement of expenses arising during the period from and after the Petition Date and to the Confirmation Date or otherwise in accordance with the provisions of this Plan, any fees or charges assessed against the Debtors' estates pursuant to 28 U.S.C. § 1930 or as determined by the Bankruptcy Court to be an Administrative Claim in a Final Order.

Administrative Claims Reserve Fund:  Such amount of Cash, constituting proceeds of Excluded Assets, which are allocable to Administrative Claims under the Asset Reallocation and Settlement

Agreement (including under any applicable line items in the Wind Down Budget), as the Debtors and the Creditors' Committee shall determine to be necessary to retain on the Effective Date in respect of unpaid Allowed Administrative Claims and Professional Fees or, if Disputed, for the purpose of paying such Disputed amounts to the extent such Disputed amounts become Allowed. Such Administrative Claims Reserve Fund shall be equal to an amount to be disclosed in a notice that the Debtors will file and serve on or before five (5) days prior to the Confirmation Date (which amount shall not exceed the sum of (i) expenses set forth in the Wind Down Budget from the Effective Date to entry of the Final Decree), and (ii) amounts attributable to Disputed Administrative Claims (not to exceed the amounts available under the Asset Reallocation and Settlement Agreement for the payment of such claims. The Debtors will serve this notice via overnight express mail or Federal Express upon (i) the US Trustee, (ii) counsel to the Lenders, (iii) counsel to the Creditors' Committee, and (iv) parties that have requested notice pursuant to Rule 2002 of the Bankruptcy Rules.

Administrative Expense Carve Out: The amount of Contributed Assets described in Paragraph 3Aii of the Asset Reallocation and Settlement Agreement, up to $250,000 allocated for the payment of administrative expenses, as more particularly defined and provided in Section 3Aii of the Asset Reallocation and Settlement Agreement.

Agent: Bank One, N.A., as Administrative Agent under the Credit Agreement.

Allowed: The term "allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which the Debtors or other party in interest have not filed an objection by the Effective Date; (b) a Claim that either is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) in any stipulation with the Debtors of amount and nature of Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court, (ii) in any stipulation with the Debtors of amount and nature of Claim executed on or after the Confirmation Date and, to the extent necessary, approved by the Bankruptcy Court, or (iii) in any contract, instrument, indenture or other agreement entered into or assumed by the Debtors in connection with this Plan; (d) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been filed by the Bar Date or has otherwise been deemed timely filed under applicable law; or (e) a Claim that is allowed pursuant to the terms of this Plan.

Allowed Claim/Allowed Interest: Any Claim against or Interest in the Debtors (i) proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of Claim against or Interests in the Debtors, (ii) if no proof of Claim or Interest has been timely filed, which has been or hereafter is listed by the Debtors in their Schedules as liquidated in amount and not disputed or contingent or (iii) any Interest registered in the stock register or partnership documents maintained by or on behalf of the Debtors as of the Record Date and, in each such case in clauses (i), (ii) and (iii) above, a Claim or Interest as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Bankruptcy Code or the Bankruptcy Rules. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any claim which the Debtors may hold against the holder thereof, to the extent such claim may be set off pursuant to section 553 of the Bankruptcy Code.

Asset Reallocation and Settlement Agreement: The settlement agreement dated as of May 13, 2003, and approved by Order of the Bankruptcy Court entered on June 16, 2003, by and among (i) Insilco Technologies and its affiliated debtors, (ii) the official committee of unsecured creditors appointed in the Insilco Technologies bankruptcy cases, (iii) Bank One N.A., as agent and the lenders, including Bank One N.A., under the Second Amended and Restated Credit Agreement dated as of August 25, 2000, as

amended, (iv) Wachovia Bank, National Association as indenture trustee for the 12% senior subordinated notes due 2007 issued by Insilco Technologies, and (v) U.S. Bank, National Association as indenture trustee for the 14% senior discount notes due 2008 issued by Insilco Holding Co., Inc. A true and correct copy of the Asset Reallocation and Settlement Agreement and the Final Order approving it are attached hereto as Exhibit A and incorporated herein by reference.

Assets: Any and all real or personal property of any nature, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, cash, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, Rights of Action and any other general intangibles of the Debtors, as the case may be, of any nature whatsoever, including, without limitation, the property of the estate pursuant to section 541 of the Bankruptcy Code.

Avoidance Actions: All actions, causes of action or claims of the Debtors or their estates arising under chapter 5 of the Bankruptcy Code, whether or not commenced as of the Effective Date.

Bankruptcy Code: Title 11 of the United States Code, as applicable to the Chapter 11 Cases, as amended.

Bankruptcy Court: The United States Bankruptcy Court for the District of Delaware.

Bankruptcy Rules: The Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 cases, promulgated by the United States Supreme Court under 28 U.S.C. § 2075 and any Local Rules of the Bankruptcy Court.

Bar Date: May 15, 2003.

Bar Date Order: The Order (A) Establishing Procedures and Deadlines for the Filing of (i) Proofs of Claim and (ii) Requests for Payment of Administrative Expenses, (B) Establishing Consequences for the Failure to Comply with Such Procedures and Deadlines and (C) Approving Form and Scope of Notice of Such Procedures and Deadlines, entered by the Bankruptcy Court on March 25, 2003.

Budget: The budget annexed to this Plan as Exhibit B, which sets forth the expenses of the wind-down of the Debtors from and after the Effective Date, and which is incorporated by reference in its entirety in this Plan. The Budget shall be funded exclusively from Excluded Assets subject to and in accordance with the Asset Reallocation and Settlement Agreement and as provided under the Cash Collateral Order in respect of the Wind Down Budget and the Carve Out (as defined in the Cash Collateral Order).

Cash: Cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments and obligations of the United States of America or instrumentalities thereof.

Cash Collateral Order: The Final Order Authorizing Use of Cash Collateral and Granting Replacement Liens entered by the Bankruptcy Court on January 16, 2003, as amended.

Chapter 11 Cases: The cases under chapter 11 of the Bankruptcy Code, commenced by Debtors in the Bankruptcy Court, being jointly administered under Case No. 02-13672 (KJC).

Charging Lien: Any lien or other priority in payment arising prior to the Effective Date to which the Indenture Trustees are entitled, pursuant to the Indentures, against distributions to be made to Noteholders.

Claim: Any right to payment from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Claims Reserve Balance: The Cash constituting proceeds of Excluded Assets in the Unsecured Creditor Disputed Claims Reserve on the first date after which (a) all Distributions or payments to be made under this Plan or a Final Order in respect of each Allowed Unsecured Creditor Claim have been made, (b) no Unsecured Creditor Claim is a Disputed Claim and (c) all payments to be made from the Unsecured Creditor Disputed Claims Reserve have been made.

Class: A category of Holders of Claims or Equity Interests as set forth in Article IV of this Plan.

Confirmation Date: The date upon which the Confirmation Order is entered by the Bankruptcy Court in its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

Confirmation Order: The order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

Consummation: The occurrence of the Effective Date.

Contributed Assets: Subject to the provisions of Paragraph 4B of the Asset Reallocation and Settlement Agreement, the following cash and proceeds have been reallocated by the Senior Lenders to the Holders of Allowed Unsecured Claims pursuant to Paragraph 3 of the Asset Reallocation and Settlement Agreement:

(a)     $1,750,000 from the Net Proceeds realized from the closing of the Going Concern Sales;

(b)     Net Proceeds from the sale of the Debtors' real properties located in Larne, Northern Ireland, Taylorsville, North Carolina and McAllen, Texas and the Net Proceeds from the sale of the miscellaneous office equipment and furnishings located in the Debtors' Columbus, Ohio offices as listed on Schedule 1 hereto; provided, however, that, to the extent that the Estates do not otherwise have sufficient readily available unencumbered assets to pay Administrative Claims (other than Professional Fees) required to be paid in order to obtain confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code, the Estates shall be entitled to use up to $250,000 of the Net Proceeds described in this subparagraph (b) for the payment of such Administrative Claims; and provided further that the aggregate Net Proceeds provided in this subparagraph (b) shall not exceed $1,250,000 (inclusive of the $250,000 that may be allocated for Administrative Claims hereunder). Any Net Proceeds from the sale of the assets described in this subparagraph (b) that exceed $1,250,000 shall not be considered Contributed Assets and shall be promptly remitted to or retained by the Agent in accordance with the Asset Reallocation and Settlement Agreement;

(c)     $250,000 of cash collateral (which shall be asset sale proceeds), plus 10% of the net recoveries derived from (x) the Debtors' claims and causes of action against Star Services, Inc. relating to the litigation bearing Supreme Court of the State of New York Index No. 605676/97 and generally referred to as the "Star Services Litigation" and (y) income tax refunds received by the Debtors from and after April 15, 2003, for the purpose of establishing a "Creditor Trust" to investigate and pursue Rights of Action Recoveries, provided the Contributed Assets under this subparagraph (c) shall not exceed $750,000, with any excess over $750,000 to be promptly remitted to or retained by the Agent in accordance with the Asset Reallocation and Settlement Agreement and which excess (including any net recoveries derived from the assets described under (x) and (y) beyond the amount allocated to the Creditor Trust in this paragraph (c)) will not constitute "Contributed Assets";

(d)     the Reallocated Monies; provided, however, that the first $200,000 of any such Reallocated Monies shall be allocated first to the payment of the Allowed fees and expenses of the Creditors' Committee's professionals incurred from and after May 1, 2003, with any remaining Reallocated Monies available for the payment of other Administrative Claims.

Credit Agreement: The Second Amended and Restated Credit Agreement, dated as of August 25, 2000, as thereafter amended from time to time, among Insilco Technologies and TAT Technology Inc., as Borrowers, U.S. Bank, N.A., as Administrative Agent, DLJ Capital Funding, Inc., as Lead Arranger and Syndication Agent, TransAmerica Business Credit Corporation and LaSalle National Bank, as Co-Documentation Agents, and the various financial institutions party thereto.

Creditor Trust: The statutory trust created pursuant to the Delaware Statutory Trust Act (12 Del. C. Section 3801 et. seq.), organized in series and composed of an Unsecured Creditor Series and a Senior Lender Series, created pursuant to Sections 3804 and 3806(b)(2) of the Delaware Statutory Trust Act, the Trust Agreement and this Plan.

Creditor Trust Expense Fund: A fund, which shall be held by the Creditor Trust for use in paying the expenses of administering the Unsecured Creditor Series of the Creditor Trust, consisting of the following Contributed Assets: $250,000 of cash collateral plus ten percent of the net proceeds recovered from (a) the Star Services Litigation and (b) Tax Refunds, with all of the foregoing to be used to fund prosecution of the Rights of Action and expenses of the Creditor Trust or otherwise distributed to Holders of Allowed Unsecured Claims pursuant to the provisions of the Asset Reallocation and Settlement Agreement, as incorporated in this Plan; provided, however, that the aggregate amount of the Contributed Assets funding the Creditor Trust Expense Fund shall not exceed $750,000, with any excess over $750,000 deemed not to constitute Contributed Assets and to be immediately remitted to or retained by the Agent for the benefit of the Senior Lenders in accordance with the Asset Reallocation and Settlement Agreement.

Creditors' Committee: The Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on or about January 3, 2003.

Debtors or Debtors in Possession: Insilco Technologies, Inc., Insilco Holding Co., InNet Technologies, Inc., Insilco International Holdings, Inc., Precision Cable Mfg. Corporation, Eyelets for Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc., Signal Caribe, Inc. and Signal Transformer Co., Inc.

Disclosure Statement:  The disclosure statement for this Plan, filed concurrently herewith, and approved by the Bankruptcy Court as containing adequate information on or about [_____], 2003.

Disputed:  Any Claim or Equity Interest (a) listed on the Schedules as unliquidated, disputed or contingent, or (b) as to which Debtors or any other party in interest with standing have interposed a timely objection or request for estimation or subordination in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by Debtors or any other party in interest with standing in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order, or (c) unless otherwise indicated in this Plan, a Claim as to which the period within which to object to such Claim has not yet expired.

Distribution:  The Cash or Assets to be distributed to Holders of Allowed Claims under the terms of this Plan.

Distribution Date:  Any date on which the Creditor Trust makes a Distribution pursuant to this Plan.

Effective Date:  The eleventh day following the Confirmation Date or, if an appeal of the Confirmation Order has been taken, the first business day following the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions specified in Article XII of this Plan have been (i) satisfied or (ii) waived pursuant to Article XII.

Effective Date Distributions:  Those Distributions payable on the Effective Date in respect of (i) Allowed Administrative Claims, (ii) Other Secured Claims, and (iii) Priority Claims.

Entity:  An entity as defined in section 101(15) of the Bankruptcy Code.

Equity Interests:  Any equity interest in one or more of the Debtors, including, but not limited to, all issued, unissued, authorized or outstanding shares or stock, together with any warrants, options or contract rights to purchase or acquire such interests at any time.

Excluded Assets:  Those Assets defined as Excluded Assets in Paragraph 2 of the Asset Reallocation and Settlement Agreement.

Final Decree:  The decree contemplated under Bankruptcy Rule 3022.

Final Order:  An order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

First Administrative Bar Date:  May 15, 2003.

14% Note Indenture:  That certain Indenture governing the Senior Discount Notes dated August 17, 1998, between Silkworm Acquisition Corporation, as issuer, and Star Bank, N.A. n/k/a U.S. Bank, as indenture trustee, together with any amendments thereto.

**14% Note Indenture Trustee:**  Star Bank, N.A. n/k/a U.S. Bank, National Association, as indenture trustee under the 14% Note Indenture.

**General Unsecured Claims:**  Unsecured Claims other than Noteholder Claims and Term-C Loan Claims.

**Going Concern Sales:**  The sales of substantially all of the Debtors' Assets pursuant to (i) an Asset Purchase Agreement with SRDF Acquisition Company, LLC for the sale of assets related to the Debtors' precision stampings business for approximately $13 million dated as of December 15, 2002; (ii) a Stock and Asset Purchase Agreement with Amphenol Corporation and Amphenol Technical Products International Co. for the sale of the assets related to the Debtors' custom assemblies business for $10.14 million, dated as of December 15, 2002; (iii) a Stock and Asset Purchase Agreement with Bel Fuse Ltd., Bel Fuse Macau, L.D.A., Bel Connector Inc. and Bel Transformer Inc. for the sale of the assets related to the Debtors passive components business for $35 million, dated as of December 15, 2002; (iv) a Share Sale and Purchase Agreement with Stephen Bullock for the sale of the Debtors' interest in Insilco Teoranta for $100,000 and the assumption of certain liabilities, dated as of December 15, 2002; and (v) an Asset Purchase Agreement with LL&R Partnership for $1.7 million for the sale of the Debtors' North Myrtle Beach, South Carolina facility, dated as of December 15, 2002.

**Holder:**  An Entity holding an Equity Interest or Claim.

**Impaired:**  A Claim or Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**Indenture:**  The 12% Note Indenture and the 14% Note Indenture.

**Indenture Trustees:**  The 12% Note Indenture Trustee and the 14% Note Indenture Trustee.

**Initial Distribution Date:**  The first Distribution Date, which date shall be fifteen days following the date on which at least 80% of the General Unsecured Claims filed against the Debtors in these cases are Allowed Claims or have been disallowed or as soon as practicable thereafter.

**Intercompany Claims:**  Any Claim held by any of the Debtors against any other Debtor.

**Interim Compensation Order:**  The Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Professionals entered by the Bankruptcy Court on January 10, 2003, as amended by the amended order dated February 20, 2003.

**Lenders:**  The lenders and financial institutions (and any of their successors or assigns) that are party to the Credit Agreement.

**Lien:**  Any charge against or interest in property to secure payment or performance of a claim, debt or obligation.

**Net Proceeds:**  The total proceeds derived from the sale, liquidation, disposition or other recoveries on any Asset or the Going Concern Sales, net of all direct and indirect expenses of such disposition, including, but not limited to, the costs of maintaining, preparing and marketing such Asset for sale.

**Noteholder Claims:**  The Claims of Noteholders.

WP3:960753 1                                                          61683 1001

Noteholder Release: The release, waiver and discharge of the Senior Lenders described in Paragraph 4B of the Asset Reallocation and Settlement Agreement and set forth in Section 14.9 hereof.

Noteholders: The Holders of the Senior Discount Notes and the Senior Subordinated Notes.

Noteholder's Share: The ratio of (x) the allowed claims of Holders of Class 5 Claims or Class 6 Claims that have not granted or are not deemed to have granted the Noteholder Release to (y) the allowed claims of all Unsecured Creditors.

Other Secured Claims: Those Secured Claims other than the Senior Lenders' Secured Claims as of the Petition Date.

Petition Date: December 16, 2002.

Plan Oversight Committee: The committee created pursuant to Section 6.9 of this Plan.

Priority Claims: Those claims afforded priority under sections 507(a) and 502(f) of the Bankruptcy Code.

Professionals: An Entity (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement have been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

Professional Fees: Those fees and expenses claimed by Professionals retained through a Bankruptcy Court order under sections 330, 331 and/or 503 of the Bankruptcy Code, and unpaid as of the Effective Date.

Reallocated Monies: A sum of Cash, not to exceed $500,000, equal to the difference between (x) the amounts allocated to line items other than "Selling Costs" in the Wind Down Budget and (y) the actual amounts necessary to fund such line items, which sum may be reallocated and used by the Debtors' estates for the purposes set forth in Paragraph 3A(iv) of the Asset Reallocation and Settlement Agreement.

Record Date: The Confirmation Date, unless otherwise provided by order of the Bankruptcy Court.

Released Claims: Those Rights of Action or Claims that were specifically waived and released under the Asset Reallocation and Settlement Agreement.

Released Employees: Collectively, Michael Elia, Fred Stewart, Steve Crea and Phil Pitman.

Released Lender Parties: The Agent and each of the Senior Lenders and each of their agents, employees and professionals.

Releasing Estate Parties: The Debtors and the Creditors' Committee, on behalf of themselves and the estates of the Debtors, and each of their respective predecessors, successors and assigns.

Rights of Action: All actions, causes of action, suits, rights of action, counterclaims, crossclaims, rights of setoff, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants,

contracts, controversies, agreements, promises, variances, trespasses, damages or judgments arising under any theory of law or equity, including, without limitation, the Bankruptcy Code, including the Avoidance Actions and all claims against Creditors or Holders of Interests, parties having dealings, relationships or transactions with or related to the Debtors, any party named or identified in the Schedules or any pleadings filed in the Chapter 11 Cases (including, but not limited to, officers and directors of the Debtors and parties other than the Released Lender Parties and Released Employees), in each case held by or in favor of any of the Debtors or their estates whether or not commenced as of the Effective Date, but excluding any of the foregoing which (i) are Released Claims or (ii) relate to the recovery of Settlement Proceeds, including the Star Services Litigation and the Tax Refunds.

Rights of Action Recovery:  Any Cash recovery from the Rights of Action less those costs and expenses of the Unsecured Creditors' Trustee and Plan Oversight Committee relating to the prosecution of the Rights of Actions (including those costs and expenses incurred by professionals retained by the Unsecured Creditors' Trustee and Plan Oversight Committee that are not paid from the Reallocated Monies) in excess of the Creditor Trust Expense Fund, that shall be payable to Holders of Unsecured Claims pursuant to the Asset Reallocation and Settlement Agreement, as incorporated in this Plan.

Schedules:  The Debtors' schedules of assets and liabilities, statements of financial affairs, and such other schedules filed with the Bankruptcy Court on January 23, 2003 by the Debtors in accordance with section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as amended.

Second Administrative Bar Date:  The date that is forty-five (45) days after the Confirmation Date.

Secured Claim:  A Claim against the Debtors that is secured by a Lien on the Debtors' property or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Debtors' property or to the extent of the amount subject to setoff as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code.

Senior Discount Notes:  The 14% Senior Discount Notes issued by Insilco Holding Co., f/k/a Silkworm Acquisition Corporation, due 2008, and governed by the 14% Note Indenture.

Senior Lenders:  The Lenders other than the Term C-Lenders.

Senior Lender Series:  The series of the Creditor Trust created and maintained for the benefit of the Senior Lenders.

Senior Lenders' Trustee:  The co-trustee of the Creditor Trust appointed by the Agent to administer the Senior Lender Series of the Creditor Trust.

Senior Notes:  Collectively, the Senior Discount Notes and the Senior Subordinated Notes.

Senior Subordinated Notes:  The 12% Senior Subordinated Notes issued by Insilco Technologies, Inc., f/k/a Insilco Corporation, due 2007, and governed by the 12% Note Indenture.

Series:  The Senior Lenders Series and/or the Unsecured Creditor Series.

Settlement Proceeds:  The total proceeds derived from the sale, liquidation, disposition or other recoveries on all Assets except Excluded Assets, and including, without limitation, (i) all proceeds, all Cash or cash equivalents in the possession of the Debtors as of the Effective Date or to which the Debtors

are entitled or receive in the future, (ii) all accounts receivable, (iii) all deposits, rebates, Tax Refunds (other than the percentage constituting Contributed Assets under the Asset Reallocation and Settlement Agreement), escrow accounts, or other similar security accounts to which the Debtors are entitled, (iv) insurance proceeds, (v) any proceeds from the disposition of Assets (other than Excluded Assets), whether before or after the Effective Date (other than the $1.75 million allocated under the Asset Reallocation and Settlement Agreement), (vi) all recoveries from the Star Services Litigation (other than the percentage constituting Contributed Assets under the Asset Reallocation and Settlement Agreement), (vii) all amounts allocated for line item expenses under the Wind Down Budget that are in excess of the actual line item expenses for which such amounts were allocated (less, for the avoidance of doubt, the Reallocated Monies), (viii) unused Professional retainers after application of such retainers in payment of allowed Professional fees pursuant to an order entered on the final fee application in respect of any Professional holding such retainer, and (ix) refunded monies relating to security for self-insured claims or unused insurance premiums.

Star Services Litigation: The Debtors' claims and causes of action against Star Services, Inc. relating to the litigation bearing Supreme Court of the State of New York Index No. 605676/97.

Tax Refunds: All tax refunds of whatever kind or nature received by or payable to the Debtors from and after April 15, 2003, from any municipal, federal, state, foreign or other taxing authority.

Term-C Lenders: DLJ Capital Funding, Inc., DLJ Merchant Banking Partners II, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Offshore Partners II, C.V., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., DLJ EAB Partners, L.P., DLJ Millennium Partners, L.P., DLJ ESC II, L.P., DLJ Millennium Partners-A, L.P. and Donaldson, Lufkin and Jenrette Securities Corporation and their respective successors and assigns.

Term-C Loan: The loan made pursuant to Section 2.1.6 of the Credit Agreement.

Trust Agreement: The series trust agreement that documents the powers, duties and responsibilities of the Trustees, which agreement shall be in form and substance acceptable to the Creditors' Committee and the Agreement and filed with the Bankruptcy Court not less than five (5) days prior to the date of the hearing fixed by the Bankruptcy Court to consider confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

Trustees: The co-trustees of the Creditor Trust, comprising the Unsecured Creditors' Trustee and the Senior Lenders' Trustee.

12% Note Indenture: That certain Indenture governing the Senior Subordinated Notes, dated November 9, 1998, between Insilco Corporation, as issuer, and Star Bank, N.A., as original indenture trustee (having been succeeded by Wachovia Bank, National Association), together with any amendments thereto.

12% Note Indenture Trustee: Wachovia Bank, National Association as successor indenture trustee under the 12% Note Indenture.

Unsecured Claim: Any Claim that is not a Secured Claim or a Claim entitled to priority under section 507(a) of the Bankruptcy Code.

Unsecured Creditor Disputed Claims Reserve: The amount of the Unsecured Creditor Distribution Fund to be placed in a reserve account, as determined by the Debtors or Unsecured Creditors' Trustee before any Distribution to Unsecured Creditors is made herein in order to ensure that

Disputed Unsecured Claims receive their ratable share of such Distribution if such Claims ultimately become Allowed.

Unsecured Creditor Distribution Fund: The Cash derived from Excluded Assets to be distributed to Unsecured Creditors under this Plan, in accordance with the terms of the Asset Reallocation and Settlement Agreement and this Plan, following liquidation of any unliquidated Contributed Assets.

Unsecured Creditor Series: The series of the Creditor Trust created and maintained for the benefit of the Holders of Unsecured Claims.

Unsecured Creditors' Trustee: The co-trustee appointed by the Creditors' Committee to administer the Unsecured Creditor Series of the Creditor Trust.

US Trustee: The United States Trustee for the District of Delaware.

Wind Down Budget: The Budget annexed to the Cash Collateral Order as Exhibit B.

(b)     Other Definitions: Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in this Plan but that is defined in the Bankruptcy Code shall have the meaning assigned to that term in the Bankruptcy Code. Unless otherwise specified, all section, schedule or exhibit references in this Plan are to the respective section in, article of, or schedule or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

## ARTICLE II
## SUBSTANTIVE CONSOLIDATION OF DEBTORS;
## CANCELLATION OF INTERCOMPANY CLAIMS

Section 2.1. *Substantive Consolidation*

On the Effective Date, the Chapter 11 Cases and the Debtors and their estates shall be deemed to be substantively consolidated for voting and distribution purposes only under this Plan. The assets and liabilities of the Debtors shall be pooled and all Claims shall be satisfied from the assets of a single consolidated estate. Any Claims against one or more of the Debtors based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Debtor shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to Distributions under this Plan only with respect to such single Claim.

Section 2.2. *Cancellation of Intercompany Claims*

On the Effective Date, all Intercompany Claims shall be eliminated and extinguished.

## ARTICLE III
## ADMINISTRATIVE CLAIMS AND PROFESSIONAL FEES

Section 3.1. *Introduction*

Certain types of Claims are not placed into voting Classes. Such Claims are not considered Impaired and they do not vote on this Plan because they are automatically entitled to specific treatment